Mark A. HOPKINSON, Appellant
(Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 5268.

Supreme Court of Wyoming.

July 2, 1981.

Rehearing Denied Aug. 21, 1981.

82 ■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■

Edward K. Brass and Robert Van Sciver (argued), Salt Lake City, Utah, signed the briefs, for appellant.

* Chief Justice since January 5, 1981.

** Retired March 26, 1981, but continued to participate in the decision of the court in this case pursuant to order of the court entered March 30, 1981.

Gerald A. Stack, Deputy Atty. Gen., Bruce A. Salzburg, Senior Asst. Atty. Gen. (argued), Mary B. Guthrie, Asst. Atty. Gen., Edward P. Moriarity, Sp. Asst. Atty. Gen. (argued), and Brian E. Thiede, Law Clerk, Cheyenne, Wyo., signed the briefs for appellee.

Before ROSE, C. J.*, McCLINTOCK **, RAPER ***, and THOMAS, JJ., and SAWYER, D. J.****

RAPER, Justice.

## INTRODUCTION

In September of 1979, appellant was tried by a jury and convicted on four counts of first-degree murder and two counts of conspiracy. Those six counts, of a fourteen count grand jury indictment, charged:

1. "That Mark A. Hopkinson on or about the 7th day of August, 1977, in the County of Uinta, State of Wyoming, did wilfully, unlawfully, purposely, feloniously and with premeditated malice kill a human being, namely Vincent Vehar in violation of the provisions of Section 6–4–101(a)(b) Wyoming Statutes Annotated, 1977, Republished Edition, previously cited as Section 6–54.1(a)(b), Wyoming Statutes, 1957 as amended, by aiding, abetting, counseling, encouraging, hiring, commanding and otherwise procuring such murder to be committed during a period beginning in December of 1976 and continuing up to and including August 7, 1977, in violation of the provisions of Section 6–1–114 Wyoming Statutes Annotated, 1977, Republished Edition, previously cited as Section 6–14, Wyoming Statutes 1957 as amended, and contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Wyoming.

*** Chief Justice at time of oral argument.

**** ROONEY, J., recused himself and SAWYER, D. J., was assigned.

"Such murder was committed with aggravating circumstances which mandate the death penalty as specified in the provisions of Section 6–4–102(h) Wyoming Statutes Annotated, 1977, Republished Edition, and previously cited as Section 6–54.2(h), Wyoming Statutes 1957 as amended, as follows:

"(1) The murder was committed by a person, namely Mark A. Hopkinson, who was under sentence of imprisonment.

"(2) The defendant, Mark A. Hopkinson knowingly created a great risk of death to two or more persons, namely the risk of death to the entire Vehar family from the bombing of their home.

"(3) The murder was committed while the defendant was engaged in the discharge of a destructive device or bomb.

"(4) The murder was committed for pecuniary gain.

"(5) The murder was especially heinous, atrocious and cruel."

2. [Same as (1) except charged the murder of Beverly Vehar with same aggravating circumstances alleged.]

3. [Same as (1) except charged the murder of John Vehar with same aggravating circumstances alleged.]

4. "That Mark A. Hopkinson on or about the 18th day of May, 1979, and in the County of Uinta, State of Wyoming, did wilfully, unlawfully, purposely, feloniously and with premeditated malice kill a human being, namely Jeffrey Lynn Green, contrary to the provisions of Section 6–4–101(a)(b) Wyoming Statutes Annotated, 1977, Republished Edition, by aiding, abetting, counseling, encouraging, hiring, commanding, and otherwise procuring such murder to be committed, in violation of the provisions of Section 6–1–114, Wyoming Statutes Annotated, 1977, Republished Edition, and contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Wyoming.

"Such murder was committed with aggravating circumstances which mandate the death penalty as specified in the provisions of Section 6–4–102(h) Wyoming Statutes Annotated, 1977 Republished Edition as follows:

"(1) The murder was committed for the purpose of avoiding or preventing the lawful arrest of Mark A. Hopkinson relating to the murders of Vincent, Beverly and John Vehar.

"(2) The murder was committed for the purpose of avoiding or preventing the lawful arrest of Michael Jack Hickey relating to the murders of Vincent, Beverly and John Vehar and Kellie [Kelly] Marie Wyckhuyse.

"(3) The murder was committed for pecuniary gain.

"(4) The murder was especially heinous, atrocious and cruel.

"(5) The murder was committed by a person, namely Mark A. Hopkinson, while the said Mark A. Hopkinson was under a sentence of imprisonment."

5. "Mark A. Hopkinson, a person, on or about the months of November, 1976, through March, 1977, and in the County of Uinta, State of Wyoming, did unlawfully, willfully and feloniously conspire with another person, namely Harold James Taylor, to commit a felony in the State of Wyoming, namely the murder in the first degree of Vincent Vehar as is made unlawful by the provisions of Section 6–54(a) and (b), Wyoming Statutes 1957 as amended and one or more of such persons did an act or acts within the State of Wyoming to effect the object of the conspiracy, including that Mark A. Hopkinson paid money to Harold James Taylor and Harold James Taylor accepted such money to undertake the felony, that Harold James Taylor selected the location to commit such felony, that Harold James Taylor selected the weapon, namely a shotgun, with which to commit such felony, and that Harold James Taylor waited outside the office of Vincent Vehar in order to obtain a shot and to shoot Vincent Vehar, in violation of the provisions of Section 6–16.1, Wyoming Statutes 1957 as amended and currently cited as 6–1–117, Wyoming Statutes Annotated, 1977 Republished Edition, and contrary to the form of the statute in such case made and

provided and against the peace and dignity of the State of Wyoming."

6. "Mark A. Hopkinson, a person, on or about the months of March and April, 1977, and in the County of Uinta, State of Wyoming, did unlawfully, willfully and feloniously conspire with another person, namely Michael J. Hickey, to commit a felony in the State of Wyoming, namely murder in the first degree of William Roitz, as was made unlawful by the provisions of Section 6–54 (a) and (b), Wyoming Statutes 1957, as amended, and one or more of such persons did an act or acts within the State of Wyoming to effect the object of the conspiracy, including that Mark A. Hopkinson gave a .357 magnum revolver to Michael J. Hickey with which to commit such felony, that Michael J. Hickey purchased bullets for such revolver, that Mark A. Hopkinson pointed out to Michael J. Hickey how and where such felony could be committed, and Mark A. Hopkinson offered to pay money to Michael J. Hickey for the commission of such felony by Michael J. Hickey, in violation of the provisions of Section 6–16.1, Wyoming Statutes 1957, as amended, and currently cited as Section 6–1–117, Wyoming Statutes Annotated, 1977 Republished Edition, and contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming."

A presentence hearing was conducted under § 6–4–102, W.S.1977,[1] to determine whether appellant should be sentenced to

1. Section 6–4–102, W.S.1977:

"(a) Upon conviction of a person for murder in the first degree the judge shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. The hearing shall be conducted before the judge alone if:

"(i) The defendant was convicted by a judge sitting without a jury;

"(ii) The defendant has pled guilty; or

"(iii) The defendant waives a jury with respect to the sentence.

"(b) In all other cases the sentencing hearing shall be conducted before the jury which determined the defendant's guilt or, if the judge for good cause shown discharges that jury, with a new jury impaneled for that purpose.

"(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible.

"(d) Upon conclusion of the evidence and arguments the judge shall give the jury appropriate instructions, including instructions as to any aggravating or mitigating circumstances, as defined in subsections (h) and (j) of this section, or proceed as provided by paragraph (ii) of this subsection:

"(i) After hearing all the evidence, the jury shall deliberate and render a recommendation of sentence to the judge, based upon the following:

"(A) Whether one (1) or more sufficient aggravating circumstances exist as set forth in subsection (h) of this section;

"(B) Whether sufficient mitigating circumstances exist as set forth in subsection (j) of this section which outweigh the aggravating circumstances found to exist; and

"(C) Based upon these considerations, whether the defendant should be sentenced to death or life imprisonment.

"(ii) In nonjury cases, the judge shall determine if any aggravating or mitigating circumstances exist and impose sentence within the limits prescribed by law, based upon the considerations enumerated in (A), (B) and (C) of this subsection.

"(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foremen of the jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.

"(f) Unless the jury trying the case recommends the death sentence in its verdict, the judge shall not sentence the defendant to death but shall sentence the defendar e to life imprisonment as provided by law. Where a recommendation of death is made, the court shall sentence the defendant to death.

"(g) If the trial court is reversed on appeal because of error only in the presentence

death or life imprisonment. Following the recommendation by the jury that the death sentence be imposed for his murder of Jeff Green, the district court, bound by that finding, did in fact order appellant executed. In all cases in which the death penalty is given, the judgment of conviction

hearing, the new trial which may be ordered shall apply only to the issue of punishment.

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"*(vii) The murder was especially heinous, atrocious or cruel*;

"(viii) The murder of a judicial officer, former judicial officer, county attorney, or former county attorney, during or because of the exercise of his official duty.

"(j) Mitigating circumstances shall be the following:

"(i) The defendant has no significant history of prior criminal activity;

"(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(iii) The victim was a participant in the defendant's conduct or consented to the act;

"(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

"(v) The defendant acted under extreme duress or under the substantial domination of another person;

"(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

"(vii) The age of the defendant at the time of the crime." (Emphasis added.)

2. Section 6–4–103, W.S.1977:

and sentence of death are subject to automatic review under § 6–4–103, W.S.1977.[2] We are required by law to specifically consider whether:

"(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

"(a) The judgment of conviction and sentence of death is subject to automatic review by the supreme court of Wyoming within sixty (60) days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed thirty (30) days by the supreme court for good cause shown. Such review by the supreme court shall have priority over all other cases.

"(b) Within ten (10) days after receiving the transcript, the clerk of the trial court shall transmit the entire record and transcript to the supreme court of Wyoming together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a statement of the judgment, the offense and punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the supreme court of Wyoming.

"(c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.

"(d) With regard to the sentence, the court shall determine if:

"(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

"(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances;

"(iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, may:

"(i) Affirm the sentence of death;

"(ii) Set the sentence aside and impose a sentence of life imprisonment; or

"(iii) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel."

"(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances;

"(iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

In addition, we must consider appellant's allegations of error in the conduct of the trial and the presentence hearing, as well as Wyoming's jurisdiction to try the appellant for the Jeff Green homicide, an issue raised by this court. We do not ordinarily retain record references in the published version of an opinion but do so in this case to expedite any further review which might be undertaken.

We will affirm the convictions but reverse the death sentence as to the murder of Jeff Green and remand for new trial on the penalty only.

## ISSUES

The issues raised by this appeal will be dealt with in the following order:

I Whether Wyoming has jurisdiction to charge the appellant in the murder of Jeff Green as an accessory before the fact;[3]

II Whether the joinder of the six charges was proper;[4]

III Whether the failure of Judge Brown to voluntarily disqualify himself denied appellant any constitutionally mandated due process or equal protection;

IV Whether there was prosecutorial error during the voir dire of the prospective jurors;

V Whether the opening statement of the prosecutor was improper;

VI Whether character evidence of the victims was improperly admitted;

VII Whether character evidence of the appellant was improperly admitted;

VIII Whether hearsay was improperly admitted;

IX Whether exculpatory polygraph evidence was improperly excluded;

X Whether the trial judge abused his discretion when he permitted the admission of photographs, charts, slides, and testimony depicting the torture of Jeff Green prior to his death;

XI Whether admission of a photographic identification of Mike Hickey, by a witness who was identified as the man who had given him a ride the night of the Vehar bombing, was error;

XII Whether the prosecutor committed reversible error when he called a witness who exercised his Fifth Amendment rights and the prosecutor had, prior to calling the witness, reason to suspect that the witness would in fact invoke his Fifth Amendment rights;

XIII Whether the refusal of the State's witnesses to discuss their testimony with the appellant's counsel was improper;

XIV Whether the prosecution's closing argument in the guilt phase of the trial was improper;

XV Whether the evidence was insufficient to support a conviction of the two conspiracy counts;

XVI Whether the evidence was insufficient to support a conviction of the Jeff Green homicide;

XVII Whether the Wyoming death penalty statute is unconstitutional;

XVIII Whether the conduct of the jury selection was improper for a capital case;

XIX Whether the prosecution's closing argument in the penalty phase of the trial was improper;

XX Whether the instructions given the jury in the penalty phase were inadequate to satisfy the constitutional standards imposed by the U.S. Supreme Court;

---

3. This issue was raised by this court.

4. Issues II through XX were raised by the appellant.

XXI Whether the imposition of death is proper under § 6-4-103, W.S. 1977.[5]

## NARRATIVE

The facts of this case present one of the most bizarre stories in the judicial history of the State of Wyoming. The complex and skillfully connected evidentiary chain of events began with the return of Mark Hopkinson to his native home in the Bridger Valley area of southwest Wyoming sometime in 1975. He had earlier left the Valley after accepting a football scholarship to the University of Arizona. While away he was convicted on charges of delivering controlled substances in 1971. (T.Vol.XV, p. 1993) It was shortly after his release from a federal prison that he reappeared in Wyoming.

During the latter part of 1975, Mr. Hopkinson became embroiled in two legal disputes in which Vincent Vehar, an attorney, assumed something of an adversary role. The first dispute arose basically between two families, the Hopkinsons and the Roitzes, over water rights. In 1974, Joe Hopkinson, Mark's father, began doing ground work for a trailer court and covered up a ditch carrying water to the Roitzes. The Roitzes consulted Mr. Vehar and, as a result, filed a lawsuit against Joe Hopkinson. (T.Vol.V, p. 389) It was shortly after a judgment was entered in the Roitzes' favor that Mark Hopkinson returned to the Valley. Mark not only assumed control over the development of the trailer court, but also sought to have that judgment reversed on appeal.[6] (T. Vol.IV, p. 170)

In April 1976, Mark visited the Roitzes and asked them if they, together without any attorneys, could work out a settlement. When the Roitzes refused, Mark warned them that he could construct the trailer court in such a manner so as to make life miserable for them. (T.Vol.V, p. 391) On May 6, 1976, Mark revisited the Roitzes and attacked 55-year-old Frank Roitz. After Mark was pulled away from Frank, Mark's father, Joe, armed with a hammer, arrived at the scene. The two men together then beat upon Frank Roitz. (T.Vol.V, p. 396) When the fracas was finally over, the Roitzes consulted with Mr. Vehar and decided to talk to the county attorney about pressing charges; however, the county attorney was Jim Phillips, the individual who had been hired by Mark to appeal the judgment granting the Roitzes the water rights. Mr. Phillips, acting in his official capacity, refused to file any charges in the matter.

Meanwhile, the other dispute in which Vincent Vehar and Mark Hopkinson were pitted against each other had begun to brew. In 1975, Joe Hopkinson had approached the Fort Bridger Sewer and Water Board, a client of Mr. Vehar, to see if he could get the proposed trailer court annexed to the sewer district. It was his desire to hook up to the district for the usual $100 charged as the initial hookup fee. Before any official action could be taken, the Board was presented with a petition, signed by 95% of the district's membership, seeking to raise the fee. (T.Vol.IV, p. 257) The Board conducted several public meetings in order to determine what it should charge to hook up the trailer court. After extensive negotiations between Mark's attorney, Mr. Phillips, and the District's attorney, Mr. Vehar, a contract was entered into on March 13, 1976, providing for the annexation of the Hopkinson property to the district and requiring the payment of a hookup fee of $300 per trailer.

Once the hookup had been completed, Mark announced that it was his intention not to pay the contract price. During the ensuing struggle in which the Board tried to force Mark to pay, various board members received threats from Mark. This re-

---

5. The court must address this issue under the cited statutory section (see fn. 2).

6. The judgment was entered May 25, 1976. A motion for new trial was made June 1, 1976, by appellant's attorney, James Phillips. After the motion was denied July 19, 1976, notice of appeal was filed August 4, 1976. (Plaintiffs' Exhibit 28B) The oral arguments in the matter were set for late in the year of 1977, at which time, after the murder of the Vehars, Phillips appeared and voluntarily moved to dismiss the appeal. (T.Vol.IV, pp. 171–172)

sulted in the filing of a suit on January 28, 1977, by Mr. Vehar on behalf of the Board. The complaint filed not only sought to force Mark to pay the money due under the contract but also requested $50,000 in exemplary damages because of the threats made against the Board members.

It was during 1976 that Mark first hired Jeff Green as a carpenter to work on various projects he had going. Jeff in turn introduced Mark to his friends, Mike Hickey, an admitted alcoholic, and Jamey Hysell. Along with these friends, Jeff had engaged in several larcenies and burglaries in the area.

In June of 1976, Jamey Hysell was arrested for possession of marijuana as a result of a statement made to the authorities by Kelly Wyckhuyse, a fifteen-year-old girl with whom Jamey had spent a night at his place. In retaliation, Jamey plotted with Mike Hickey to murder her. In accordance with their plan Hickey picked Kelly up on June 27, 1976, and took her to an isolated spot in the country where he was to meet Hysell. Because Hickey had already informed Kelly of their plan to kill her, when Hysell failed to show, he struck her on the head with a rock, thus killing her. He then cut out her "privates" to take to Hysell as proof that the job was done and buried her remains.[7]

Late in 1976, Mark Hopkinson first approached Harold James Taylor about "doing a job for him." During the course of their numerous conversations, Hopkinson explained that the job involved working over a gentleman in Evanston, Wyoming. An arrangement was made whereby in exchange for $200 Mr. Taylor agreed to perform the job. Hopkinson then offered Taylor photographs of Vincent Vehar, the intended victim, and explained that he was a lawyer who lived in Evanston. Before the job could be done, Mark came back to Taylor and stated that his people wanted Vincent Vehar killed. Taylor agreed to this but upped his price to $600; he received this money on December 19, 1976. (T. Vol.VI, p. 708) Shortly thereafter Taylor

announced that he would not murder Vincent Vehar.

In March or April of 1977, Mark had a conversation with Kenny Near, a past president of the Sewer Board. During their talk Mark offered Near about $2,000 for testimony that the Sewer Board was acting in a vindictive manner towards the Hopkinsons. However, Mr. Near refused the offer. (T.Vol.IV, pp. 254–258)

Mark Hopkinson then turned to Jeff Green and Mike Hickey for ideas as to how to get rid of Vincent Vehar. Several plans were suggested, but none of them were carried through. It was also during this time period that Mark Hopkinson first learned that Mike Hickey had the previous summer killed Kelly Wyckhuyse.

On April 4, 1977, Jeff Green was caught with a bomb in his possession when he was stopped in Utah for speeding while driving Mark Hopkinson's car. He was on his way to Arizona in order to plant the bomb in George Mariscal's car on behalf of Hopkinson. When Mark was informed of Green's plight, he drove to Utah with Hickey and bailed Green out. Hopkinson thereafter refused to further discuss his plans for Vincent Vehar with Jeff Green.

It was during the next four months that Hopkinson asked Mike Hickey about various ideas to either kill William Roitz or Vincent Vehar. Hopkinson promised Hickey $2,000 plus expenses and help in covering up the Wyckhuyse murder, if he would take care of one of these two men. Hopkinson and Hickey made several trips to various locations in the area in order to plan how the murder should be executed. Finally, by the end of July, Hopkinson had concluded that it was Vehar who should be killed and that the best way to do it was to toss a bomb through a basement window of the Vehar home.

Hopkinson received notice during the first week in August that he would be deposed by Vehar in connection with the sewer board's lawsuit on August 9, 1977.

---

7. This seemingly out of order discussion about the murder of Kelly is mentioned at this point to maintain a chronological sequence of events. Its importance will become apparent later.

On Saturday, August 6, when Hopkinson saw Hickey at approximately 6:00 P.M., he ordered him to bomb the Vehar home that night. Hickey then went to the local bar where he stayed until approximately 1:30 A.M. He was then driven out into the country for a liaison with a woman whom he had met at the bar. Afterwards, he returned to the bar at approximately 2:30 A.M. in order to pick up his vehicle. Very drunk he drove home; once there, he discovered that the girl friend with whom he lived had not returned. He then finally decided to go do the job as Hopkinson had demanded.

He was seen by a highway patrolman who was investigating an accident on the Interstate heading toward Evanston, approximately 30 miles away, at 2:45 A.M. He arrived in Evanston and cased the Vehar home. After making sure it was safe, he threw the bomb in the basement window and departed. At approximately 3:35 A.M., the Vehar home exploded. On his way back to the Valley, Hickey picked up a hitchhiker. The hitchhiker testified that this must have occurred sometime between 3:30 and 4:00 A.M. Around 4:30 A.M., Hickey found his girl friend and they returned home.

After the Vehar bombing, Hopkinson decided it would be a good idea if he and Hickey were not seen together. As a result, Hickey saw very little of Hopkinson and was never paid the $2,000 that had been agreed upon.

Hickey visited California during the fall; while he was away things began to unravel. Jamey Hysell, at whose command Mike Hickey had killed Kelly Wyckhuyse, was questioned by the police about several larcenies. As leverage, he told them about Kelly's murder. Since Hickey had shown Hysell where the body was, Hysell was able to take authorities to the grave site where the body was found. Hysell also implicated Hickey and Green in several of the small burglaries. The police tracked Hickey down in California and asked him about his

involvement in these matters. At the time he denied any connection whatsoever but promised to return to Wyoming shortly. After his arrival back in the state he was charged in the Wyckhuyse murder.

In order to save Hickey, Hopkinson came up with a plan whereby Hickey, Green and Hopkinson would all tell stories implicating Hysell. Eventually this led to the dropping of the murder charges against Hickey and the indictment of Hysell for the murder of Kelly Wyckhuyse. Nonetheless, Hickey did go to prison on burglary charges in the spring of 1978.

It was before and during Jamey Hysell's trial for the murder of Kelly Wyckhuyse in July of 1978 that Jeff Green broke down and decided to tell the truth. He first implicated Hopkinson and Hickey in the Vehar matter and then later, out of fear that Hysell may be put to death, confessed that his statements incriminating Hysell were lies, and that, in fact, Hickey had committed the murder. Green also expressed fears about the repercussions that might befall him as a result of his betrayal of Hopkinson. Green's testimony led to the dismissal of the charges against Hysell. The news of Green's testimony hit the newspapers shortly thereafter. It was at this time that Hopkinson promised Green's sister that he would get Jeff.

In March of 1979, Hopkinson and Hickey were tried in the United States District Court in Cheyenne on federal charges arising out of Green's April 1977 attempt to place a bomb in Mariscal's car. After Jeff Green had testified against him in the trial, Mark Hopkinson also promised Jennifer Larchick that he would get Jeff. (T.Vol.XI, p. 1220) As a result of the trial, Hopkinson, but not Hickey, was convicted, sentenced and confined to the federal minimum security facility in Lompoc, California.[8]

At Lompoc Hopkinson had unlimited access to the telephone. Once there he began

---

**8.** Affirmed, *United States v. Hopkinson*, 10th Cir. 1980, 631 F.2d 665, cert. denied, 1981, —— U.S. ——, 101 S.Ct. 1489, 67 L.Ed.2d 620.

making numerous telephone calls.[9] He called a former roommate from Salt Lake City, Hap Russell, in order to have him visit at Lompoc. According to Russell, during the resulting visit they conspired to suborn perjured testimony in connection with the Mariscal conviction; however, the State argued that in fact what was taking place was the planning of the murder of Jeff Green.

Hopkinson also telephoned Jennifer Larchick numerous times and begged her to send a photo of Jeff Green to Hap Russell. When Jennifer balked at this, Hap Russell came up to see Jennifer in order to convince her to send the photo. Finally she agreed and sent a photo cut from a high school yearbook to Russell on April 24, 1979. Jennifer did not again talk to Hopkinson until May 16.

Meanwhile Hap had contacted John Suesata, a man of an admittedly dubious reputation in Salt Lake City. During their meetings several thousand dollars changed hands.

Early in May of 1979 Hopkinson began phoning an ex-girl friend, Kristi King. After several phone calls, he asked her if she would be willing to hide some money in her bank account for him; to this she agreed.

On May 16 Mark called Jennifer Larchick and asked about Jeff Green's whereabouts. He called again on the 17th making the same inquiry. In the meantime, Jeff Green

9. From April 8 to May 29, 1979, a period of 51 days, Hopkinson made a total of 114 calls summarized as follows:

| | | |
|---|---|---|
| April 1979 | 5 calls—Jennifer Larchick | |
| April 1979 | 22 calls—Hap Russell | |
| April 1979 | 16 calls—Scott Hopkinson | |
| April 1979 | 1 call—George Cuzounian | |
| April 1979 | "44 calls"–"Total" | |

| | | |
|---|---|---|
| May 1979 | 4 calls—Jennifer Larchick | |
| May 1979 | 24 calls—Hap Russell | |
| May 1979 | 16 calls—Scott Hopkinson | |
| May 1979 | 1 call—George Cuzounian | |
| May 1979 | 4 calls—Cindy Taylor Shroud | |
| May 1979 | 14 calls—Kristi King | |
| May 1979 | 2 calls—Judy Hopkinson | |
| May 1979 | 1 call—Deena Hoffman | |
| May 1979 | 4 calls—Frankie Ford | |
| May 1979 | "70 calls"–"Total" | |

CALLS FROM LOMPOC
MARK A. HOPKINSON 1979

| | | | |
|---|---|---|---|
| 4–8–79....Jennifer | 4–25–79...Hap | 5–6–79....Scott | 5–17–79...Scott |
| 4–10–79...Hap | 4–25–79...Hap | 5–6–79....Scott | 5–17–79 .Cindy |
| 4–10–79...Scott | 4–26–79...Hap | 5–6–79....Deena | 5–17–79...Kristi |
| 4–11–79...Scott | 4–26–79...Hap | 5–7–79....Hap | 5–17–79...Frankie |
| 4–12–79...Hap | 4–26–79...Scott | 5–7–79....Scott | 5–17–79...Jennifer |
| 4–12–79...Jennifer | 4–27–79...Hap | 5–7–79....Scott | 5–18–79...Hap |
| 4–13–79...Hap | 4–27–79...Hap | 5–8–79....Hap | 5–19–79...Scott |
| 4–14–79...Scott | 4–27–79...Scott | 5–8–79....Scott | 5–19–79 .Jennifer |
| 4–15–79...Scott | 4–28–79...Hap | 5–8–79....Scott | 5–19–79...Kristi |
| 4–16–79...Hap | 4–28–79...Scott | 5–9–79....Hap | 5–19–79...Kristi |
| 4–16–79...Hap | 4–29–79...Scott | 5–9–79....Scott | 5–20–79...Scott |
| 4–16–79...Scott | 4–29–79...Scott | 5–9–79....Frankie | 5–20–79...Jennifer |
| 4–16–79...Jennifer | 4–30–79...Hap | 5–10–79...Hap | 5–20–79...Kristi |
| 4–17–79...Hap | 4–30–79...Hap | 5–10–79...Hap | 5–20–79...Kristi |
| 4–18–79...Hap | 4–30–79...Scott | 5–10–79...Hap | 5–21–79...Hap |
| 4–18–79...Hap | 5–1–79....Cindy | 5–10–79...Frankie | 5–21–79...Kristi |
| 4–18–79...Scott | 5–2–79....Hap | 5–11–79...Hap | 5–21–79 . Kristi |
| 4–18–79...Scott | 5–2–79....Hap | 5–11–79...Hap | 5–22–79...Kristi |
| 4–18–79...Scott | 5–2–79....Kristi | 5–11–79...Scott | 5–22–79...Cindy |
| 4–18–79...George | 5–3–79....Hap | 5–12–79...Scott | 5–23–79...George |
| 4–19–79...Hap | 5–3–79....Hap | 5–13–79...Kristi | 5–23–79...Kristi |
| 4–20–79...Jennifer | 5–3–79....Hap | 5–13–79...Frankie | 5–24–79...Hap |
| 4–23–79...Hap | 5–3–79....Judy | 5–15–79...Scott | 5–24–79...Scott |
| 4–23–79...Hap | 5–4–79....Hap | 5–16–79...Hap | 5–25–79...Kristi |
| 4–24–79...Hap | 5–4–79....Cindy | 5–16–79...Hap | 5–25–79...Kristi |
| 4–24–79...Scott | 5–5–79....Hap | 5–16–79...Scott | 5–29–79...Hap |
| 4–24–79...Scott | 5–5–79....Hap | 5–16–79...Jennifer | 5–29–79...Judy |
| 4–24–79...Jennifer | 5–5–79....Kristi | | |
| 4–25–79...Hap | 5–6–79....Hap | | |

had gone to Iowa in order to attend the funeral of his grandmother. He and his mother returned the night of the 17th, and on the morning of the 18th he disappeared in the company of two men. Mark Hopkinson once again called Jennifer Larchick to inquire about Jeff Green on May 19th. On May 20, Jeff Green's mutilated body was found, two days before the scheduled opening of the grand jury's investigation into the Vehar bombing. Later in that day Mark Hopkinson made his last call to Jennifer. She advised him that Jeff was dead.

On May 21st, $15,000 turned up in Kristi King's bank account. The next day Kristi King received a phone call from someone who identified himself as Joe. He asked Kristi if she had received the $20,000 in her bank account yet and became upset when she said no. He then indicated that he would meet her at the airport in order to receive what she had gotten.

When Mark Hopkinson next called Kristi on the 25th of May, she demanded to know what was going on and told him she was going to send the money back to his mother; Mark replied, "No, send it back to Scott." (T.Vol.XII, p. 1647) Immediately after this Kristi sent Scott, Mark's brother, three cashier's checks for $5,000 each via registered mail.

Mike Hickey, when called to testify before the grand jury convened in Uinta County in the latter part of May, 1979, broke down and confessed not only to the Wyckhuyse killing but also to the Vehar bombing. In a plea bargain arrangement Hickey agreed to turn State's evidence against Mark Hopkinson in the Vehar case in return for a twenty-year sentence for the murder of Kelly Wyckhuyse.

Mark Hopkinson was then indicted for, among other crimes, the murders of the Vehars and Jeff Green, and brought to trial on September 3, 1979. The appellant elected to produce no evidence on his own behalf and rested at the close of the State's evidence after moving for a judgment of acquittal, which was overruled. After the jury returned their finding of guilt on all six charges, they were asked to deliberate as to whether the death penalty should be imposed on the four murder convictions. The jury returned a recommendation of life imprisonment for the three Vehar counts but death for the murder of Green. Bound by that recommendation, the district court sentenced Mark Hopkinson to two terms of seven and one-half to ten years imprisonment to be served consecutively for the conspiracy convictions, three consecutive terms of life imprisonment for the Vehar killings and to death for the Green murder.

Other facts will be developed when necessary in the disposition of the multiple issues. The reference to other facts in the disposition of the issues will flesh out the bare facts just related.

## DISCUSSION AND HOLDINGS ON ISSUES

### I

This court, while examining the briefs in preparation for oral argument, discovered that, under language used in *Goldsmith v. Cheney*, Wyo.1970, 468 P.2d 813, a question existed which indicated that the State of Wyoming may have been without jurisdiction to try Mark Hopkinson for the murder of Jeff Green because of his absence from the state on the date of that event and his acts as an accessory before the fact taking place in California. On September 9, 1980, the day before oral arguments, through the Clerk of Court, we advised the parties to be prepared to discuss Goldsmith and its application here. During oral arguments the State presented the court with a supplemental brief. On September 16, appellant filed his supplemental brief on the issue. The case was thereupon taken under advisement and the court commenced its review.

In order to appreciate the difficulty presented by Goldsmith, an understanding of what transpired there is first necessary. On or about August 22, 1967, Robert Stucker and Larry Olinger were murdered in Nevada. David Goldsmith was arrested on January 19, 1968 in Teton County, Wyoming upon a fugitive warrant issued from Nevada. After extradition to Nevada, on

May 28, 1968, the State of Nevada formally charged Goldsmith with the murders, even though he had concededly not been in Nevada at the time of the murders nor at any time during the year of 1967. On June 25, 1969, the charges of murder were dropped, and instead Goldsmith was merely charged with conspiracy. After Goldsmith pleaded nolo contendere, the Nevada Attorney General unsuccessfully sought to reinstate the murder charges. The Nevada court then sentenced Goldsmith to a term of one year. Since he received credit for time served, Goldsmith was discharged from custody. Upon his return to Wyoming, Goldsmith was charged as an accessory before the fact to murder.

In a petition for habeas corpus, he challenged Wyoming's authority to try him on the charges for, among other reasons, its lack of jurisdiction over an individual charged as accessory before the fact when the underlying crime—the homicide—was committed outside the state. As to that particular question the Wyoming Supreme Court concluded that the site of the underlying felony did not matter so long as the accessorial acts, for which the individual was charged, occurred in Wyoming. However, the language it used in reaching that conclusion was much broader than was necessary in order to decide the case:

" * * * By decisions of this Nation's courts in cases dealing with felonies in which the preparations occurred in one state and the actual felony in another, it has been held, consistent with the common law rule, that absent a statute which provides otherwise an accessory before the fact may be tried where the accessorial act took place and only there. [Citations] Such interpretations are correct, and accordingly, the petition for writ of habeas corpus must be dismissed." 468 P.2d at 816.

The import of this statement is that Wyoming's jurisdiction over an accessory before the fact existed only if an accessorial act occurred within the state's boundaries. Since the facts, as adduced in the present case, demonstrate that Mark Hopkinson was in California at the time he made all the detailed arrangements to hire someone to kill Jeff Green, Wyoming's jurisdiction to try appellant as an accessory to murder appeared problematic.

The State has presented two arguments as to why Wyoming had jurisdiction to try Mark Hopkinson as an accessory to the Jeff Green murder. First, the State reasons:

"To determine where the accessorial act occurred, it is first necessary to define Appellant's accessorial acts. Appellant's accessorial acts were counseling, encouraging, commanding, and procuring the murder of Jeffrey Green through phone conversations made to Wyoming while Appellant was in California. The simple fact that Appellant was physically outside of Wyoming when he performed his accessorial acts does not necessitate the conclusion that the accessorial acts occurred solely outside of Wyoming. The analysis must go deeper.

"Judge Dobie, in his article, 'Venue in Criminal Cases in the United States District Court,' 12 Va.L.Rev. 287 (1926), seems to have found the solution to the problem of determining where a crime was committed. He analyzed the problem as follows, 'crimes are often defined, hidden away amid pompous verbosity, in terms of a single verb. That essential verb usually contains the key to the solution of the question: In what district was the crime committed?' Dobie, supra, at 289; cited in *United States v. Walden,* 464 F.2d 1015, 1018 (4th Cir. 1972). Since 'by definition accessories cannot alone commit a crime,' the verbs that describe accessorial acts necessarily describe both an action and a result. *Walden,* at 1020. That is, to command is not merely to speak, but to instruct another in a course of action. The accessorial act of commanding is of two parts, speaking the command by the accessory and hearing the command by the other. Therefore, the telephone conversations in which Appellant counseled and commanded the murder of Jeffrey Green, though begun in California were completed in Wyoming. Thus, clearly giving Wyoming jur-

isdiction to prosecute Appellant in the case at bar.

"The reasoning posited here is analagous to that drawn in the famous case of *Simpson v. State*, 92 Ga. 41, 17 S.E. 984 (1893). In *Simpson*, the defendant, while standing on the South Carolina bank of the Savannah River, shot at 'the prosecutor' who was in a boat on the Georgia side of the river. In holding that it had power to prosecute defendant, the Georgia Supreme Court observed:

"'The law deems that a crime is committed in the place where the criminal act takes effect. Hence, in many circumstances, one becomes liable to punishment in a particular jurisdiction while his personal presence is elsewhere. Even in this way, he may commit an offense against a state or county upon whose soil he never set his foot. 1 Bish.Crim.Proc., Section 53. *Simpson*, 17 S.E. at 985. See also quoting similar language *Commonwealth v. Prep*, 186 Pa.Super. 442, 451, 142 A.2d 460, 465.'

"Thus, it is clear that in numerous instances a defendant may be tried for a crime committed in one state while defendant's physical presence was in another state. Appellant's incarceration in California during the time when he ordered the killing of Jeff Green does not impair the court's jurisdiction."

The second argument propounded by the State is that:

"Even if this court concludes that Appellant's accessorial acts occurred outside of Wyoming, this court should hold that Wyoming was a proper place to try Appellant for the Green murder.

"Appellee asserts that the legislature has addressed this question. To fully analyze the question whether the legislature has extended jurisdiction over accessories who perform accessorial acts outside of Wyoming, which are related to crimes committed in Wyoming, it is necessary to examine not only the current law, but also its evolution.

"At common law, accessories before the fact in felony cases were treated separately from principals. This dichotomy allowed accessories before the fact, who had performed their accessorial acts in a county [1] other than the county in which the felony occurred, to escape punishment. The common law solution to this problem is embodied in the statute the Court cited in *Goldsmith*, English 2 and 3 of Edw. VI, c. 24 (1548), which provided that the accessory could be tried where his accessorial act occurred. Goldsmith at 816.

"Since the common law controls, unless the legislature or case law has altered it, W.S. 8–3–101 (1977), a court following the common law rule would be forced to hold that an accessory before the fact 'may be tried where the accessorial act took place and only there.' *Goldsmith*, supra, at 816. The Wyoming Legislature, however, has adopted a 'statute which provides otherwise.' Ibid.

"W.S. 6–1–114, which covers accessories before the fact, provides that such an accessory may be 'tried and convicted in the same manner as if he were a principal.' W.S. 6–1–114 (1977). This language indicates that the legislature intended that accessories should be tried in Wyoming if the crime was committed in Wyoming, regardless of where the accessorial act occurs. An accessory may be tried where the principal would be tried—where the substantive offense occurs. Not only does Wyoming have jurisdiction over accessorial acts which occur within Wyoming resulting in harm outside Wyoming, Goldsmith at 816, but Wyoming also has jurisdiction over accessorial acts performed outside of Wyoming resulting in harm within Wyoming."

In oral arguments the State elaborated further by noting the effect of a contrary conclusion. An individual would be able to visit some place in the world that lacks an extradition agreement with Wyoming, arrange for the murder of someone in this state and then return here. Since Wyoming would not have jurisdiction to charge

him as an accessory before the fact, he could never be charged for the crime.

Section 6–1–114 provides:

"Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed shall be deemed an accessory before the fact, and may be indicted, informed against, tried and convicted in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or informed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

We hold that the statutory language may be "tried and convicted in the same manner as if he were a principal" grants Wyoming jurisdiction if the felony occurred here regardless of where the accessorial acts took place. We further observe that this is in accord with the overwhelming weight of authority from other jurisdictions. See, "Jurisdiction to Prosecute Conspirator Who Was Not in State at Time of Substantive Criminal Act, for Offense Committed Pursuant to Conspiracy," 5 A.L.R.3d 887. It would seem absurd in this day and age to adhere to the common law rule which:

" * * * was a rule of necessity that grew out of subtle niceties made in felony cases between principals and accessories before the fact in order that such accessories not present in the jurisdiction where the felony such as murder was actually committed would not go unpunished. * * * "

10. Rule 11, W.R.Cr.P.:

"(a) Joinder of offenses.—Two (2) or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction, or on two (2) or more acts or transactions connected together or constituting part of a common scheme or plan.

"(b) Joinder of defendants.—Two (2) or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or trans-

*Goldsmith v. Cheney*, supra, 816, Gray, C. J., dissenting.

■ Therefore, we conclude that the language in *Goldsmith* was unduly broad. The rule of that case should be read to mean that Wyoming has jurisdiction over an accessory before the fact if any accessorial acts occurred here. Many accessorial acts were actually committed in Wyoming in that it was in this state that the numerous phone calls were completed just as surely as though the appellant was standing on Wyoming soil when he communicated his requests and instructions to his agents and they were carried out. The telephone transmitted his presence into this jurisdiction where he could manipulate and play his local pawns. The presence and acts of his agents within this state were his presence and acts. In this case our holding is that Wyoming has jurisdiction to try an accessory before the fact if the underlying crime occurred within the boundaries of this state.

II

As his first issue, appellant challenges the propriety of the district court's refusal to sever the Green murder count and try it separately. He concedes that the initial joinder was proper under Rule 11, W.R. Cr.P.,[10] but contends that since prejudice to him was shown under Rule 13, W.R.Cr.P., the district court abused its discretion by denying the numerous motions for severance.

■ Rule 13 provides:

action, or in the same series of acts or transactions, constituting an offense or offenses. Such defendants may be charged in one (1) or more counts together, or separately, and all of the defendants need not be charged in each count."

Appellant states on page 12 of his brief:

" * * * Under the rules and the cases, joinder would appear initially proper as the Vehar cases and Green case were both homicides, 'offenses of the same or similar character,' and it appeared initially that they were 'part of a common scheme or plan,' Rule 11, W.R.C.P. [W.R.Cr.P.]. * * * "

"If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information, or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance, the court may order the prosecuting attorney to deliver to the court for inspection in camera any statements or confessions made by the defendant which the state intends to introduce in evidence at the trial."

This rule was discussed in *Dobbins v. State,* Wyo., 1971, 483 P.2d 255. There, this court stated:

" * * * as a general proposition * * * there is always a possibility of prejudice resulting from a joinder of similar offenses and care must be taken at the initial stage of the proceedings to guard against such a possibility. In doing so one of the prime considerations is whether or not evidence relating to the similar offenses charged would be admissible in the separate trial of each offense. * * *

* * * * * *

" * * * [I]t is well established that the grant or denial of severance is a matter of discretion with the trial court and will not be reversed except for clear abuse of such discretion. *Gornick v. United States,* 10 Cir., 320 F.2d 325, 326; *Walton v. United States,* 10 Cir., 334 F.2d 343, 347; certiorari denied *Comley v. United States,* 379 U.S. 991, 85 S.Ct. 706, 13 L.Ed.2d 612, and *Chow v. United States,* 379 U.S. 991, 85 S.Ct. 707, 13 L.Ed.2d 612; *Sullins v. United States,* 10 Cir., 389 F.2d 985, 989. * * * It is also the rule that on a motion for severance the burden is on the movant to present facts demonstrating that prejudice will result from a joint trial, which in effect would be a denial of a fair trial. *United States v. Wolfson,* S.D.N.Y., 289 F.Supp. 903, 908; *United States v. Steel,* S.D.N.Y., 38 F.R.D. 421, 423. * * *"

Thus, under *Dobbins,* in order to determine whether a defendant is prejudiced by the joinder the trial judge must ascertain whether all of the evidence admissible in a joint trial would be admissible in separate trials on each of the charges; if it would be, then there is no prejudice. Also see, *Tabor v. State,* Wyo.1980, 616 P.2d 1282, which upheld the *Dobbins* approach.

█ It is well established that deference is given to a trial judge's rulings as to the admissibility of evidence; as long as there is some reasonable basis for his conclusions, this court will not second-guess him on appeal. *Daellenbach v. State,* Wyo. 1977, 562 P.2d 679. Since at the core of a motion for severance appears the question of admissibility, the same standard of review for the trial court's finding on the severance issue should logically be applied. Thus, we conclude that the burden is upon the appellant to show that there was no reasonable basis for the trial judge to deny the motion for severance.

In his brief:

"The appellant concedes that the joinder of the Taylor-Vehar and Hickey-Roitz conspiracies to the Vehar deaths was proper. The motive that the State outlined to explain the death of the Vehars was tied to problems the appellant had had with a local sewer board. The State theorized that it was necessary for Mr. Hopkinson to intimidate or subjugate the board. In order to accomplish his goal, it was said that Mr. Hopkinson had Mr. Vehar, the board's attorney, murdered and the method used also claimed the lives of John and Mrs. Vehar. The conspiracies were properly joined to the Vehar counts because the conspiracies were designed to accomplish the same goal, the death of Mr. Vehar or the death of the sewer board's president, Roitz. * * *" (Appellant's brief p. 9)

We agree with appellant. All the evidence admissible in a trial only for the conspiracy counts would have been admissible in a trial solely for the Vehar murders and vice versa. As Rule 404(b), W.R.E. provides:

"(b) Other crimes, wrongs, or acts.— Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

It is the appellant's contention, however, that error occurred when the trial judge refused to sever the Green count for a separate trial. He argues:

"Prejudice was inherent in the very nature of the cases. The Vehar case was marked by the testimony of the supposed killer who had confessed and supplied the prosecution with all of the details of the killing. The Green case was a weak case of circumstantial evidence, as the lower Court seemed to note at Transcript, Vol. IX, p. 899. It was 'proven' by a series of phone calls, some threats, and exchanges of money and a photo of Green. The danger to the appellant was that the jury would conclude that if he had something to do with the Vehar deaths, then it follows that the circumstantial evidence on Green, though weak, must be true. This danger would have been obviated by severance.

"Additional prejudice to the defendant was caused by the admission of some evidence on the Vehar counts which would have had no place in a separate Green trial, and vice versa. It is difficult for the appellant to perceive how, for example, evidence of the sewer board disputes, the fight with Frank Roitz, the Hopkinson-Roitz feud, the Taylor-Vehar conspiracy, or J. R. Goos' [Goo's] beating would have any relevance or admissibility in a separate Green trial, as it is equally difficult to understand how the Russell and Sueseta [Suesata] transactions and Green's role as the 'star witness' in the Mariscal trial would have had any bearing on the issues in a separate trial on the Vehar counts.

\* \* \* \* \* \*

"Here it has been shown that most of the evidence of the Vehar counts would not have been admissible in the Green case, and vice versa. The plain prejudice to the appellant was amplified by its failure to prove the alleged basis for joinder, that Green had some knowledge of the Vehar deaths. The denial of severance was an abuse of discretion under these circumstances and a new trial on severed counts must be ordered." (Appellant's brief, pp. 12–14)

■ Appellant is in reality making two contentions here. First, he disputes that all of the evidence admissible on the Vehar counts would be relevant and hence admissible in a trial conducted solely on the Green count. Second, he argues that even if relevant, some of the evidence would be inadmissible as unduly prejudicial under Rule 403, W.R.E. which provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

As to appellant's first argument, all of the evidence establishing his guilt on the Vehar counts would have been relevant in a separate trial on the Green murder. Again, Rule 404(b), W.R.E. allows the admission of evidence of other crimes if offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Also see, *Elliott v. State*, Wyo.1979, 600 P.2d 1044, 1048. In this case, because of Green's knowledge of information, which either directly or indirectly implicated the appellant in the Vehar murders, proof of those murders constituted circumstantial evidence of a motive to silence Green.

Appellant disputes that there was any evidence that Green had any damaging knowledge of the Vehar bombing. However, in the transcript of Jeff Green's testimony at Jamey Hysell's trial, which was admitted into evidence in this case, the following transpired when Green was ques-

tioned by Mr. Lancaster, the County Attorney:

"Q. Will you tell the Court what Mark Hopkinson's attitude was toward Vincent Vehar, if he ever made any threats on him or made any attempts through hiring somebody to kill him?

"A. Mark Hopkinson hated Vincent Vehar with a severe passion and he had hired—I was trying to think of the guy's name. Oh, he hired Jim Taylor to shoot Vincent Vehar, but it was never carried out.

"Q. Was there an attempt made to your knowledge?

"A. Yes.

"Q. Will you describe that?

"A. Mark had told me that Jim had—was standing outside the door of Vincent Vehar's office with a shotgun, ready to shoot him as he came out the door, but he came out with somebody else and he was unable to complete it.

"Q. Did Mr. Hopkinson state with any frequency that he wanted to kill Vincent Vehar?

"A. Yes. He did.

"Q. How frequently would he discuss it?

"A. Well, for a few months, he would talk about it every time I saw him.

"Q. Was this shortly before Augsut [sic] 7, 1977?

"A. Yes. It was.

"Q. What were your impressions upon hearing that the Vehar family had been blown up?

"A. I was—I had thought that Mark had the job done and I believed that he was responsible for it, but I never did know for sure." (T.Vol.XI, pp. 947–948) This certainly establishes that Green did have damning knowledge.

Further, the State argued to the jury that the appellant wanted to silence Green in the Wyckhuyse matter in order to protect Hickey and prevent him from being placed in a position where he may be inclined to turn State's evidence against Hopkinson in the Vehar bombing. Hickey,

in his testimony, admitted that Green knew that he had killed Kelly Wyckhuyse when the following exchange occurred on direct examination by Mr. Spence:

"Q. So would you tell the ladies and gentlemen of the jury the names of the people who knew you had killed Kelly Wyckuse [Wyckhuyse]?

"MR. VAN SCIVER: Not the names that he thinks now, the names of the people he may have told.

"Q. (By Mr. Spence) That's correct.

"A. Jamey Hysell, Forest Green and Jeff Green and Mark Hopkinson." (T.Vol.VI, p. 803)

Green's knowledge of Hickey's involvement with the Wyckhuyse murder placed Hopkinson in jeopardy since Hickey, if exposed, may have desired to use his knowledge of the Vehar matter as leverage in negotiations for a plea bargain. As a result of this, all the evidence which would establish that Hopkinson in fact ordered Hickey to bomb the Vehars is relevant as to one of Hopkinson's motives in killing Jeff Green—protection for his weak link, Mike Hickey. This includes evidence of the sewer board dispute, the fight with Frank Roitz, the Hopkinson-Roitz feud, the Taylor-Vehar conspiracy (which Green had knowledge of), the Kenny Near bribe, the Hickey-Roitz conspiracy, or J. R. Goo's beating; all of which appellant acknowledged was relevant on the Vehar counts.

■ The evidence establishing Hopkinson's involvement in the Green murder would have been relevant in a trial solely upon the Vehar bombing. Subsequent activity in order to prevent detection of a crime is relevant circumstantial evidence of guilt. *Jones v. State*, Wyo.1977, 568 P.2d 837, 845. Here, Hopkinson's involvement in the elimination of the threat Green posed was circumstantial evidence of his guilt in the Vehar matter.

We find no merit in appellant's contention that even if the direct evidence of each murder was relevant as circumstantial evidence of the other murders, the danger of prejudice outweighed the probative value. In order to warrant reversal under Rule

403, supra, the probative value of the evidence must either be slight or none at all. *Key v. State*, Wyo.1980, 616 P.2d 774. Here, the probative value of the evidence was substantial.

The conclusion we then reach is that there was no error in the trial court's refusal to sever the Green count.

### III

 The third issue present in this appeal concerns whether the failure of the Honorable C. Stuart Brown to voluntarily disqualify himself denied appellant either due process or equal protection of the law. Judge Brown, as the district judge for Unita County, Wyoming, was the original judge of record in this case. Appellant peremptorily challenged him under Rule 23(d), W.R. Cr.P.[11] on or about August 1, 1979, over a month before trial. (R.100) Thereafter the case was assigned to the Honorable Robert B. Ranck.

First it should be noted that nowhere in the record appears even a suggestion that Judge Brown should disqualify himself at any time during any of the district court proceedings. The first mention of it is here on appeal. Pursuant to Rule 49, W.R. Cr.P.[12] any error which was not brought to the attention of the trial court was waived unless plain error can be shown. As stated in *Madrid v. State*, Wyo.1979, 592 P.2d 709, 710:

"* * * For this court to invoke the plain-error rule, as embodied in Rule 49(b), W.R.Cr.P., three specific criteria must be fulfilled: first, the record must be clear as to the incident that occurred at trial

that is alleged as error; second, the proponent of the rule must demonstrate a violation of a clear and unequivocal rule of law; and third, the proponent must prove that a substantial right has been violated and that the defendant has been materially prejudiced by that violation. *Jones v. State*, Wyo., 580 P.2d 1150 (1978); *Hampton v. State*, Wyo., 558 P.2d 504 (1977); *Hays v. State*, Wyo., 522 P.2d 1004 (1974). These requirements must be fulfilled even if constitutional rights are involved."

Appellant premises this contention of error on the failure of Judge Brown to voluntarily remove himself from the case and further claims that this was a violation of the Code of Judicial Conduct. In particular, appellant points to Canon 2(B):

"B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness."

Appellant further cites Canon 3(C)(1):

"(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

"(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

---

11. Rule 23(d), W.R.Cr.P. states:

"(d) Peremptory disqualification.—The state or the defendant may peremptorily disqualify a district judge by filing a motion for change of judge. Such motion shall be filed at least fifteen (15) days before the date set for the hearing on any motion filed pursuant to Rule 16, W.R.Cr.P., or if there be no such motion hearing set, at least fifteen (15) days before the date set for pretrial, and if there be no pretrial set, then at least fifteen (15) days before the date set for trial, or if the date is set within fifteen (15) days after the order of setting, within five (5) days after receipt of such order; provided, however, that no more

than one (1) such motion shall be filed by the state or by any defendant. After the filing of such motion for change of judge, the presiding judge shall immediately call in another district judge to try the action."

12. Rule 49, W.R.Cr.P.:

"(a) Harmless error.—Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) Plain error.—Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Appellant lists several facts as proof of Judge Brown's misconduct. First, as a judge in a relatively unpopulated area in which Vincent Vehar had practiced law, he had become acquainted with Vehar and become friends with his family. Second, Judge Brown had presided over the Jamey Hysell trial at which Jeff Green made statements incriminating Mark Hopkinson in the Vehar murders. Third, Judge Brown had presided over the grand jury investigation which resulted in the indictment of Hopkinson for the deaths of the Vehars and Green. Fourth, during the grand jury proceedings the judge had granted immunity to Mike Hickey for the Vehar bombings in exchange for his testimony against Mark Hopkinson. Finally, after Hopkinson's counsel had, in his opening statement to the jury, discredited the plea bargain arrangement involving Mike Hickey, the prosecutors sought to call Judge Brown as a witness in order to explain "the sequence of events that led up to the plea bargain." (T.Vol.VII, pp. 1065–1066)

This court has recently spoken concerning the role of a district judge in a comparatively small community where friendships and social relationships are apt to arise and later a judge must rule in cases involving his acquaintances. In *Cline v. Sawyer*, Wyo.1979, 600 P.2d 725, it was said that an allegation of friendship without more is not sufficient to establish bias and partiality; and further, a judge has a duty to sit and should only recuse himself when there exists a valid reason.

Of course, a presiding judge during the course of a jury trial hears the evidence. A district judge does not preside over a grand jury during its investigatory and prosecutorial proceedings. He instructs the grand jury as to its functions and duties and receives its indictments. He is never in the grand jury room while it is in session; it is presided over by its foreman.

Granting immunity is a duty of a judge's office and in this case we cannot see it as any but a wise decision that involved discretion. There is a complete absence of any showing or indication that he in any way abused that discretion. Hickey is serving a substantial sentence for his part in the crimes [13] and without his testimony, appellant would have gone untried. It is a common practice to grant immunity to an accomplice to convict another. Though the prosecutors may have shown a desire to call Judge Brown to testify about the plea bargain, he did not in fact testify.

We utterly fail to see how these facts demonstrate that Judge Brown was biased or prejudiced against Mark Hopkinson or that any official action taken on his part reflected outside or improper influences. The fact that he was later considered as a prosecutorial witness does not establish that during the time he was the presiding judge he had personal knowledge of any disputed evidentiary fact or violation of Canon 3(C)(1)(a). No dispute had yet arisen concerning the plea bargain arrangement. Further, any knowledge he had in the matter was obtained through his office; thus, it was not personal knowledge as we understand that term. Appellant made no showing that he had been materially prejudiced by the failure of Judge Brown to disqualify himself. We conclude Judge Brown violated no Canon of Judicial Ethics. We find no merit in this claim of error.

IV

The thrust of the fourth issue is upon various statements made by the special prosecutor during the voir dire of the prospective jurors. Appellant alleges that he was prejudiced by these remarks and, as a result, deserves a new trial. His synopsis of the voir dire vividly demonstrates a propensity to misstate the facts:

"* * * [Appellant] was prejudiced by the misconduct of counsel. Over two motions for mistrial and many objections, the prosecution repeatedly tried to prejudice the jury against the defendant even in

---

**13.** He is currently serving concurrent sentences of 20 to 21 years on a state charge for killing Kelly Wyckhuyse and 20 years on a federal charge for setting a bomb that maimed Tony Vehar. (T.Vol.VII, pp. 885–887)

the voir dire phase. The prosecutor made the statement that 'they were working without pay' (Transcript, Vol. I, p. 84). He said, 'If I were representing the State in a case where your family was involved, you would want me to be careful in selecting a jury.' (Transcript, Vol. I, p. 89.) It was said that the jury, ' * * * has to give the death penalty in a case like this.' (Transcript, Vol. I, p. 118.) After the judge was very careful to tell jurors to keep their opinions to themselves, the prosecutor said to them, 'If you were to say, I think the dirty so and so is guilty as hell. And if you said that * * * you might affect the judgment of other jurors.' (Transcript, Vol. I, p. 155.) He went on to say that in Wyoming there is parole from life imprisonment and so a life sentence is shorter than the 20–21 year sentence Hickey received (Transcript, Vol. I, p. 171). He went on for five pages to vouch for the credibility of Hickey, over two sustained objections (Transcript, Vol. I, pp. 168–173); a reference was made to 'what's left of the Vehar family' (Transcript, Vol. II, p. 252); in open Court in the presence of all potential jurors a claim was made that the defendant 'smiled and winked' at a female juror (Transcript, Vol. II, p. 476); and, finally, the claim was made that the death penalty could be used to save future lives (Transcript, Vol. Ii, [sic] p. 490)." Appellant's brief, pp. 21–22.

In order to fairly review the charges of error during the voir dire, they must be reviewed in correct context. Thus the transcript references set out by appellant will be examined one by one. The prosecutor began his examination for cause on page 82 of the transcript. On page 84 he stated:

"But I wanted to say that you as jurors and Mr. Moriarity and Mr. Williams and I have something in common. We have been appointed in this case to act as special prosecutors. We generally are not special prosecutors. I'm generally not a prosecutor. Mr. Moriarity and I generally sit over here on this side. We are prosecutors here without pay, and so you're getting paid more than we are when you get paid $12 a day. And I hope that our service won't reflect the amount of pay that we get here."

The record reflects no objection by defense counsel.

On page 89, the prosecutor remarked:
"I don't think I could sit on a jury. I don't think I would be qualified to sit on this jury. I don't think Mr. Van Sciver would be either. The crime is having some reason that you feel in your heart ought to be given to us as we ask these questions that you don't give to us. That would be a crime because under your oath you are required to do that. Does everybody understand that? Does everybody feel okay now about answering questions? Nobody wants to embarrass you, nobody will. And if I were representing the State in a case where your family, your family were involved, maybe had been murdered, you would want me to be careful in selecting a jury to make certain that the State gets a fair trial just as the defendant."

Again the record reflects no objection by defense counsel.

On page 118, the record shows the prosecutor stating:
"MR. SPENCE: You see, the law is laid out for us. If you're selected as a juror you have to take an oath to follow the law. Just like that I have the obligation in asking for the death penalty. It has to be done under a case of this kind."

This is not at all what appellant alleged in his brief to have been stated by the prosecutor, supra. However, it was in response to this statement that the record indicates that defense counsel made his first objection. (T.Vol.I, p. 118) The court then suggested reading the proposed jury instruction of the death penalty. After counsel agreed, the instruction was read to the jury.[14] The court asked defense counsel, "does that adequately explain what you had

14. "THE COURT: It is possible that this trial may be divided into two stages of which this portion is the first and both of which will be decided by the same jury. Only if you find

in mind?" Mr. Van Sciver replied, "It does, your Honor." (T.Vol.I, p. 123)

On page 154 the trial judge reminded the prospective jurors of an earlier warning he had given them about blurting out their opinions of the defendant. The transcript shows the following exchange on page 155:

"MR. SPENCE: Okay. I'm not going to ask what their opinion is, Judge, at all. And what the Judge is saying he's not trying to frighten you, I'm sure of that.

the defendant guilty of first degree murder will the case enter the second stage during which evidence will be presented upon which you will recommend whether the defendant should be sentenced to death or life imprisonment.

"You are not, during the first stage of this trial to consider what punishment might be inflicted upon the defendant if found guilty of any offense, nor are you, at any time, to consider what punishment might be inflicted if the defendant is guilty of any lesser crime; as the punishment for any lesser crime is solely within the province of the Court and is not for the jury.

\* \* \* \* \* \*

"Now, if you were to find the defendant guilty of first degree murder, came back in the courtroom, this would be an instruction, the substance of which, at least, you would hear.

" 'The jury has determined beyond a reasonable doubt in the first stage of the trial that the defendant is guilty of murder in the first degree. The law of Wyoming states that a person convicted of murder in the first degree shall be punished by death or life imprisonment according to law.

" 'Therefore, before the death penalty may be imposed the State must prove beyond a reasonable doubt that at least one or more of the following aggravated circumstances existed at the time of the murder.

" '1. The defendant knowingly created a great risk of death to two or more persons.

" '2. The murder was committed for the purpose of avoiding or preventing a lawful arrest.

" '3. The murder was especially heinous, atrocious or cruel.

" 'If the jury finds beyond a reasonable doubt the existence of one or more aggravating circumstances it will then consider whether or not any of the following mitigating circumstances existed at the time of the murder. Mitigating circumstances are not required to be proven beyond a reasonable doubt.

" '1. The defendant has no significant history of prior criminal activity.

What he's wanting to make sure of is you don't state—for example—let me just give you an example. Supposing in a case that's been highly publicized as this one, and somebody says, yes, I think the dirty so and so is guilty as hell. And if you said that outloud that might affect the judgment of other jurors that were listening and that's what he's concerned about. He doesn't want you to tell me whether you have an opinion or not; am I correct?

" '2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

" '3. The victim was a participant in the defendant's conduct or consented to the act.

" '4. The defendant acted under extreme duress or under the substantial domination of another person.

" '5. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

" '6. The age of the defendant at the time of the crime.

" '7. Any other mitigating circumstances.

" 'After hearing all the evidence the jury shall deliberate to determine whether or not sufficient mitigating circumstances, if any, exist to outweigh the aggravating circumstances, if any, found to exist and shall render a recommendation of the sentence to the Court.' Then there is a retirement instruction and then there are findings and recommendation of sentence. And each of these things is set out, and when you unanimously agree as to one of them the foreperson will check that space with reference to those things I have just read. And then as to each charge you will find this statement.

"For instance, in this case, as you know, there are a number of charges. Now, the only charges which will be given to you is if first you find beyond a reasonable doubt that the defendant is guilty of first degree murder. If you do find any one of the charges this is the question for you. That as to charge, whatever it is, sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the defendant be sentenced to death.

"The next place you check under that charge is: That as to charge, whatever it is, sufficient mitigating circumstances do exist to outweigh the aggravating circumstances and the jury recommends the defendant be sentenced to life imprisonment."

"THE COURT: Correct.

"MR. SPENCE: He wants you to not say what your opinion is so you don't affect other jurors who may hear your answer. That's all."

No objection was made, despite later claims to the contrary.

The record reflects that from page 168 to 173, the nature of the prosecutor's voir dire examination was to determine what, if any, biases the jurors might have against a witness testifying as a result of a plea bargain arrangement. An objection was made on page 168 and was sustained. In fact, the judge suggested reading a proposed instruction to the jury covering the weight to be given testimony of an accomplice, which with the permission of defense counsel was done.[15] (T. Vol. I, pp. 169–170)

On page 171 the prosecutor stated:

" * * * Judge Brown * * * sentenced Michael Hickey, based upon the plea bargain and the information that he gave the Grand Jury in the case, to the Penitentiary. His sentence in that case was 20 years, not less than 20 nor more than 21 which is actually more than a life sentence. I understand that you're subject for parole in 7 years and in this case you're paroled—"

At which point Mr. Van Sciver cut the prosecutor off with an objection sustained by the trial judge. The jury was then instructed to disregard "any statements [made] by counsel [concerning] what a pro-

posed sentence might be * * *." (T. Vol. I, p. 172)

And then on page 173, the prosecutor began:

"You must understand, ladies and gentlemen, it's always true that those who know the most about a crime and are the best information are those—"

Again defense counsel cut him off with an objection sustained by the trial judge.

During the afternoon recess, defense counsel made his first motion for a mistrial. In chambers the following transpired:

"MR. VAN SCIVER: Your Honor, if the case weren't so serious, I wouldn't do this, but it's serious, and I think there are 5 things that in my judgment Mr. Spence's have caused a mistrial and I'll make that motion for the purpose of the record.

"And in all fairness he was trying to preface an observation he wanted to make, but he said something about him being guilty as hell; he said Hickey pled guilty to the Vehar murder which is a misstatement; that he pled guilty to the injury to Tony Vehar who was involved in some way by virtue of his law practice; he misrepresented that 20 years is longer than a life sentence—

"THE COURT: Take them one at a time, Bob. Repeat it so we can get it in context.

---

15. Instruction covering testimony of accomplice, as read by the court:

"THE COURT: * * * I have an instruction which reads substantially like this. Now, you understand that the instruction portion of the trial is given after the evidence in Wyoming and before the closing arguments. In Federal Courts the attorneys argue first and then the jury gets the instructions. In other words, you're kept in the dark to the very last moment to what you're supposed to do. I'm trying to tell you as we go along. I'll give you an instruction substantially in this form. I have given the instructions to both counsel that I contemplate giving right now at the conclusion of this trial. They may change but this is one such instruction in substantial form that I will give.

" 'An accomplice is one who unites with another person in the commission of a crime,

voluntarily and with common intent and who could be charged with the same offense as the defendant, either as a principal or as accessory before the fact. An accomplice does not become incompetent as a witness because of participation in the crime charged. On the contrary, the testimony of an accomplice alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilty, even though not corroborated or supported by other evidence. However, the jury should keep in mind that such testimony is always to be received with caution and weighed with great care.

" 'You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that unsupported testimony beyond a reasonable doubt.' "

"MR. VAN SCIVER: I'm not sure we can, Judge. The thrust of it was he was talking about—and my recollections' a little vague to what he was talking about but he was saying something about the defendant seated there is innocent or are any of you bothered by having to make a decision and can you put stuff out of your mind. It was in connection with publicity on what they heard and do you believe him as guilty as hell, was the statement. That was made. Seated there he could be guilty as hell or something to that effect.

"THE COURT: All right. Number one, did you make an objection at that time?

"MR. VAN SCIVER: Yes. [The record does not show this.]

"THE COURT: Did I sustain it?

"MR. VAN SCIVER: Yes. And then in that connection I think he rather skillfully covered himself in a hurry but he made the observation to the prospective veniremen he was guilty as hell, and the exact context in which it was made I'm not sure, but it seemed to me it was in connection with Utah publicity.

"THE COURT: Okay.

"MR. VAN SCIVER: And in that regard I don't think I made an objection because I think he rather quickly covered himself.

"THE COURT: Number one, I have instructed the jury already about the presumption of innocence, the burden of proof, and as the defendant sits there he's innocent and if they were going out and vote right now they would have to vote not guilty. I have already instructed them there. You didn't make an objection and there is no way I can do anything to correct what ever error you might think there is now.

"MR. VAN SCIVER: All right.

"THE COURT: So that motion is overruled.

"MR. VAN SCIVER: Okay.

"THE COURT: Now, the next one?

"MR. VAN SCIVER: That Hickey pled guilty to the Vehar murder and I think that was misrepresentation.

"THE COURT: All right.

"MR. VAN SCIVER: And I don't think that's been corrected.

"THE COURT: All right. Do you want that corrected?

"MR. VAN SCIVER: I can correct it, I think.

"THE COURT: You may correct it. Now, do you withdraw the motion or do you want to make the motion?

"MR. VAN SCIVER: No, let me go correct it. I think I'll get a little more latitude that way.

"THE COURT: You may correct it. The third thing?

"MR. VAN SCIVER: The misrepresentation that 20 years is longer than a life sentence.

"THE COURT: I thought that was bad and I was about ready to say 'Sustained' and I thought I instructed the jury with reference to that matter. In fact, my recollection is I told the jury that, you know, sentencing was a thing I didn't like. If I said it right then again or not, I don't know, but that was totally within the Court's discretion and that the Parole Board matter is totally within their discretion. That's not a matter for them to consider and they should forget about it and I sustained your objection. I think I said the only thing where sentencing comes in is in a death case and we have been over that. That motion is overruled.

"Mr. Spence, please don't go too far.

"MR. VAN SCIVER: Now, there is little I can say about this because I'm not aware of the pecuniary gain or advantage or what have you to Mr. Spence in terms of trying this case.

"THE COURT: Okay. Now, you're talking about when he first started the voir dire he said he was not being paid.

"MR. VAN SCIVER: Yes.

"THE COURT: I think that's totally irrelevant. But as we sit here right now in chambers I don't think it makes a spec [sic] of difference to that jury because

they may think a number of things. They may think for instance, well, Mr. Spence isn't that lahdi-da. Number one, you don't need the money. Isn't that big of you to say that. It could work to his detriment. Or you say that, Mr. Spence, but look at all the publicity you're getting. That's worth a lot more than you would get paid anyway.

"Then the observation might also be that this county wants to know what it's costing this county to have this trial. I have told them that Uinta County is paying for it. They may not feel that it pays for the attorneys. I don't know.

"Now, if you would have made that objection right then and there I would have sustained it and would have told them that was irrelevant to this case. I don't know what I can do about it now. How could it be prejudicial? Tell me that. And whether you're getting paid or not. Do you want to tell them you are not getting paid?

"MR. VAN SCIVER: No. It would be a misstatement. It wouldn't be true. I don't know how you cure it now but the inference is one might conjecture that a man of his stature that's willing to do this for nothing must mean we got to bury this worthless bastard that's in there.

"THE COURT: You want to make that point on voir dire?

"MR. VAN SCIVER: Yes.

"THE COURT: You may do so.

"MR. VAN SCIVER: We had another thing that bothered me some. He was starting to vouch for the credibility of Hickey and the objection was sustained. You read the accomplice instruction.

"THE COURT: Yes.

"MR. VAN SCIVER: I wonder if it would be inappropriate if they were reminded they are the ultimate arbitrators.

"THE COURT: You want me to tell them when we go back in there?

"MR. VAN SCIVER: Sure.

"THE COURT: I have no problem with it at all. Is there anything else?

"MR. VAN SCIVER: I think not.

"THE COURT: All right. Then what you want me to do is talk about credibility of witnesses. Then Mr. Spence will finish his voir dire very soon, I'm certain, and then you may start and you may go over those matters that we just discussed.

"Is there some other thing I can do?

"MR. VAN SCIVER: No. Thank you." (T.Vol.I, pp. 177–182)

Thus, as it was left, defense counsel agreed to cures for four of the alleged errors. The cures were apparently to appellant's satisfaction because no further objections or renewed requests appear. On only one point was a motion for mistrial left standing; and as to it, defense counsel grossly misstated what had occurred.

On page 252 the prosecutor drew an objection by stating:

"* * * But it's our job to see that the people of the State, all 400,000 of them, also get justice and the Vehar family, what's left of them, have justice."

The judge sustained the objection adding:

"* * * The jury will disregard the statement of counsel about what's left and things like that. I'm sure you understand that we are here with respect to the six charges that Mr. Spence has just elicited and nothing else.

"What he's talking about is a so-called side issue as he so eloquently put it."

However, no motion for mistrial based upon this was ever made.

On page 476, while the prosecutor was examining a particular juror for cause, the following exchange occurred:

"MR. SPENCE: * * * Yesterday somebody reported to me that when [the defendant] was looking at you he gave you a big smile and winked which I guess is all right to do.

"MR. VAN SCIVER: Your Honor, I object.

"THE COURT: Yes.

"MR. VAN SCIVER: That's a little unfair.

"MR. SPENCE: But it's true.

"MR. VAN SCIVER: It's not true.

"THE COURT: Now, wait a minute. Let me just make something clear right now and that is, Mr. Spence, I don't like you doing that.

"MR. SPENCE: May I approach the Bench for a moment; please?

"THE COURT: No, you may not. I want to read you a part of an instruction. This will be read to you verbatim. This is part of an instruction.

" 'If any counsel intimates by any of his questions that certain hinted facts are or are not true, you must disregard any such intimation and must not draw any inference from it. As to any statement made by counsel in your presence concerning the facts of the case, you must not regard such a statement as evidence. Provided, however, that if counsel for all parties stipulate to any fact, you are to regard that fact as being conclusively proved and if, in the trial, any party admits a fact to be true such admission may be considered by you as evidence in the case.'

"I want to instruct the panel right now what counsel says is not evidence. It doesn't have anything to so [sic] with this case and what Mr. Spence has now brought up is called a side issue and he's already talked about side issues.

"Now, he's talking about another side issue and he has a right to do that on voir dire because that's when you talk about side issues.

"Mrs. Becker, I also looked at you and smiled.

"MS. BECKER: And I smiled at you.

"THE COURT: Yes. Now, I didn't wink. But that's not because I didn't want to.

"MR. SPENCE: All right, Judge.

"THE COURT: Let's leave that alone.

"MR. SPENCE: I'm embarrassed about that and I'm sure everybody else is. All I'm trying to do is find out. It may

not be true. It was reported to me. I didn't see it. All I want to know is the conduct you observed of the defendant at this time, would it in any way affect your judgment about him?

"MS. BECKER: No.

"MR. SPENCE: How about mine? I have just apparently made a boo boo and I don't think you liked it very well. Does that prejudice you against me?

"MS. BECKER: No." (T. Vol. II, pp. 476–478)

A motion for mistrial, based upon the prejudice to the defendant of the prosecutor's remarks, was made at page 497. The judge denied the motion.

Finally, on page 490, the prosecutor asked a juror:

"And if it were shown in this case, after weighing the facts the death penalty were indeed called for to save further lives, would you give it?"

No objection was made.

 The State, as well as the defendant, is entitled to examine prospective jurors. Rule 25(a), W.R.Cr.P.[16] The purpose of voir dire is to inquire of the jurors as to their prejudices and biases which would interfere with their ability to decide the case fairly. *Lopez v. State*, Wyo.1976, 544 P.2d 855. This examination is to be conducted under the supervision and control of the trial judge, in whose judgment deference is given in determining the permissible bounds. *Gerard v. State*, Wyo.1973, 511 P.2d 99, cert. denied 414 U.S. 1072, 94 S.Ct. 585, 38 L.Ed.2d 478 (1973).

 In the present case we find no reversible error. Most of the claimed errors were cured to the satisfaction of the appellant during voir dire. Those statements to which an overruled objection was left standing, such as the prosecutor's remark concerning the defendant winking at a prospective juror, may have done more to hurt the prosecutor than the defendant. Since

16. Rule 25(a), W.R.Cr.P.:

"(a) Examination of jurors.—The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and con- trol of the court, and the court may itself conduct such further examination as it deems proper." See also, Rule 17, Uniform Rules for the District Courts.

the trial judge was right there and in a position where he could better gauge what, if any, prejudice the defendant suffered, and since we are faced with a cold record, we must defer to his judgment absent a showing the judge's rulings were clearly erroneous. We find no error as to those portions of the voir dire claimed to be prejudicial.

## V

■ The fifth issue is appellant's claim of prejudice as a result of the prosecutor's opening statement. He argues that by interjecting prejudicial argument into its opening statement, the State interfered with appellant's right to a fair trial. We acknowledge the validity of Mr. Chief Justice Burger's recent description of the purpose and scope of an opening statement:

> "An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. To make statements which will not or cannot be supported by proof is, if it relates to significant elements of the case, professional misconduct. Moreover, it is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict." *United States v. Dinitz*, 1976, 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267, 276–277 (concurring opinion).

But we do not find any prosecutorial misconduct here.

To support his position, appellant again presents a distorted version of the record:

> "The State began by vouching for its own credibility: 'I don't see my role in a Courtroom as somebody who will misguide, misstate, mislead a jury to a false conclusion.' (Transcript, Vol. III, p. 685.) Twice he referred to the appellant's alleged Mexican and Las Vegas underworld connections (Transcript, Vol. III, pp. 708, 720). He discussed the humble background of the Vehars (Transcript, Vol. III, p. 689) and the 'heinous, unbelievable, and hideous crimes and torture involved in the case' (Transcript, Vol. III, pp. 686, 697–698). He said the defendant had 'disdain for police and law and order,' that he had one J. R. Goo beaten up, that he attempted to bribe one Kenny Near, that he controlled the Uinta County Attorney, that he threatened the same man's family, that he bought dope from a witness, that he tried to scare an attorney in Arizona with a bomb, and that if Hopkinson were killed he could even come back from the grave to get revenge (Transcript, Vol. III, pp. 695, 701, 704, 706, 734–746, 755–756). He referred to a witness being in a Federal Witness Protection Program (p. 703), that Jeff Green knew that Mike Hickey had put a bomb in the Vehar home (p. 742), and that Jeff Green had disappeared into a truck like Johnny Sueseta's [Suesata's] (p. 757). Each time the defendant's attorney objected to the statements of the prosecutor as argumentative the Court merely said that 'what counsel says is not evidence,' an admonition that was to reverberate throughout the trial (Transcript, Vol. III, pp. 695, 733)." Appellant's brief, pp. 25–26.

In order to fairly review the allegation of error, it is necessary to consider the record in detail. This includes not only the prosecutor's comments alluded to in appellant's brief by record references, but also the evidence which it summarized. We will follow the record references. The prosecutor's opening statement began on page 683 of Vol. III of the transcript. On page 684 he commented:

> "Now, I want to say something else to you about my function and I think it applies, also, to defense counsel. Contrary to what many attorneys see their roll [sic] to be in a courtroom, I don't see my roll [sic] in a courtroom as somebody who will misguide, misstate, mislead a

jury to a false conclusion. I think that would be a travesty and would make my job and my position a travesty. I hope I will not be guilty of that. I hope when you have concluded a month's time with me you will conclude that I have not been guilty of that. My function, instead, is to help you."

He specifically included defense counsel in his observation. It is impossible to see prejudice there. Further, no objection was made at the time.

On page 708 reference was made to underworld connections:

"Well, who was Mark Hopkinson and what was he doing? I would say this to you: his business dealings were somewhat localized for certain periods of time in the Bridger Valley. He had a clothing store there. I think the evidence will show that he was engaged in multi-state operations; that he had connections clear into the Mexican underworld; that he bragged about his underworld connections into Las Vegas; that he used these underworld connections to threaten; that he used his underworld connections to threaten Vince Vehar. * * *"

And again on pages 719–720:

"* * * It was a situation, ladies and gentlemen of the jury, almost incredulous that people like you can't understand, can't fathom, but it was a situation that Mark Hopkinson could not fathom either because he had never in his life come up against anybody who just stood there strong and righteous and fearless and said, I won't budge and you can't intimidate me with your Las Vegas connections and I'll fight for these little people and I'll fight for them and you can't do anything about it because I'll beat you. * *"

Again, no objection was made. However the following testimony was received from J. R. Goo in response to questioning by the prosecutor on pages 359–360 of Vol. V of the transcript:

"Q. Speaking of people from out of town, did you have conversations with

Mr. Hopkinson regarding alleged Vegas connections?

"A. At one time, yes, sir, I did.

"Q. When was that, approximately, if you know?

"A. The date I don't, but it was right after we had a dinner meeting, a Sewer Board in Kemmerer. The direct time I don't know. If you look back and see what time when that meeting was, it was just a few days after that meeting.

"Q. Was this prior to the time that the lawsuit was filed?

"A. Just a matter of days. Yes.

"Q. What conversations, if any, did you have with Mr. Hopkinson regarding Vegas connections?

"A. I asked him about the Vegas connections, if he had any. He looked at me and grinned and he says, 'I have Vegas connections and people, I know people that you guys would never even heard of.'

"Q. He had made some reference that would have been a subject matter discussed at the Sewer Board meeting, that is how you became aware of the Vegas coneections [sic]?

"A. Yes."

During the opening statement on pages 688–689 of Vol. III of the transcript, the prosecutor did in fact discuss the humble beginnings of Vincent Vehar, but no objection was made. And again evidence was introduced through the testimony of John Troughton describing Vincent Vehar's life.[17]

On page 686, the prosecutor remarked:
"* * * It will become a big case because the facts we will produce will show you, I believe, the most heinous and unbelievable series of murders that have ever been committed in the history of this state."

And then again on pages 697–698 reference was made to the torture of Jeff Green, with the prosecutor concluding:

"But it was the death of Jeff Green, his hideous torture that was the major mistake made by the defendant in this case. * * *"

---

17. A challenge to the introduction of that evidence will be discussed later.

No objection to any of the statements was recorded. Evidence was introduced establishing that Jeff Green was tortured before his death.

Beginning on page 694 of Vol. III of the transcript the following was recorded:

"* * * You have heard the name of Mike Hickey. Let's put him on the board. And he became involved with the defendant, Mark Hopkinson.

"The way he became involved with Mark Hopkinson was that he went to work for Mark Hopkinson as a carpenter when Mark Hopkinson was building this new complex at Urie called the Style Den in which there was a beauty parlor and some other rental offices. And he got exposed to Mark Hopkinson when he was young and formative, and he was impressed with this man and he was influenced by him and he was awed by him. Here was a man considerably older than he. A man in his late twenties who seemed to know everything; who was smarter than the local police; who had a disdain for law and order; who had a disdain for—

"MR. VAN SCIVER: I'm going to object, your Honor. That's not proper.

"MR. SPENCE: The evidence will show—

"THE COURT: Just a minute. What's the ground?

"MR. VAN SCIVER: The ground is that may be his conclusion based on the evidence. That's not a demonstration of what he contends his evidence will show.

"THE COURT: Overruled. Let the jury be aware of the fact that counsel at this time are just painting the picture that they believe the evidence is going to show. What counsel aays [says] is not evidence and everyone has told you that and I have told you that already three times. We are listening to both sides just to hear what their case was and nothing happens in a vacuum.

"Please proceed."

Evidence of the character of the defendant was admitted to describe the relationship he had with Mike Hickey as well as for other purposes.[18]

On page 704 the prosecutor stated:

"With Jimmy Goo of the Sewer Board, it was first simply providing him with a little dope. Jimmy Goo runs a restaurant. First it was to provide him just with a little amphetaamines [sic] from Mark Hopkinson to Jimmy Goo. And then it was to loan Jimmy money. And then it was to ask him to vote on the Sewer Board for his case and when that didn't happen and when that didn't occur, Jimmy Goo was beaten up. * * *"

No objection was made. Even though evidence of a statement by Jeff Green was offered to establish the truth of the above assertion, defense counsel did succeed in preventing the jury from receiving it when the judge sustained a hearsay objection. (T. Vol. V, pp. 343–351)

On page 704 of Vol. III of the transcript the prosecutor continued:

"With Mr. Near, the chairman of the Sewer Board, first it was just to ask for his support on the Sewer Board. You don't know what the Sewer Board problem is yet and I'll tell you in a minute. First it was to ask him for his support and then he tried to bribe him for his support for $2,000. * * *"

No objection was recorded to this. Further, the following testimony was elicited from Mr. Near:

"* * * I wonder if you would just tell the ladies and gentlemen of the jury the complete conversation you had with Mr. Hopkinson that you were about to tell us about.

"A. Well, he would like to solicit my testimony saying that the Sewer Board had acted in a vindictive way to stop his trailer court.

"Q. What else?

"A. Well, that he would—if I would do it, he would give me the sum of one of the payments to be made to the Sewer Board for this testimony.

---

18. Defendant's challenge to this evidence will be discussed later.

"Q. In exchange for your testimony he would pay you how much?

"A. I don't remember the amount, I just know it was one of whatever the payments were.

\* \* \* \* \* \*

"Q. (By Mr. Spence) Well, you have testified in this matter before, have you not?

"A. Yes. The Grand Jury.

"Q. Yes, at the Grand Jury. And, at that time, I think you were aware of the amount that—

"A. Yeah. Not specifically, I said it was somewhere in the neighborhood of $2,000 or $2,500 as I told them, I don't recall.

"Q. That's your best memory, is it?

"A. Yes."

On pages 733–734 of Vol. III of the transcript, the prosecutor stated:

"\* \* \* The evidence in this case will show that Jimmy Phillips [Uinta County Attorney] compromised himself; he compromised his office; and he compromised his duty to the State because of the control and the manipulations of Hopkinson.

"The evidence will be that he simply walked over one day to Mr. Phillips' desk where he proudly had a picture of his family, of his children and his wife and himself. You will see the picture. And Hopkinson picked the picture up and said, 'It would be a shame if something happened to these nice children and this nice family.' The evidence from Mr. Phillips will be not only that but he was building a brand new house and Mr. Hopkison would say to him, 'It would be a shame if something happened to your house.' At first, Phillips was pleased that he was representing this individual. He went home to his wife and said 'I got this new client, Mark Hopkinson' but later on it became a milestone around his neck."

Evidence was introduced to show that Mr. Phillips had a conflict of interest problem because of his representation of both the county and Mark Hopkinson. (T. Vol. VI, p. 615) Further circumstantial evidence was admitted in order to establish that Mr. Phillips' decisions as county attorney were influenced by Hopkinson. (T. Vol. V, p. 406) However the trial judge refused to allow Mr. Phillips to testify concerning any threats made to him by Hopkinson because of the possibility it was covered by an attorney-client privilege. (T. Vol. VI, p. 648) But,

"Where a statement by the Government in opening argument is not substantiated at trial because of a subsequent ruling by the trial judge, both the good faith on the part of the prosecution and the impact of the statements in the context of the particular trial must be assessed. \* \* \*" *United States v. Akin*, 7th Cir. 1977, 562 F.2d 459, 466, cert. denied 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531. (Footnote omitted.)

■ Here it was reasonable and in good faith on the part of the prosecutor to believe that the evidence would be admitted, because one would assume, based on case law, that a threat made by a client to his attorney would not come within the ambit of the privilege. As the United States Supreme Court has stated:

"Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged. [Citations] The purpose of the privilege is to encourage clients to make full disclosure to their attorneys. [Citations] As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice. However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege. \* \* \*" *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39, 51 (1976).

We cannot imagine a threat of injury made by a client toward the family and property of an attorney as being privileged and within those communications protected. If anything, it was error against the State to exclude the testimony.

Further, there was evidence introduced of Hopkinson threatening Mr. Goo, on pages 363–364 of Vol. V of the transcript, in the same manner in which the prosecutor described the threat to Mr. Phillips. As a result, it is difficult to see any prejudice even if error was present. Mr. Goo testified as follows:

"Q. Okay. Would you tell me, relate to the Court and to the jury what Mr. Hopkinson said when your wife and kids came out.

"A. My kids come running out, they said, 'Daddy, Daddy how are you?' I said, 'Good.'

"Being in the cafe business, I got to push them off to the side to do my business but this particular day they come up and they gave me a kiss, the wife comes through and she needed some stuff so I went back into the kitchen, got what were needed, come out and talked—

"Q. Talked to who?

"A. Mark Hopkinson.

"Q. Okay.

"A. Mark was ready to leave. And he put his arm around me and he says, 'How's Gina and the kids?' He says, 'Wouldn't it be a shame if they got beat up, cut or hurt?'

"I said, 'You bet, sure.'"

Nowhere in the record can we find the prosecutor accusing the defendant of buying drugs from a witness as charged by appellant in his brief.

On pages 706 and 707 of Vol. III of the transcript the prosecutor did state:

"Now, it wouldn't do to kill Mariscal because to kill Mariscal would destroy his bank source. He couldn't get money from a dead man but it did well and he decided it served him well to frighten him. * * *

"* * * And [Hopkinson] sent Jeff Green down to Phoenix in Hopkinson's car. It's a big—I can't remember whether it was a Continental or a Cadillac. It may have been a Cadillac. And they made a bomb, put the bomb in the car, in the Cadillac, and Hopkinson sent Jeff Green with a bomb and told him to go to Mariscal's house and put the bomb under Mariscal's car and light the fuse and blow Mariscal's car up and if he blew his car up maybe he would pay. * * *"

No objection was made. However, evidence was admitted supporting the prosecutor's assertion which included the following testimony elicited from Mike Hickey on page 908 of Vol. VII of the transcript:

"Q. What did you find out in that regard?

"A. Well, Jeff Green was picked up at Coleville, Utah and me and Mark was going to go down and see if we could bail him out.

"MR. VAN SCIVER: I am going to object to that, that is not responsive to the question.

"MR. SPENCE: He's trying to explain the background.

"THE COURT: I understand.

"Don't repeat everything to me, please, let me just do it. I understand.

"Q. (By Mr. Spence) Now go ahead and tell us how you found out and what happened.

"A. Mark went and got $2,000 that he had. He said he kept this $2,000 on hand for emergencies.

"Q. I see. When Jeff Green got picked up in Utah, what happened? What occurred there?

"A. He got picked up there, he was driving Mark Hopkinson's car and there was a bomb in the car and Jeff Green was driving. He got picked up for speeding going through Coleville."

And then later on pages 929 and 933:

"Q. Why hadn't you—what happened to that earlier discussion about going in with a bomb or dynamite?

"A. The reason we come to the, like the natural gas or the shooting is because

had we discussed the dynamite then in April Jeff Green got picked up with dynamite in Mark Hopkinson's car and Mark said we couldn't use dynamite because it would lead to Jeff Green or Mark.

\* \* \* \* \* \*

"Q. I am going—I am trying to phrase my question.

"Can you state whether or not any other person was considered as a victim?

"A. Yes.

"Q. Other than Vincent Vehar? And I am thinking now of other members of his family other than the immediate family of the Vehars?

"A. Well, after Jeff had got picked up with the dynamite he didn't think he could use dynamite because it would lead to either Jeff or him.

"Q. This is the Mariscal thing?

"A. That's when he was picked up in Coleville, yes. \* \* \*"

From Mr. Barry Strohbehn, a special agent for the Bureau of Alcohol, Tobacco and Firearms, the following testimony was received on pages 1355, 1361–1362 of Vol. VIII of the testimony:

"Q. I hand you what has been marked for identification as Plaintiff's Exhibit 112, can you identify what that is please?

"A. These are the various components taken out of the two stick dynamite bomb in Coleville, Utah. These were taken out of the vehicle by the Utah Highway Patrol Department. The vehicle was a Lincoln Continental belonging to Mark Hopkinson and was at that time being driven by Jeff Green. That date was April 4th of 1977.

\* \* \* \* \* \*

"Q. Now was this bomb, Plaintiff's Exhibit 112, utilized in an earlier trial proceeding?

"A. Yes, it was.

"Q. And were you present during the course of that trial?

"A. Yes, sir, I was.

"Q. Would you state to the jury what that trial was?

"A. The trial involved an interstate transportation of destructive device which is in fact this bomb, for purposes of intimidating an individual in Phoenix, Arizona.

"Q. Do you know the person's name?

"A. Yes. George Mariscal.

"Q. You can re-take the stand.

"Do you know who the Defendant was in that trial that you just identified?

"A. Yes, Mark Hopkinson who is seated beside the Defense attorney."

Back to the prosecutor's opening statement, on pages 700–701 of Vol. III of the transcript, what in fact the prosecutor said was:

"Well, who is this man, this Mark Hopkinson who I have said to you has done such things and who has said such things and power over people and who has an uncanny ability to manipulate people? The master manipulator, I'll say to you, a man who has uncanny charm over people, particularly women, uncanny control over people *whose own position was that he could* control things and make things happen as he chose *and that* nobody, nowhere, at any time could stop him and that *even if he were killed he could come out of the grave* and control things. This was his position—

"MR. VAN SCIVER: The evidence is not going to show that.

"MR. SPENCE: The evidence will show that.

"THE COURT: Well, the jury will decide if the evidence can show it or not. I don't know.

"MR. SPENCE: Your Honor, ladies and gentlemen of the jury: the evidence in this case will show that one simple man is so frightened to testify to you today because he believes that even after Mark Hopkinson is gone he will come forward and destroy him and that Mark Hopkinson has promised to do that." (Emphasis added.)

On pages 361 and 365 of Volume V, Mr. Goo testified as follows:

"Q. When he was reacting in that way, what did [Hopkinson] say to you?

"A. He told me that he'll get—He says, 'I'll get everyone of you son-of-a-bitches.' He says, 'I'll get William, get all the Roitzes, Vince Vehar, Nancy, I'll get everybody even if I have to come back from my grave, I'll get all of you.'

\* \* \* \* \* \*

"Q. (By Mr. Moriarity) When did Mark say what you were going to testify to?

"A. He would come back from the dead to get us all.

"Q. You have already testified when that occurred?

"A. Yes. I believe Mr. Hopkinson—I like him, I still do. I don't know what his feelings are on me but I believe that Mark can do what he wants to do, whatever he feels is necessary, he'll have done."

In his opening statement, on page 703 of Volume III, the prosecutor commented:

"\* \* \* Jimmy Taylor was the first person that was contacted by Mr. Hopkinson to beat up Mr. Vehar. Old man Vehar. Almost 70 years old. Jimmy Taylor was a Hell's Angel type. He lived in Mr. Hopkinson's trailer court. He had a big beard; he was huge; he was gruff; tough. He has been in protective custody, Federal protective custody since he has testified before the Federal Grand Jury about a related case that I'll tell you about in a moment."

No objection was made and the following evidence was introduced during the direct examination of Mr. Earl Jimmy Taylor on page 721 of Vol. VI of the transcript:

"Q. Are you presently being taken care of?

"A. Yes, I am.

"Q. Tell the Court and jury how and what the circumstances are.

"A. I am under the United States Federal Protection Program.

"Q. How did that come about?

"A. Come about after—

"MR. VAN SCIVER: I am going to object to that, Your Honor, *any more than that* I think is probably prejudicial.

"THE COURT: Sustained." (Emphasis added.)

In the opening statement, the prosecutor stated the following on page 742 of Vol. III of the transcript:

"\* \* \* [Green] said to Judge Brown at that time on the record, 'Not only did Mark Hopkinson make up this story that I was supposed to tell in order to protect Hickey, but he's also responsible for the deaths of the Vehars because I have been told by Hickey about that. I know Hickey put the bomb in the Vehar house,' and he implicated Mark Hopkinson for the first time with the bombing of the Vehars."

No objection was made, though the evidence in fact showed through the transcript of Green's testimony that he merely suspected Hickey and Hopkinson.

And, finally, the last allegation of error in the prosecutor's opening statement focuses upon the following from pages 756–757:

"\* \* \* On the Friday before the Grand Jury two men came to—or on the Thursday before the Grand Jury two men came to her house, to Mrs. Green's house and asked where Jeff was. She gave descriptions of the men. They have never been apprehended. Who those men are, exactly, are not known at this time. I have to tell you that. I have to tell you that that investigation is continuing and that it's not at a dead end. We don't know who the men are. The evidence is he hired them; that he procured them; that he was the accessory before the fact. These two men came to the house and asked, and Mark Hopkinson had been wondering about the Utah car. Had Jennifer seen it yet. They asked where Jeff Green was and the mother Green said, 'Well, he's out tonight.' They came back the next morning at 7:00 o'clock in the morning and said to Mrs. Green, 'Where's Jeff?' She said, 'He's out in the little cabin sleeping.' She saw the men. She will testify here.

"They came back; gone out and picked up Jeff Green and saw him leave with those two men; saw him get into a pick-up of the kind owned and description and

color owned by Johnny Suesata, the gambler from Salt Lake City. There aren't too many small, foreign light pickups with a camper on the back and an orange stripe around it. That was the pickup. It has to be one like he has."

No evidence was ever introduced describing the vehicles as alleged, though the record does show that Hopkinson had asked people to be on the lookout for any cars with Utah license plates in Jeff Green's neighborhood. In any event no objection was made to the prosecutor's assertion.

■ As appellant conceded in his brief, *each* party is entitled to make opening remarks outlining his case. However,

"* * * [t]he law does not require that opening trial statements be completely supported by evidence introduced during the trial. Such a rule, rigidly enforced, would effectively eliminate opening remarks and deprive the jury of a very useful outline of the trial as the attorneys expect it to unfold. * * *" *Mares v. United States*, 10th Cir. 1968, 409 F.2d 1083, 1085, cert. denied 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564.

"* * * Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given." *Frazier v. Cupp*, 1969, 394 U.S. 731, 736, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684, 691.

"* * * A prosecutor's misstatement of the evidence does not automatically call for reversal. Instead, the court will reverse only if there is a serious possibility of prejudice to the defendant. * * *" *United States v. Jones*, 9th Cir. 1979, 592 F.2d 1038, 1043, cert. denied 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056.

The trial judge repeatedly admonished and instructed the jury that statements of counsel were not evidence. We see no prejudice to the defendant.

■ Questions concerning the propriety of the opening remarks are best resolved by the trial court. *Boyd v. State*, Wyo. 1974, 528 P.2d 287, 291, cert. denied 423 U.S. 871, 96 S.Ct. 136, 46 L.Ed.2d 102;

*Goodman v. State*, Wyo. 1979, 601 P.2d 178, 188; *Mares v. U. S.*, supra; *United States v. Jones*, supra. This is true because the trial court is in a better position to gauge what prejudice may have resulted from any erroneous comments. For that reason it has been stated:

"* * * Objection should be made at the time of allegedly prejudicial comments so that the trial court will have an opportunity to take corrective action. [Citations]" *Goodman v. State*, supra at 187.

Failure to timely interpose an objection constitutes a waiver unless the misconduct is so flagrant as to constitute plain error. *Jones v. State*, Wyo. 1978, 580 P.2d 1150, 1153.

In the case at bar, very few objections were made by the defense counsel to the prosecutor's opening remarks now challenged on appeal. Thus, in those instances, in order to warrant reversal, the error must be so grievous so as to justify the invocation of the plain error doctrine. This doctrine is:

"* * * applied only where the error seriously affects the fairness or integrity of judicial proceedings. [Citation] There must be a transgression of a clear and unequivocal rule of law, in a clear and obvious way, which adversely affects a substantial right. [Citation]" *Jones v. State,* supra at 1153.

The only comments of the prosecutor in his opening statement which were unsupported by any evidence and not objected to concerned Jeff Green's knowledge of Hopkinson's involvement in the Vehar bombing and the description of John Suesata's pickup. Because of the trial judge's oft-repeated admonition that what counsel says is not evidence, we cannot conclude that appellant's rights were adversely affected. There was plenty of evidence of Jeff Green's knowledge of other matters which directly or indirectly incriminated Hopkinson, thus providing Hopkinson with a motive to kill Green. The prosecutor's misstatement seems most minor in this regard.

As for the prosecutorial comment concerning the similarity between the vehicle seen hauling Jeff Green away and the one owned by John Suesata, this was not a crucial link in the case. There was sufficient other evidence upon which the conviction can rest. The real question, however, is whether the conviction did rest on the other evidence. However, since no objection was made at the time that the prosecutor failed to prove the facts stated in his opening statement, under the plain error doctrine the party challenging the trial must bear the burden of demonstrating the prejudice as well as the error. *Leeper v. State*, Wyo. 1979, 589 P.2d 379. This appellant has not done here; therefore, we cannot conclude there was plain error.[19]

There was one objection made during the prosecution's opening comments for which no direct evidence was actually admitted in support thereof. The prosecutor said that Jim Phillips had been threatened by Mark Hopkinson. When evidence was sought to be admitted on this point, it was excluded as being within the attorney-client privilege. We cannot conclude that the trial court is not entitled to deference in his decision to overrule appellant's objection since there was other evidence of the control Hopkinson exercised over Phillips. Further, since the evidence of threats made by Hopkinson to J. R. Goo was practically identical to that alleged by the prosecutor in his brief, no real prejudice can be shown.

Finally, no objection was registered in appellant's motion for acquittal at the close of the State's evidence.

### VI

▆ The sixth challenge to appellant's conviction is that the trial court improperly allowed character evidence of the victims, the Vehars and Jeff Green. First, as to the Vehars, the record shows that John Troughton testified concerning the Vehar family's background and his own relationship with Vincent Vehar. (T.Vol.IV,

pp. 70–90) This testimony preceded Mr. Troughton's discussion of his involvement with Vehar in the sewer district's lawsuit. During this testimony no objection was made that it was improper character evidence. In fact on page 72, defense counsel conceded that the testimony was "all right," that it was "foundational."

Dorothy Price, Vincent Vehar's long-time secretary, discussed her knowledge of the man as well as his wife. (T.Vol.VI, pp. 650–652) However, most of this discussion was purely foundational for later testimony of Ms. Price which described particular habits of the Vehars and mentioned various fears of Hopkinson that Vincent expressed to her. (T.Vol.VI, pp. 652–669) Again the record reflects no objection by defense counsel.

Ted Taylor, during his testimony, explained how Vincent Vehar had helped him get into rehabilitation after Mr. Taylor's back had been broken. This also was foundational; it led into Mr. Taylor's testimony concerning his nightly watching Mr. Vehar cross the street to Mr. Taylor's bar as a favor to and at Mr. Vehar's request. (T.Vol.VI, p. 691) During the trial appellant made no objection to the testimony as impermissible character evidence.

Finally, Tony Vehar testified about his family and his relationship with its members; on the record this lasted for about a page of double spaced testimony. (T.Vol.IX, pp. 820–821) During the recess that immediately followed, proceedings were held in chambers to discuss an unrelated matter. (T.Vol.XI, p. 822) Following this discussion appellant's counsel indicated he had something he wanted to put on the record, and then he stated:

"It's hard enough, okay, to defend somebody in a case like this. The awesomeness of the responsibility just continues to amaze me how mortals can undertake to do it and it doesn't make it one bit easier to have a family member or Mr. Troughton spend 45 minutes to an hour reminding us what a wonderful family that was.

---

19. If appellant had been concerned during the trial, in his closing statement he could have specifically pointed out to the jury that the prosecution had not produced the evidence it had promised.

"I'll stipulate it was a wonderful family and I'll stipulate it was a horrible thing. But to require that man to sit up there and to cry when he has not one probative fact yet to add to this case other than to talk about how wonderful his mother and father is is just the kind of stuff that ought not to go on in a murder trial, and it ought to arise to the status of something objective and meaningful.

"It's a cheap theatrical shot from the prosecution and just the kind of stuff the Supreme Court's going to take a look at. And I don't think we ought to be back here retrying this case. We had the Attorney General [John Troughton]. We are going to end now with another son crying and it's just not the kind of stuff that we could have avoided.

"Now, I can't tell him how to run his case but, certainly, somewhere along the line the Court has to take a look at the kind of emotional stuff that's being presented not necessarily that's in controversy or issue, but to have a family member who feels a loss and reminds the jury of the loss and it's just not the good kind of clean objective kind of stuff that ought to be in a murder trial." (T.Vol.IX, pp. 824–825) (Bracketed material added.)

At most, this monologue can be interpreted as an objection to any further continuation of testimony by Tony Vehar though no formal motion to strike the testimony and instruct the jury to disregard was made. The trial court, nonetheless, made clear that in its opinion the testimony of John Troughton was probative (T.Vol.IX, p. 829) and the testimony of Tony Vehar was merely foundational to a discussion of what transpired the night of the bombing. After the recess Tony Vehar did in fact testify to the events of the night of the bombing, as well as the fears of Mark, Vincent Vehar had expressed.

Again, where alleged errors in the conduct of a trial were not called to the attention of the trial court, on appeal the errors must be shown to have been plain error in order to warrant reversal. *Hampton v. State*, Wyo. 1977, 558 P.2d 504, 507. Since clearly no objection was made to the testimony of John Troughton, Dorothy Price or Ted Taylor as being improper character evidence,[20] to be entitled to reversal on the grounds sought here appellant must demonstrate the applicability of the plain error doctrine. This includes adequately demonstrating that there was a transgression of a clear and unequivocal rule of law and that appellant was prejudiced by such a transgression. See part V of this opinion.

 Appellant argues that the admission of the testimony violated:

"* * * the 'clear and unequivocal rule of law' that evidence of a victim's good character is never admissible unless first attacked by the accused. This rule is embodies [sic] in Rule 404, W.R.E., which permits evidence of a victim's good character only after his character has been attacked. * * *" Appellant's brief at pp. 33–34.

Appellant misstates the law. Rule 404(a), W.R.E. reads:

"(a) Character evidence generally.— Evidence of a person's character or a trait of his character is not admissible *for the purpose of proving that he acted in conformity therewith on a particular occasion*, except: [Emphasis added.]

"(1) Character of Accused.—* * *

"(2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

"(3) Character of Witness.—* * *"

**20.** Appellant claims that it would have been unwise tactically to object during the testimony of the Wyoming Attorney General. However, he does not explain why he had to wait a week, until Vol. IX of the transcript, to make his first comment on record regarding the alleged improper character evidence.

Thus, the rule generally bans character evidence offered to prove that behavior was in conformity therewith on a particular occasion. But here, the "character evidence" was used to demonstrate the relationship between the Vehars and each witness in order to give a background to the relevant communications Vincent Vehar had with each witness. The evidence was of a foundational nature. Arguably the prosecutor got in more evidence than was necessary to lay a proper foundation, but that does not amount to plain error. At the most, it was surplusage.

■ As to the testimony of Tony Vehar, the trial court held that the evidence obtained prior to appellant's "motion" was admissible as foundational. A trial court's ruling as to the admissibility of evidence is entitled to considerable deference. *Daellenbach v. State*, Wyo. 1977, 562 P.2d 679. As long as there exists a legitimate basis for the district court's conclusions, this court will not reverse on appeal. *Key v. State*, Wyo. 1980, 616 P.2d 774. Since the testimony only described Tony Vehar's family and his relationship within it and it actually consisted of less than a page in length, we cannot conclude that the district court's determination lacked a legitimate basis.

Now as to appellant's charge that improper evidence of Jeff Green's character was admitted, it is first observed that appellant's challenge is to the testimony of three witnesses. The first witness was Donley Linford, Green's attorney. He was asked to describe Green's demeanor after Green testified at the Hysell trial against Hickey and Hopkinson. In response Linford commented:

"A. He was a lot easier to talk to. He enjoyed being around people now. We spent a lot of time. We would go up to the Ramada and have lunch. Quite a few people would come over and talk to us.

"Q. He seemed more at peace and at ease?

"A. A lot more peace and at ease." (T.Vol.IX, p. 951)

Clearly this testimony was admissible as circumstantial evidence in support of the truth of Green's testimony at the Hysell trial, which had just been, prior to these observations, read into evidence. (T.Vol.IX, pp. 936–948)

Judy Jensen, Jeff's sister, when asked about the inner conflict Jeff had been struggling with prior to his testimony in the Hysell trial stated that "he had been raised to always tell the truth and be an honest, good person," and that this conflicted with what Mark wanted from him. (T.Vol.X, p. 1008) Defense counsel made no objection. Later when she was asked why Jeff had refused to go into a witness protection program, Ms. Jensen stated:

"A. Because he said he had fought all his life to be Jeff Green and finally he's the Jeff Green that he really liked and he wasn't going to leave. He loved Bridger Valley. He felt like he would be protected there." (T.Vol.X, p. 1026)

Again defense counsel made no objection.

Lorieta Green, Jeff's mother, testified as to his childhood for a total of five lines in the transcript. (T.Vol.X, p. 1065) She then discussed the changes in him and his general conduct during the last eight months of his life; this testimony stretched over the next five pages. (T.Vol.X, pp. 1065–1070) No objection to this testimony as improper character evidence was recorded in the transcript.

■ Again where no objection was made to the testimony as improper character evidence, on appeal the appellant must demonstrate that the court's failure to exclude the evidence was plain error. *Hampton v. State*, supra. We conclude that appellant cannot avail himself of this doctrine, since in fact the challenged testimony appears to have been admissible on the very key question as to when was Jeff Green telling the truth. This was probative on the Vehar counts since Green's later statements corroborate Hickey's story. It was probative on the Green count because it went to show why Hopkinson may have been afraid of Green and concomitantly why he may have wanted Green dead. The

evidence was not character evidence so much as it was testimony (1) describing Jeff's demeanor, or (2) testimony providing a foundation for the witness' knowledge of Jeff. Thus, the appellant has not shown a violation of a clear and unequivocal rule of law.

### VII

Appellant's seventh contention is that he was prejudiced by "an astounding litany of irrelevant bad acts and crimes allegedly committed by the appellant." Appellant's discussion of the record is misleading:

"First was the beating of J. R. Goo, a member of the sewer board (Transcript, Vol. IV, pp. 205–206, 214), which the county attorney said was done on the order of the defendant to scare the sewer board (Transcript, Vol XIV, pp. 1786, 1932). Next was an alleged attempt to bribe a board member (Transcript, Vol. V, p. 258). A fight in which Mark and Joe Hopkinson and Frank Roitz were involved followed (Transcript, Vol. V, pp. 392–399). Roger Coursey testified that in a conversation with Hopkinson, the appellant said if Coursey knew anyone who had large quantities of money, he could obtain it by violence or nonviolence. 'Hopkinson could have someone ripped-off, fucked up bodily for life, fucked up a little bit, or not hurt them at all,' (Transcript, Vol. V, p. 590). Dorothy Price referred again to Frank Roitz being beaten up and put in the hospital 'by Mark,' (Transcript, Vol. VI, pp. 656–657). Mike Hickey testified that he was presently afraid of Hopkinson, that he was wearing a bullet-proof vest while testifying, and that Hopkinson was hauling drugs (Transcript, Vol. VIII, pp. 1228–1229). Much testimony referred to the so-called Mariscal trial, a trial in which it was alleged that Hopkinson sent Green with a two-stick dynamite bomb to blow up the car of an attorney in Arizona in order to collect a debt (Transcript, Vol. VIII, pp. 1355–1372). Hopkinson was said to want Jamey Hysell 'dead' for once giving a statement against him (Transcript, Vol. IX, p. 943). References were made to Hopkinson standing trial for possession of marijuana (Transcript, Vol. IX, pp. 927, 929). Hopkinson placed four bets with his friend Hap Russell, a bookie, which is an illegal activity in Utah (Transcript, Vol. XI, pp. 1341, 1344). Finally, Hopkinson was said to 'hang out' with a 'con man' named Richard Taylor (Transcript, Vol. XII, p. 1611).

"This list by no means exhausts the bad acts and prior crimes of the defendant which were admitted as evidence in the trial. The other acts were omitted from the list because their admissibility was questionable. There can be no question that the statements which were admitted had no place in this trial. Virtually all were admitted over objection as tending to show motive, opportunity, intent, lack of mistake, identity, modus operandi, and/or common scheme or plan. (See Transcript, Vol. V, p. 397 for example.)"

The beating of J. R. Goo, as discussed on pages 205–206, 214 of Vol. IV of the transcript, was mentioned only as a reference point to another incident. Because of Goo's injuries a sewer board meeting was canceled, and this in turn led to a verbal exchange between the board's chairman and Mark Hopkinson. The "county attorney [Phillips]" never testified that the beating was done on the appellant's order. However, the prosecutor in his closing remarks to the jury in the guilt phase did make such an assertion, (T.Vol.XIV, p. 1786) though in the penalty phase he merely referred to Jim Goo's fear of being beaten up, (T.Vol.XIV, p. 1932) a matter to which Mr. Goo had testified (T.Vol.V, p. 365). The propriety of the prosecutor's closing argument will be discussed infra.

On page 258 of Vol. IV of the transcript, Ken Near testified to an offer made by Mark Hopkinson to purchase testimony in connection with his dispute with the sewer board. No objection was made to the receipt of this evidence under Rule 404, W.R.E.

On page 1223 on redirect after appellant's counsel had asked Hickey, "You are not

afraid of Mark are you?" (T.Vol.VIII, p. 1227), Hickey testified that it was his fear of Mark Hopkinson that caused him to join the witness protection program. He further stated he had obtained and was wearing a bullet-proof vest. No objection was made by defense counsel.

Again on redirect, after appellant's counsel had asked Hickey if he knew Green "was muling drugs," (T.Vol.VIII, p. 1221), Hickey was asked "What have you heard in your entire life relative to hauling drugs?" His response was "Nothing except that Mark Hopkinson hauled drugs * * *." (T.Vol.VIII, p. 1228) No objection was made that this was impermissible testimony.

While on the witness stand Donley Linford, Jeff Green's attorney, testified to various conversations he had with Jeff. When asked to describe when these conversations occurred, Mr. Linford stated on page 927 of Vol. IX of the transcript:

"A. When we were in Cheyenne at the time of the trial on the possession of marihuana on Mark, there were conversations with Jeff when Bill Blair was there and Leonard Hysell."

Then on page 929, while discussing conversations between Mr. Linford and Mark Hopkinson, the following exchange occurred between the prosecutor and Mr. Linford:

"Q. What was going on in Cheyenne at that time?

"A. Mark's trial.

"Q. Mark's which trial?

"A. For the possession of marihuana."

No objection was made to any of this testimony as evidence of irrelevant collateral misconduct.

On page 1341 of Vol. XI of the transcript, Hap Russell, a former roommate of Hopkinson's, admitted to being a bookie. Whereupon the following discussion occurred between Mr. Russell and the prosecutor:

"Q. Thank you. Did Mr. Hopkinson place bets with you?

"A. Yes, he did.

"Q. How often?

"A. I can tell you exactly how many times. Four times."

No objection was made by defense counsel to the receipt of this testimony.

On page 1610 of Vol. XII of the transcript Kristi King was asked by the prosecutor if she knew a man by the name of Richard Taylor. After Ms. King indicated she did, the following exchange occurred on pages 1610–1611:

"Q. Can the jury hear her? And what do you know about Richard Taylor just in a general way?

"A. Well, I heard things about him that—

"MR. VAN SCIVER: Well, I'll object to what she heard.

"MR. SPENCE: Well, that's how reputation is established.

"THE COURT: That's overruled. Go ahead.

"A. I just heard him described in different ways as a con-man.

"Q. (By Mr. Spence) A con-man?

"A. Yes.

"Q. Now, can you tell me whether or not there came a time when you were going with Mark Hopkinson that he became involved with Richard Taylor?

"A. Yes.

"Q. And when was that? During the period of time that you were going together?

"A. You want the year?

"Q. Yes.

"A. Probably 1971."

No objection was made to the testimony that it concerned irrelevant collateral misconduct.

■ As previously stated, failure to timely interpose an objection constitutes a waiver unless the misconduct is so flagrant as to constitute plain error. Since the alleged errors just discussed were not objected to during the trial, in order to warrant reversal, appellant must establish that the alleged error was plain error. This includes adequately demonstrating that there was a transgression of a clear and unequivocal rule of law and that prejudice to appellant resulted. Appellant has not established that here; it is not clear that the evidence

was inadmissible on any basis. First, the testimony discussing J. R. Goo's beating did not attribute the beating to Mark Hopkinson. Second, the attempted bribe of Ken Near may have been relevant to demonstrate how desperate Mark Hopkinson was to win the lawsuit filed against him by Vincent Vehar and the lengths he would go to attain his ends. Mike Hickey's testimony may have been admissible to rebut inferences attempted to be drawn by defense counsel during the cross-examination of Hickey. Donley Linford's statements that Mark was on trial for possession of marijuana appears to have been given only as a time-frame reference; if defense counsel was afraid the jury would use it for more, he should have asked for a limiting instruction. Hap Russell's acknowledgment that Mark had placed bets with him may have been merely foundational, as it was elicited in an attempt to depict Russell's and Hopkinson's relationship. Finally, we recognize that Kristi King's testimony that Hopkinson associated with a con man by the name of Richard Taylor was of questionable relevance. However, because of the remoteness in time from the incidents in question and the relative unimportance of it in the overall trial, we must conclude that the appellant has failed to demonstrate that he was prejudiced by it in any way.

Appellant challenges other testimony as improperly including references to irrelevant bad acts attributable to him; however, to these appellant did object at trial. On pages 392–399 of Vol. V of the transcript, Arlene Sweat testified about a fight she witnessed between her father, Frank Roitz, and Mark and Joe Hopkinson. She stated that during the fight Joe Hopkinson beat upon Mr. Roitz with a hammer. She also identified a photograph taken of her father following the incident, which was then placed in evidence. On page 398, defense counsel objected that the testimony and the photograph involved was irrelevant collateral misconduct and therefore inadmissible; the court overruled the objection. Later more testimony concerning this incident was elicited from Dorothy Price. (T.Vol.VI, pp. 656, 657).

Roger Coursey, a former special agent for the State of Wyoming, testified that during the course of his undercover work he became acquainted with Mark Hopkinson. On page 590 of Vol. V of the transcript he stated that Mark Hopinson had told him that:

"* * * if we [Coursey and whoever] wanted someone ripped-off that he [Hopkinson] could have it done and we could have these individuals fucked up bodily for life or we could just fuck them up a little bit or not hurt them at all."

An objection had been generally made to Coursey's testimony; as to this statement it had been overruled.

During the course of the trial numerous references were made to the Mariscal matter. The record is replete with the argument by appellant that all discussion of the case should be excluded; however the trial court overruled appellant's objections.

In discussing the propriety of the admission of this evidence, attention should be directed to Rule 404, W.R.E. which reads:

"(a) Character evidence generally.—Evidence of a person's character or a trait of his character *is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion,* except:

"(1) Character of Accused.—Evidence of an pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

"(2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

"(3) Character of Witness.—Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

"(b) Other crimes, wrongs, or acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of

a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."* (Emphasis added.)

■ The rule operates only to ban the use of character evidence to prove that behavior was in conformity therewith on a particular occasion. This is made abundantly clear by language in sub-rule (b) to the effect that evidence may be admissible for other purposes. See *Sanville v. State*, Wyo. 1979, 593 P.2d 1340, 1345; *Kwallek v. State*, Wyo. 1979, 596 P.2d 1372, 1377.

■ One of the possible uses of evidence of misconduct specifically recognized by the rule is if the evidence tends to establish motive. See 2 Louisell and Mueller, Federal Evidence, § 140, pp. 122–123. The altercation occurring between Frank Roitz and Mark and Joe Hopkinson was argued by the State as being admissible as going to show that Hopkinson had a motive to get rid of Vincent Vehar, Roitz's attorney who advocated filing charges in the matter. On this basis the judge overruled appellant's objection.

It is well established that deference is given to a trial judge's determinations upon the admissibility of evidence. As long as there is a legitimate basis for his conclusions, this court will uphold the trial court's rulings. *Daellenbach v. State*, Wyo. 1977, 562 P.2d 679. In this case the evidence did show that because of the incident the animosity between Vincent Vehar and Mark Hopkinson continued to grow, thus there was a legitimate basis for the trial judge's determination.

■ When evidence is admitted under Rule 404(b) consideration must be given to the question of whether the danger of unfair prejudice is too great and thus mandates that the evidence not be received under Rule 403, W.R.E.[21] See 2 Louisell and Mueller, Federal Evidence, § 140, pp. 114–115. In this particular instance, the risk of prejudice was relatively small since in fact it was Mark's father who had actually beaten on Mr. Roitz with a hammer. Therefore we cannot conclude that the trial judge erred in admitting this evidence.

■ Roger Coursey's testimony concerning Hopkinson's statements to him, really does not involve Rule 404, supra, at all. It was not character evidence or evidence of a bad act committed by the defendant. It was evidence of an assertion by Hopkinson of his ability to arrange accidents—thus, an admission. As such, it was clearly admissible.

■ We cannot conclude that there was no legitimate basis for the trial court's determination as to all evidence in the Mariscal matter. First, Jeff Green's testimony against Hopkinson in that case went towards establishing Hopkinson's motive to kill him; a proper purpose under Rule 404(b), supra. Second, the use of the same dynamite for both the Mariscal and Vehar bombs went towards establishing identity. See 2 Louisell and Mueller, Federal Evidence, § 140, p. 144. That is, by showing the involvement of Hopkinson in the Mariscal bombing plan and then the fact that dynamite from the same source was used to bomb the Vehar's house, establishes such a relationship between the two cases that it adds further evidence of Hopkinson's involvement in both bombings. It was admissible in that it tended to prove a material fact, *State v. Lindsay*, 1957, 77 Wyo. 410, 317 P.2d 506, appellant's connection with the Vehar bombing. Of course the evidence did "prejudice" appellant in the sense that it was properly admissible as parts of a web of circumstantial evidence pointing to guilt. But the key is whether it unfairly prejudiced appellant. That is, would the danger that the jury may misuse the evidence and convict appellant because of the collateral

**21.** Rule 403, W.R.E.:

"Although relevant, evidence my be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

misconduct outweigh the relevancy of the evidence. Since we cannot conclude that the danger of misuse of the evidence was sufficiently great so as to outweigh its probative value and warrant the reversal of the trial court, we uphold its ruling to admit the evidence.

One further note, in connection with Rule 404(b), supra, is that numerous jurisdictions have read it as not limiting the uses of evidence of collateral misconduct to those enumerated; those listed in the rule are merely provided as examples. *State v. Bain*, Mont. 1978, 575 P.2d 919; *State v. Daniels*, Utah 1978, 584 P.2d 880; *McMichael v. State*, 1978, 94 Nev. 184, 577 P.2d 398. In particular there has been a recognition of a most fitting exception where the collateral misconduct amounts to what has been termed "an inseparable part of the whole deed." [22] See 2 Louisell and Mueller, Federal Evidence, § 140, pp. 123–125. We recognize the validity of the exception particularly in this case due to its complexity and the inability of a jury to adequately understand what and why something happened on a particular date without having the whole story to consider.

Finally, appellant also contends that a statement alleging that Hopkinson had said he wanted Jamey Hysell dead was erroneously admitted into evidence. The statement was made by Jeff Green and came into evidence when a transcript of his testimony was read into evidence. No ob-

jection was made to this particular statement. However an objection had been made that the transcript was inadmissible hearsay, and as a result the trial court had instructed the jury that the testimony was not offered to prove that the facts stated were true, but merely to show that the statements were made by Green. The hearsay issue will be discussed infra.

Further, this was not evidence of collateral misconduct, it was a statement that Mark Hopkinson wanted Jamey Hysell dead because he had signed a statement that claimed Hopkinson had picked up dynamite from him. (T.Vol.IX, p. 943) Ignoring the hearsay problem for the moment, this evidence was relevant to show how desperate Mark was to cover up any connection between him and the dynamite used in the Vehar bombing and fitted into a pattern of conduct related to the Vehar deaths by dynamite. It also went to show how Hopkinson handled obstacles. It constituted another link in the chain of proof and tended to prove the dynamite issue. *Horn v. State*, 1903, 12 Wyo. 80, 73 P. 705. Thus, we find no error under Rule 404, supra.

### VIII

The eighth issue before involves both the hearsay rule [23] and the somewhat related constitutional requirement that a defendant have an opportunity to confront all witnesses against him. [24] Appellant specifically challenges the district court's determination

**22.** 1 Wigmore, Evidence, § 218 (3rd Ed. 1940).

**23.** This is embodied in Rule 802, W.R.E.:
"Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute."

**24.** The Sixth Amendment to the United States Constitution:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him*; to have compulsory process for obtaining witnesses in his favor, and to have

the Assistance of Counsel for his defence." (Emphasis added.)

Section 10, Article I, Wyoming Constitution:
"In all criminal prosecutions the accused shall have the right to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses, and to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed. When the location of the offense cannot be established with certainty, venue may be placed in the county or district where the corpus delecti [delicti] is found, or in any county or district in which the victim was transported."

to admit various statements made by Vincent Vehar and Jeff Green, as well as phone conversations initiated by a man who only identified himself as "Joe."

Turning first to those statements attributed to Vincent Vehar, they generally concerned Vehar's fear for his safety because of threats he received from Hopkinson. They came into evidence through John Troughton (T.Vol.IV, pp. 134, 157), Dorothy Price (T.Vol.VI, pp. 658, 662), Ted Taylor (T.Vol.VI, pp. 691–692), and Tony Vehar (T.Vol.IX, pp. 846–847). Appellant objected to the evidence on the basis that it was all hearsay as defined in Rule 801, W.R.E. This rule provides in part:

"The following definitions apply under this article:

"(a) Statement.—A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

"(b) Declarant.—A 'declarant' is a person who makes a statement.

"(c) Hearsay.—'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The State conceded that the evidence was hearsay, but argued the admissibility of these statements under two exceptions to the hearsay rule. First, it cited Rule 803(3), W.R.E.:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"* * * * * *

"(3) Then-existing mental, emotional, or physical condition.—A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

The argument the State made under this exception was that the statements were admissible to establish Vehar's state of mind. The trial court bought this argument, and allowed the evidence in, and on occasion instructed the jury that the evidence was admitted for the limited purpose of proving Vehar's mental state just prior to his death. (T.Vol.IX, p. 846)

The State's second argument was based upon Rule 804, W.R.E., the pertinent parts of which provide:

"(a) Definition of unavailability.—'Unavailability as a witness' includes situations in which the declarant:

"* * * * * *

"(4) Is unable to be present or to testify at the hearing because of death or then-existing physical or mental illness or infirmity; or

"* * * * * *

"(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former Testimony. * * *

"(2) Statement Under Belief of Impending Death. * * *

"(3) Statement Against Interest. * * *

"(4) Statement of Personal or Family History. * * *

"(5) Statement of Recent Perception. * * *

"(6) Other Exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it

makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant." [25]

The trial judge never rejected this argument; however, on the occasions that he excluded testimony as inadmissible hearsay, it was after inquiring as to whether the notice requirements in Rule 804(b)(6), supra, had been satisfied. (T.Vol.IV, pp. 189, 219)

As frequently stated during the course of this opinion, deference is given to a trial court's findings concerning questions pertaining to admissibility of evidence. We will not reverse unless there is clearly no adequate basis in law supporting the trial court's rulings. Thus, if we can conclude that the challenged evidence was properly admissible under any exception to the hearsay rule then we must affirm its admission into evidence.

The hearsay rule is premised upon the conclusion that the evidence excluded under it is generally less reliable than live testimony. Though all evidence consisting of human assertions entails certain risks, the four particular risks associated with hearsay, an out-of-court statement offered to prove the truth of the matter asserted, have been regarded as so acute as to warrant its exclusion from evidence. These "hearsay dangers" include ambiguity—the interpretation placed upon the statement by the trier of fact may not correspond with the declarant's intention. Second, there may have existed a lack of candor—the declarant may have intentionally misrepresented the truth. Third, the declarant's memory may have been faulty—she/he may have inaccurately recalled the matter which is asserted. Finally, there is the danger that the declarant misperceived the event about which the assertion is made. 4 Louisell & Mueller, Federal Evidence, § 413, pp. 69–70 (1980).

Though these dangers are also present when the testimony is made directly to the jury, there then exists certain safeguards. First, the witness is under oath. The oath reiterates to the witness the seriousness of the occasion and also imposes a legal obligation to speak the truth. Second, the witness testified right in front of the jurors, thus allowing them the opportunity to observe the witness's demeanor as she/he talks. This gives the jury a very real chance to gauge the reliability of the witness' statements. Finally, the witness is subject to cross-examination. Errors, inaccuracies, or misperceptions can readily be pointed out to the jury, aiding it in properly evaluating the weight to be given the testimony. 4 Louisell & Mueller, Federal Evidence, supra.

However, to exclude all out-of-court statements as unreliable would, in many instances, make certain matters virtually unprovable and result in injustice. In order to ameliorate this situation, various exceptions to the hearsay rule have been recognized; these are now embodied in Rules 803 and 804, W.R.E. These exceptions were generally designed to encompass situations in which the four hearsay dangers are substantially lessened, and thus in effect the hearsay statements assume a greater degree of trustworthiness. 4 Louisell & Mueller, Federal Evidence, supra.

One such exception covers hearsay statements offered for the limited purpose of circumstantially proving the declarant's state of mind at the time the statement was made. This is listed as Rule 803(3) in the Wyoming Rules of Evidence. The theory behind this exception is that it cuts down on the number of risks associated with hearsay. The danger that the declarant has a faulty memory or misperceptions is unimportant since the issue is only concerned with what in fact was in his or her mind when the statement was made. Technically speaking, this is a non-hearsay use of the declarant's statement since the statement is not being offered to prove the truth of the matter asserted. However, because in the

---

**25.** Subdivision (b)(6) is identical to Federal Rule 804(b)(5).

past many have failed to draw the distinction, it has come to be listed as an exception. 4 Weinstein's Evidence, § 803(3)[02], p. 803–95.

One limitation on the invocation of this exception is that the state of mind of the declarant must in fact be of relevance. A party may not merely have hearsay admitted under it in order to circumvent the rule. Also Rule 403, W.R.E.[26] should be considered; if the danger that the jury will misuse the evidence as proof of the truth of the matter asserted outweighs its probative value as to the declarant's mental state, then the evidence should be excluded. 4 Weinstein's Evidence § 803(3)[04], pp. 803–107 through 803–110.

In the present case, the mental state of Vincent Vehar prior to his death is irrelevant. There is no allegation by the defense that his death was suicide or in any other manner which would make his mental state an issue.

But our inquiry does not end here, if there is an adequate basis to support the trial court's admission of the hearsay evidence, we must affirm on that issue. *Sanville v. State*, Wyo. 1979, 593 P.2d 1340, 1345. In order to make this determination we must consider the other exceptions to the hearsay rule. In particular we shall focus upon the alternate ground that the State argued the evidence's admissibility, i.e., Rule 804(b)(6), W.R.E.

Rule 804(b)(6), supra, and its identically-worded counterpart, Rule 803(24), were created in order to allow the courts additional flexibility in admitting hearsay. They are the product of a rebellion against the overly-broad and somewhat archaic and arbitrary hearsay rule. See *Dallas County v. Commercial Union Assurance Co.*, 5th Cir. 1961, 286 F.2d 388. These exceptions

are designed to allow trustworthy hearsay into evidence *but* only when it is both in fact worthy of trust and necessary to effectuate justice. 4 Louisell & Mueller, Federal Evidence, § 472, p. 959 (1980).

This court has not been called upon before to apply Rule 804(b)(6), W.R.E.; however, there are several federal cases that have construed Rule 804(b)(5), F.R.E., which is the identically worded federal counterpart. In *Furtado v. Bishop*, 1st Cir. 1979, 604 F.2d 80, cert. denied 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672, a civil case, the court upheld the admission of an affidavit by an attorney who had since died. The affidavit had been offered to prove the truth of the matter asserted, a material issue in the case. The court based its affirmance upon the fact that "[t]here were many indicia of the affidavit's trustworthiness." Id., at 91. These included: (1) as an attorney the affiant must have understood the significance of signing a sworn statement; (2) the affiant had a lack of personal interest in making the statement; (3) the affiant would have had personal knowledge of the matter asserted; and (4) there was other evidence establishing the truth of the matter asserted. Id.

The court in *Furtado* further noted that the failure to give pretrial notice was not fatally defective to an admission of hearsay. The court reached this result despite the existence of a contrary holding in the Second Circuit. That decision was criticized "as unnecessarily restrictive" and not in conformity with Rule 102, F.R.E.,[27] which requires that the rules be construed so as to obtain justice, as well as against the majority rule. *Furtado v. Bishop*, supra, at 91–92.

There have been several federal decisions in criminal cases under Rule 804's catchall exception. In *U. S. v. Carlson*, 8th Cir. 1976, 547 F.2d 1346, rehearing and rehear-

---

26. Rule 403, W.R.E.:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

27. Rule 102, F.R.E.:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

ing en banc denied 1977, cert. denied 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224, hearsay was held admissible under the exception after the court determined: (1) the declarant was unavailable; (2) the statements possessed circumstantial guarantees of trustworthiness equivalent to those inherent in the other exceptions listed in Rule 804(b); (3) the matter asserted was a material issue in the case; (4) the statement was more probative than any other evidence which could be procured through reasonable efforts; and (5) though pretrial notice was not possible because the witness did not become unavailable until the eve of the trial, the defendant was aware of the substance of the statements and did have an opportunity to prepare to counter them since notice was given of the intent to use the hearsay two days prior to its introduction.

In *U. S. v. West*, 4th Cir. 1978, 574 F.2d 1131, another criminal case, the use of hearsay evidence was also upheld as within the ambit of the catchall exception to Rule 804. The court found the requisite exceptional circumstances present necessary to lend the required degree of trustworthiness to an out-of-court statement in order to be admissible. The focus of the court's attention was upon other evidence corroborating the hearsay, as well as upon the fact that the declarant had "every incentive to be extremely accurate in his reports." Id., at 1135.

In another criminal case, it was ruled error to admit hearsay into evidence under Rule 804(b)(5), F.R.E. *U. S. v. Bailey*, 3rd Cir. 1978, 581 F.2d 341. There the court outlined a four-part test. First, it must be ascertained whether the declarant was unavailable to testify at the trial. Second, the trial court must be able to conclude that the fact that the statement will be used to prove is material to the case. Third, there must have been provided a sufficient opportunity for the appellant to prepare for and contest the admission of the hearsay evidence for failure to come within the scope of the rule. Finally, the court must determine whether the offered statements possess the guarantees of trustworthiness

equivalent to the other exceptions enumerated in Rule 804(b). Upon this point the court elaborated further:

"We do not feel that the trustworthiness of a statement offered pursuant to the rule should be analyzed solely on the basis of the facts corroborating the authenticity of the statement. Since the rule is designed to come into play when there is a need for the evidence in order to ascertain the truth in a case, it would make little sense for a judge, in determining whether the hearsay is admissible, to examine only facts corroborating the substance of the declaration. Such an analysis in effect might increase the likelihood of admissibility when corroborating circumstances indicate a reduced need for the introduction of the hearsay statement. We do not believe that Congress intended that 'trustworthiness' be analyzed in this manner. Rather, the trustworthiness of a statement should be analyzed by evaluating not only the facts corroborating the veracity of the statement, but also the circumstances in which the declarant made the statement and the incentive he had to speak truthfully or falsely. Further, consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness." Id., at 349.

Based upon these cases as well as our own reading of Rule 804(b)(6), W.R.E., we conclude that, in order for hearsay to be admissible under the catchall exception, certain requirements must be satisfied. First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness; this may be established either through other corroborating evidence or by considering

the motivation and/or behavior pattern of the declarant. Also see, 4 Louisell & Mueller, Federal Evidence, § 491, pp. 1198–1205 (1980).

■ However, before applying this test, we must incorporate any additional limits imposed upon the admissibility of hearsay by the Confrontation Clause of the Sixth Amendment to the U. S. Constitution (fn.24) and its Wyoming counterpart, § 10, Art. I, Wyoming Constitution (fn.24). As was observed in *California v. Green*, 1970, 399 U.S. 149, 155–156, 90 S.Ct. 1930, 1933–1934, 26 L.Ed.2d 489, the values of the Confrontation Clause and the hearsay rule are not identical. The admission of certain evidence may be barred by one and not the other. Thus, our purpose here is to establish a test which will be applied in ad hoc fashion and exclude all evidence either barred by the hearsay rule or the Confrontation Clause, or both.

■ The chief purpose behind the adoption of the Confrontation Clause was to bar "the particular vice * * * of trying defendants on 'evidence' which consisted solely of ex parte affidavits or depositions secured by the examining magistrates * * *." *California v. Green*, supra, 399 U.S. at 156, 90 S.Ct. at 1934, 26 L.Ed.2d at 496. Thus, the aim of the clause was to compel any witness against the accused "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 1895, 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411. Of course, the right of the accused to cross-examine the witness has been recognized as a particularly important tool in aiding the jury to evaluate the credibility of a witness and thus "the Supreme Court has placed great emphasis on cross-examination—whether at the instant trial or at another trial or hearing—as a protector of confrontation values." *U. S. v. Balano*, 10th Cir. 1979, 618 F.2d 624, 628, cert. denied. 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47.

■ Early on, in *Mattox v. United States*, supra, the Supreme Court recognized that the Confrontation Clause would not demand the impossible. If the prosecution has met its burden of establishing that a witness is unavailable, then his or her presence at the trial would not be mandatory and prior statements by the witness may be admitted under certain limited circumstances. *Ohio v. Roberts*, 1980, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597. These limited circumstances were defined best in *Mancusi v. Stubbs*, 1972, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301–302, where the Court stated:

" * * * The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' *Dutton v. Evans* [1970, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213], and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement,' *California v. Green*, supra [399 U.S. at 161, 90 S.Ct. at 1936, 26 L.Ed.2d at 498]. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these 'indicia of reliability' referred to in *Dutton*."

In *U. S. v. West*, supra, at 1136, after holding that certain evidence was admissible under Rule 804(b)(5), F.R.E., the Fourth Circuit was forced to grapple with the indicia of reliability test as discussed in *Mancusi*. It concluded that the quintessence of this test was whether the surrounding circumstances provided adequate bases for evaluating the credibility of the declarant and the truthfulness of his testimony. Also see, *Ohio v. Roberts*, supra, 448 U.S. 56, 100 S.Ct. at 2538–2539, 65 L.Ed.2d at 607–608, and 4 Louisell & Mueller, Federal Evidence, § 418, pp. 146–150 (1980).

■ It is our conclusion that, before hearsay becomes admissible, the Confrontation Clause imposes a burden upon the

State in addition to those found under Rule 804(b)(6). The prosecutor is required to establish: (1) that the declarant is unavailable to appear at trial; and (2) that there exists sufficient background information concerning the circumstances under which the hearsay statement was made to provide the jury with an adequate basis to evaluate its veracity.

■ Applying all of the foregoing to the hearsay statements attributed to Vincent Vehar, we find that the trial court properly admitted them into evidence. First, it was clear that Mr. Vehar was unavailable; as to that there was no dispute.

Second, the adverse party was given pretrial notice of the State's intent to offer the pleadings from the sewer board's lawsuit. (R.122) These pleadings contained an allegation by Vincent Vehar of Mark Hopkinson's threats. (State's Exh. 27) [28] Appellant has not challenged the admissibility of these pleadings, specifically; his challenge is to John Troughton's testimony explaining why Vincent Vehar included the allegations in the pleadings. We believe that as to Mr. Troughton's testimony, a sufficient opportunity was given the defense to prepare for and contest the admission of the hearsay admitted through his testimony because of the notice that the pleading would be offered. This is particularly true since Troughton was the attorney handling the sewer board's case after Vehar stepped aside upon filing the Complaint and he was listed by the prosecution as a witness it planned to use.

Pretrial notice was also given of the hearsay statements made by Vehar that Dorothy Price would testify to. (R.166) This notice was sufficient to satisfy the requirement of Rule 804(b)(6), W.R.E.

No pretrial notice was given specifically covering the hearsay statements testified to by Ted Taylor and Tony Vehar; however, there was notice given that there would be witnesses called testifying, in substance, that to which Mr. Taylor and Mr. Vehar did testify. (R.158–167) Notice was also given that these particular witnesses would be used. (R.108) It is also important to note that appellant has never argued surprise. In light of these facts, we conclude that here the defense had a sufficient opportunity to prepare for the introduction of the hearsay.

The third requisite under Rule 804(b)(6) is also satisfied here. The fact that the threats were made by Hopkinson is quite material since the State's position is that Hopkinson merely followed through on his threats.

Fourthly, the hearsay statement is more probative than any other evidence of the fact that Hopkinson had threatened Vincent Vehar. Since Vehar was the only witness to the threat, his statements verifying that the threats were made could be the only direct evidence.

Fifthly, the hearsay has circumstantial guarantees of trustworthiness. The Complaint in the sewer board's case corroborates the hearsay; it was signed by Vincent Vehar in conformity with Rule 11 of Civil Procedure. Such a signature "constitutes a certificate by him * * * that to the best of his knowledge, information, and belief there is good ground to support [the pleading] * * *." Further, Mr. Vehar's behavior throughout the time period was quite consistent with the truth of the hearsay statements. The story did not vary each time Mr. Vehar told it, all his statements were consistent. He was even willing to file a suit in which he planned to be a witness and

---

**28.** The second allegation of the Fifth Cause of Action of the Complaint stated:

"2. Continuously since Plaintiff annexed Defendants' land to the District, Defendant, Mark A. Hopkinson, has wilfully and maliciously conducted a campaign by words and acts to discredit and defame the District Judge, the Directors of the District and its officers and agents by voicing charges that they are guilty of misfeasance, malfeasance, nonfeasance and wrongful conduct in discharging their duties and in protecting the rights of the District and the inhabitants thereof; and, by threats of violence and by veiled references to 'Vegas' suggesting bodily harm, in an attempt to force Plaintiff and its Directors and servants to violate the Contract and comply with his aberrations."

testify under oath as to the veracity of his assertions. (T.Vol.IV, p. 105)

The final requirement, one imposed by the Confrontation Clause, is that the prosecution provide sufficient background information so as to give the jury an adequate basis to determine the proper weight of the hearsay. In this case the prosecutor went to great lengths to establish the setting. The complete history of the two lawsuits in which Vehar and Hopkinson opposed each other was provided. Evidence of Vehar's character was also introduced. The jury was thus provided with ample evidence upon which they could evaluate the motives and perceptions of Vincent Vehar when he alleged that Hopkinson had threatened him.

As a result, we conclude that the hearsay statements attributed to Vehar were properly admitted into evidence under Rule 804(b)(6). Furthermore, no violation of the Confrontation Clause resulted from this admission of evidence.[29]

██ Various hearsay statements attributed to Jeff Green were also admitted into evidence and are now challenged on appeal. These statements include Jeff Green's testimony at Jamey Hysell's trial for murdering Kelly Wyckhuyse that disclosed Hickey's involvement in that murder and that Hopkinson had attempted to arrange the death of Vincent Vehar. Also admitted were statements made by Green to John Stevens that he needed to buy life insurance (T.Vol.VIII, pp. 1340–1342), to Donley Linford that Mark had hired Taylor to murder Vehar (T.Vol.IX, pp. 947–962), to Judy Jensen that Hopkinson had tried to cover up Hickey's

involvement in the Wyckhuyse murder (T.Vol.X, pp. 1003–1021), and to Bill Blair that Hopkinson was going to get him (T.Vol.XI, p. 1194).

Since pretrial notice was given that the transcript of Jeff Green's testimony at Jamey Hysell's trial would be offered into evidence and since Jeff Green was unavailable to testify, the first two requirements for its admission under Rule 804(b)(6), W.R.E. were clearly satisfied. Further, the third element is present: the truth of the matters asserted in the transcript that (1) Hickey killed Kelly Wyckhuyse; (2) Hopkinson knew this; (3) Hopkinson had planned a cover-up; and, (4) Hopkinson threatened Green, were all quite material and relevant to the case. Also, Green's statements were generally more probative than anything else available since they were admissions made by Hopkinson. Green's testimony possessed circumstantial guarantees of trustworthiness; he was under oath at that time, there was other corroborating evidence, and his behavior, as testified to by Donley Linford, was consistent with the truth of his testimony. And finally, the jury was provided with sufficient background information characterizing Green, his relationship with Hopkinson, and his behavior at the time he testified to adequately weigh the credence to be given the testimony.

██ John Stevens testified that Jeff Green had talked to him just prior to his murder about buying life insurance. (T.Vol.VIII, pp. 1340–1342) This testimony

---

**29.** We need not reach the issue raised in *U. S. v. Carlson*, supra, regarding a waiver of the Sixth Amendment where the accused has procured the declarant's absence:

"The Sixth Amendment does not stand as a shield to protect the accused from his own misconduct or chicanery. *Diaz v. United States*, supra, 223 U.S. [442] at 458, 32 S.Ct. 250 [at 255, 56 L.Ed. 500]; *Reynolds v. United States*, 98 U.S. 145, 159, 25 L.Ed. 244 (1878); 5 J. Wigmore, Evidence, supra at § 1405(4). 'A defendant who murders a witness ought not to be permitted to invoke the right of confrontation to prohibit the use of his accusation.' Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter

Raleigh Loses Another One, 8 Crim.L.Bull. 99, 139 (1972). Similarly, a defendant should not be afforded the protection of the confrontation clause if he achieves his objective of silencing a witness by less drastic, but equally effective, means. Carlson would have been able to confront Tindall at trial had he not taken steps to assure Tindall's 'unavailability' at trial. '[The defendant] cannot now be heard to complain that he was denied the right of cross-examination and confrontation when he himself was the instrument of the denial.' *United States v. Mayes*, supra, [6 Cir.1975], 512 F.2d [637] at 651." (Footnotes omitted.) 547 F.2d at 1359.

was properly admitted as relevant because it demonstrated Green's fear about testifying before the grand jury during the ensuing week. This evidence could also be used by the jury to corroborate hearsay statements of Jeff Green admitted under Rule 804(b)(6) since it was not barred by the hearsay rule itself.

■ Seeking to buy life insurance is conduct; comments made in furtherance of an attempt to buy insurance are merely verbal parts of an act. 4 Weinstein's Evidence § 801(c)(01), pp. 801–68 through 801–70. Rule 801(a), supra, excludes from the operation of the hearsay rule any oral remarks not intended as assertions. This has been read as incorporating the pre-rules doctrine which held utterances, contemporaneous with conduct and offered to explain it, were admissible and outside the scope of the hearsay prohibition. *United States v. Jackson*, 5th Cir. 1979, 588 F.2d 1046, 1049–1050, fn.4, 49 A.L.R.Fed. 461, rehearing and rehearing en banc denied, 1979, cert. denied 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310. We agree with that conclusion and further cite Rule 803(3), W.R.E. in support of this position since the declarant's assertion would actually only be used as evidence of his state of mind at the time of the contemporaneous conduct. We therefore, hold that John Stevens' testimony falls within this doctrine. Further, as the court in *Jackson* noted, a Confrontation Clause problem is not raised by the invocation of this doctrine because the declarant is not a witness against the accused. Id.

Appellant also assails the testimony of Donley Linford as containing improper hearsay evidence; however, he misrepresents the record in his attack:

" * * * Donley Linford, an attorney of Green's related many of Green's statements, the Court noting that the defendant had not received notice of these statements (Transcript, Vol. IX, pp. 884–885). Green, through Linford, said that 'if he testified as to what he knew about the Hysell trial (the murder of Kellie [Kelly] Wyckhuse [Wyckhuyse]), he would be dead,' (Transcript, Vol. IX, p. 936), and now blamed Hickey for the girl's death. Green, still through Linford, said he 'believed' Hopkinson and Hickey played some role in the death of the Vehars but 'never did know for sure' (Transcript, Vol. IX, pp. 947–948). Green said that Hopkinson frequently said he wanted Vehar deed [sic] and that he, Green, would be dead for making these statements (Transcript, Vol. IX, p. 949). Although Linford's testimony was limited to show Green's state of mind, the prosecutor elicited a statement from the witness that it was 'true' (Transcript, Vol. IX, p. 949). A motion for mistrial based on the erroneous admission of Linford's testimony was denied (id., pp. 953, 962)." Appellant's brief, p. 49.

After recording the offered testimony of Donley Linford (T.Vol.IX, pp. 866–883), out of the presence of the jury, the following exchange occurred:

"MR. SPENCE: That will be my testimony, offered testimony, your Honor.

"THE COURT: Well, it's almost totally rejected by the Court. This is hearsay. It's not listed on your notice of defendant's statement. It doesn't come under an exception to the hearsay rule that I know of. It might have come under Rule 80324 [Rule 803(24)], but the defendant has not been given notice of the testimony other than the transcript from the trials. That's the Court's position." (T.Vol.IX, pp. 883–884)

All of the statements of Linford that appellant challenges on appeal were part of the transcript of Jeff's Green's testimony at the Hysell trial read into the record by the prosecutor and Linford. No statements by Linford, independent of the reading of the transcript, are before us. As already discussed, that transcript was properly admitted into evidence under Rule 804(b)(6), supra.

■ The admissibility of Judy Jensen's testimony relating statements made by Green is also contested on appeal. Nonetheless we conclude that her testimony was admissible under Rule 804(b)(6), supra. First, pretrial notice was given of the state-

ments made by Ms. Jensen. (R.161–162) Second, the truth of Green's assertions, (1) Hopkinson had threatened him; (2) Hopkinson was involved in the Mariscal incident; (3) Hopkinson planned to cover-up Hickey's involvement in murdering Kelly Wyckhuyse; and (4) Hopkinson hated Vincent Vehar, were relevant and material to the charges against Hopkinson. Third, these statements of Green were more probative than most of the other evidence since they involved Green's own personal knowledge as a participant or admissions made by Hopkinson only in the presence of Green. Fourth, circumstantial guarantees of trustworthiness were present; there was introduced other corroborating evidence as well as testimony of Green's behavior during the time period which was quite consistent with the truth of his statements. And finally, the jury was provided with enough background information so as to have an adequate basis to properly evaluate the credence to be given Green's story.

Appellant also disputes the admissibility of Bill Blair's testimony. His challenge contends that it contained inadmissible hearsay when, "Bill Blair testified that Judy Jensen told him Hopkinson had threatened Green and that Green himself said 'they could get him any time [they wanted to] no matter where he was' (Transcript, Vol. IX, p. 1194)." (Appellant's brief, pp. 49–50) First, appellant again misrepresents the record. Bill Blair did not testify as to what Judy Jensen said. (T.Vol.XI, pp. 1193–1194) Thus, the only question is whether it was improper for Bill Blair to testify as to various assertions made by Jeff Green.

■■■ The purpose of Bill Blair's testimony was to explain why Jeff Green, unlike several other witnesses, did not go into a witness protection program. Blair's testimony indicated that he had explained the program to Jeff Green and provided him an opportunity to enter it, but that Jeff had turned it down. The prosecutor then asked why. Blair explained that Green "figured that they could get him any time they wanted to no matter where he was."

(T.Vol.XI, p. 1194) Jeff Green's conduct in refusing to enter a witness protection program was important background information for the jury to use in evaluating Green's credibility in regard to statements he had made which were admitted under Rule 804(b)(6). This is in keeping with the aforementioned requirements of the Confrontation Clause. Also, as discussed earlier in this part of the opinion, utterances contemporaneous with conduct and offered to explain it are admissible, and outside the scope of the hearsay prohibition. See *Jackson v. State*, supra. Since Green's conduct is relevant and material, the state of his mind when the action occurred is also relevant and material. Therefore, Blair's testimony regarding Green's statements which circumstantially established his state of mind was properly received.

Appellant also contends that parts of Barry Strohbehn's testimony was hearsay and improperly received as evidence of Green's state of mind. The statements he then specifically challenges are as follows:

" * * * Barry Strohbehn testified as to what he heard transpire at the Mariscal trial, including a fingerprint on the box containing a bomb which was said to be the appellant's and his characterization of Green as the key witness in that trial (Transcript, Vol. VIII, pp. 1363–1364). * * * " (Appellant's brief, pp. 48–49)

Barry Strohbehn, who investigated the Vehar bombing, was also present at the Mariscal trial. He testified that the date shift code on the box that Hickey identified as the one from which he got the dynamite to blow up the Vehar house was the same as the date shift code on the dynamite that had been found in Jeff Green's car when he was stopped in Utah for speeding and that had also been used as an exhibit at Hopkinson's trial in the Mariscal matter. He also stated that at Hopkinson's trial testimony had been elicited identifying a fingerprint found on the Mariscal bomb as one belonging to Hopkinson. His testimony further identified Jeff Green as the key witness at the trial. More detailed descriptions as to what transpired at the previous trial were disclosed on cross-examination.

■ Strohbehn's identification of the date shift code number as the same on the dynamite and the box and explanation of the significance of that fact was perfectly permissible. Appellant's hearsay challenge is frivolous; the dynamite was handed to him and he merely stated the obvious. (T.Vol.VIII, pp. 1359–1360) He did not rely on anyone else's statements.

■ Strohbehn's characterization of Green as the key witness against Hopkinson was also admissible. No hearsay was involved; it was opinion testimony concerning a matter observed. This was admissible under Rule 701, W.R.E.[30]

■ However, Strohbehn's testimony concerning the identification of Hopkinson's fingerprints was hearsay. There is no exception under which it may be admitted. Therefore, its admission was error. However, we do not believe appellant was prejudiced by it since the jury was properly informed of his conviction as a result of that trial. See earlier discussion under Part II of this opinion.

■ Finally, appellant argues that the trial court erred in admitting evidence of phone calls from a man who only identified himself as Joe. Kristi King's testimony, to which appellant objects, concerned telephone calls which she received on May 22 and 23, 1979. Ms. King confessed that she did not recognize the caller's voice; all that she could state was that he identified himself as "Joe." The court overruled a hearsay objection to any further testimony about the phone conversation and allowed King to relate to the jury what was told her by the caller. (T.Vol.XII, pp. 1631–1636)

This testimony was properly admitted. As stated earlier, utterances, contemporaneous to relevant conduct and offered to explain it, are admissible and outside the scope of the hearsay prohibition. See *United States v. Jackson*, supra. Here, the utterances were offered as part of the conduct which was the making of the phone call. The caller himself mentioned Hopkinson and the money King had received from him. King also discussed the phone call with Hopkinson. Clearly the phone call was relevant circumstantial evidence that the money sent to King was part of some kind of payoff. Therefore, the statements of the caller, as well as the fact the call was made, was properly admitted into evidence.

Appellant cites *State v. Parmely*, 1948, 65 Wyo. 215, 199 P.2d 112, as mandating the exclusion of the contents of phone calls; however, that case is quite distinguishable. There, evidence was introduced that a physician of an assault victim had told a prosecutor over the phone that the victim could not be moved for two or three months. Thus, the conduct, the making of the phone call, was not why the evidence was being introduced as is the case here; it was introduced to prove the truth of the assertion—that the victim could not be moved for two months. Therefore, *Parmely* is not controlling.

■ Appellant's final hearsay challenge is to the testimony of Jim Taylor concerning two telephone calls received by his mother-in-law in May of 1979. Taylor testified that his mother-in-law told him that the caller who identified himself as "Joe" was looking for him. Unable to figure out who "Joe" could be and scared by the news of Jeff Green's murder, Taylor joined the federal witness protection program. (T.Vol.VI, pp. 723–726) The evidence was ruled admissible despite an objection that it was hearsay. The court indicated to the jury that the evidence was not being introduced to prove the truth of the matter asserted, but merely to explain to the jury Taylor's reason for entering into the witness protection program. Apparently the court had concluded that the fact Taylor was in such a program was relevant information for the jury to use in determining the weight to be given Taylor's testimony. We cannot disagree.

30. Rule 701, W.R.E.:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

## IX

The ninth issue is appellant's charge that "the lower court erred in refusing to admit polygraph evidence affecting the credibility of Michael J. Hickey." By order dated August 21, 1979, in reference to a "discussion concerning polygraph examinations" not shown in the record, the trial judge ruled that no mention of polygraph examinations would be made at trial. (R.254) During the course of Mike Hickey's testimony, appellant's counsel asked the following in chambers:

"MR. VAN SCIVER: I have a question in my mind I think probably ought to get some guidance and that's why we are here now.

"I'm like you, I react to polygraphs, that they ought not to get kicked around, but if he starts talking about why this complaint [charging Hickey with the murder of Kelly Wyckhuyse] was dismissed I'm wondering if I, at that time, don't have an opportunity to bring in his passage of a polygraph.

\*　　\*　　\*　　\*　　\*　　\*

"All I am saying is that rather than have a recess and coming in here I am trying to anticipate. He is talking now, or he stopped at a point where it became apparent to me he was going to review with him the dismissal, in whatever year it was, '77 or '78 of Hickey's Wyckuse [Wyckhuyse] first degree murder complaint.

"If so, my question is only I can probe the whole of that, why it was dismissed." (T.Vol.VII, pp. 1049–1050)

The court then had the prosecutors explain what testimony would be forthcoming on the subject. The prosecutors stated that Hickey would not be asked any questions about "why the complaint was dismissed because he doesn't know." (T.Vol.VII, p. 1069) Thus, it was left that the polygraph examination would not be discussed as one of the reasons for the dismissal of the murder charges, since no reasons would be discussed.

■ At no time during the course of the proceedings below did appellant make a formal offer of proof concerning any polygraph examination. We have nothing before us showing that a polygraph examination of Mike Hickey was ever administered, let alone the results of the exam or the qualifications of the examiner. This court, in *Cullin v. State*, Wyo. 1977, 565 P.2d 445, recognized that under proper circumstances the results of polygraph exams may be admissible evidence, when it stated:

"Apparently, in the federal judicial establishment until rather recently, the results of lie detector tests have been inadmissible. [Citations] In *United States v. Oliver*, 8 Cir. 1975, 525 F.2d 731, cert. den. 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743, the defendant urged that he be subjected to a polygraph test and agreed that even if unfavorable, could be offered in evidence by the Government. Ironically, he flunked, so then urged that the agreement and waiver were secured in violation of his rights. The court, after considerable discussion acknowledged that recent developments in the decisions indicate that under certain circumstances a polygraph examination may be admissible. The court placed emphasis on defendant's agreement and explored the qualifications of the expert and allowed the evidence was admissible. Another late federal case, *United States v. Marshall*, 9 Cir. 1975, 526 F.2d 1349, 1360, cert. den. 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376, discusses the widespread debate concerning the reliability of the polygraph, agrees that it may be admissible but observes that before admissible, the critical requirement of a competent examiner, the judicial problems of self-incrimination and hearsay, places a trial judge in a position where he will rarely abuse his discretion by refusing to admit the evidence even under limited conditions. We would hesitate to give such general standing advice because, a noted by the defendant in the case before us, the polygraph has and is gathering up acceptance." (Footnotes omitted.) Id. at 455.

However, since there has been no demonstration that the proper precedent qualifying circumstances were present here, we must defer to the trial court's determination that the polygraph exam was inadmissible.

## X

The tenth issue presented in this appeal concerns the admissibility of photographs, charts, slides, and testimony depicting the torture of Jeff Green. Appellant insists that the evidence was inadmissible because its prejudicial effect outweighed its probative value. Though he does not cite Rule 403, W.R.E.,[31] appellant is in effect arguing that it should have operated as a bar to this evidence.

This court recently discussed Rule 403, supra, in *Key v. State*, Wyo. 1980, 616 P.2d 774. In that case it was held that a trial court's determination that Rule 403, supra, does not prohibit the use of evidence is entitled to deference by this court. See 2 Louisell & Mueller, Federal Evidence, § 126, p. 16 (1978). Further, we will not overturn the trial judge's determination absent a showing that there existed no legitimate basis for it. "Under these standards reversal is required only if the photographs had little or no probative value, and were extremely inflammatory or introduced merely to inflame the jury." *Key v. State*, supra, at 776.

█ Reviewing the present case under this analysis, we cannot say that the trial court's ruling lacked an adequate basis. The evidence introduced established that Green was brutally tortured before his death. In doing so, it was relevant to the theory of the State's case—that Hopkinson had arranged Green's death. The nature of Green's death—the torture, the burning of a "T" on his face and arm, and the location the body was found—correlated to the motives Hopkinson had to murder Green—revenge, information concerning what had

been told the special prosecutors, and a warning to others to keep quiet. Because of this correlation, the evidence was circumstantial evidence of Hopkinson's guilt in arranging the murder.

Pictures of death at their best are repugnant but an unavoidable fact of life, particularly pertinent in a murder case. Granted the photographs taken of Green were quite gruesome. The pathologist, however, testified as to when the photos were taken and what each depicted. This is in contrast to what had occurred in *Reeder v. State*, Wyo. 1973, 515 P.2d 969, when this court reversed on the basis of improperly admitted photographic evidence.

Finally, though we acknowledge that the evidence was not pleasant nor intended to favor the defendant, it has never been held that *probative* evidence is inadmissible solely because of repugnancy. Murder is repugnant. Since the evidence had substantial probative value, we uphold the trial court's determination that it was admissible.

## XI

█ The eleventh issue we consider focuses upon the identification of a photograph of Hickey by Jeffrey Kofroth. Appellant presents a meretricious argument that the procedure used to identify the photo was so tainted as to constitute plain error; his position is clearly wrong.

Kofroth, called by the State, testified as to his observations in the Evanston area during the early morning hours of August 7, 1977. He had been hitchhiking from Seattle to Colorado Springs when he arrived in the Evanston area that morning. He described the older couple who had brought him from Utah to a Husky station there at around midnight. After spending some time walking around the town, a patrolman stopped him at about 2:30 a. m. The patrolman wanted to know who he was and what he was doing; when satisfied, he

---

**31.** Rule 403, W.R.E., provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

released him. Kofroth then made his way towards the interstate highway. When he had walked a mile or so down the highway, he was successful in obtaining a ride in a pickup truck. The driver, who was wearing blue jeans and a white cowboy hat and had apparently been drinking, conversed with Kofroth. He told him that he lived on a ranch and that he was on his way home. Thirty to forty miles down the road, the individual dropped Kofroth off when he turned off the freeway to head home. (T.Vol.IX, pp. 792–798) This testimony placed Hickey in the area at the time of the Vehar bombing and corroborates Hickey's testimony.

Kofroth also testified that the day before his testimony he had spoken with one of the prosecutors. This prosecutor had shown him a photograph of Hickey and asked whether it was of the driver of the pickup. Kofroth had stated that it was.

During this testimony, the prosecutor introduced into evidence State's Exhibit 383, a photograph of Hickey. When asked if he had an objection, defense counsel said no. The photo was shown to Kofroth, who identified it as the photo he had seen the previous day. He then stated, in reference to the face in the picture, "That's the man that picked me up in the pickup truck." (T.Vol.IX, p. 798) The photo was then handed to the jury. No mention was made as to the identity of the man pictured, contrary to appellant's statement of the facts. (T.Vol.IX, p. 799) It obviously was a photo of Hickey. Kofroth was not requested to identify Hickey as the driver of the truck who picked him up. It was the jury who would make the identification.

Appellant concedes that since he failed to make any objection to this during trial he must establish plain error. But he contends that under *Simmons v. United States*, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, there was plain error since a clear and unequivocal rule of law was violated.

Appellant's reliance on *Simmons* is misplaced. There the United States Supreme Court was faced with a situation where a witness was presented with a photograph in a suggestive manner. After identifying the photo, the witness was called to testify and identified the accused and not the photo. The Court stated:

" * * * Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on *eyewitness identification at trial following a pretrial identification by photograph* will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. * * * " (Emphasis added and footnotes omitted.) 390 U.S. at 383–384, 88 S.Ct. at 971, 19 L.Ed.2d 1253.

Thus, *Simmons* establishes that each case involving a photographic identification must be decided on its own facts. This does not provide a clear and unequivocal rule of law as necessary for reversal under the plain error doctrine.

Further, *Simmons* speaks to a matter not present here. The jury could not have been misled by the witness' identification. They saw it was the photo he identified, not Mike

Hickey. The procedure used was thoroughly explored on cross-examination. (T.Vol.IX, pp. 803, 808–810) We find nothing improper under the circumstances present here.

We conclude since no plain error has been established, that procedure must be upheld. It was up to the jury to connect the photograph with Hickey and thus this procedure avoided the complications of *Simmons*.

## XII

The twelfth issue on appeal is whether error was committed when the prosecutor called a witness who refused to answer various questions by invoking his Fifth Amendment rights and the prosecutor had, prior to calling the witness, reason to suspect that this would happen. In order to effectively resolve this question, we must first develop the exact circumstances in which it arose.

John Suesata was called to testify following Hap Russell's testimony linking Suesata with various money transfers which Russell claimed were for the purpose of suborning testimony. Russell had testified that he had contacts with Suesata on behalf of Hopkinson about purchasing testimony. The State's theory was that actually the contacts were about arranging Jeff Green's death. (T.Vol.XII, pp. 1465–1477)

In particular, Russell stated that he paid Suesata $4,500 as a down payment and that the total amount that Suesata was to receive was $15,000. (T.Vol.XII, pp. 1485–1497) Russell had also delivered to Suesata a photograph of Jeff Green obtained through Jennifer Larchick. (T.Vol.XII, pp. 1500–1502) Throughout these arrangements, Russell acted on behalf of Hopkinson. (T.Vol.XII, p. 1516) At the close of Russell's testimony, Suesata was thus established as a central character in the illegal dealings.

Immediately following Russell's testimony, proceedings were had in chambers. At that time appellant's counsel stated:

"The next witness who will be called, I think the prosecution knows at the time of calling of that witness he anticipates exercising his Fifth Amendment privilege. There are jurisdictions which are divided about the propriety of calling a witness that the prosecutor knows who will take the Fifth at the time of the trial before a jury with the defendant present.

"Now, I am of the impression that the ABA standards says that the prosecutor ought not to knowingly call a witness if he in fact knows that at the time he calls him he will exercise the Fifth. That is the Colorado rule. I know of no Wyoming rule and the Utah rule is contrary. You can knowingly call a witness and have him take the Fifth in Utah and it's not error. It's reversible error in Colorado and I can tell you what the suggested standard is and I only mention it now simply to avoid the awkwardness of doing it. I think it's more fair to you if I'm up front about it. That's why I said it." (T.Vol.XII, pp. 1579–1580)

In the ensuing discussion between the parties, the judge and Suesata's attorney, it became apparent that the prosecution refused to announce in advance what questions would be asked Suesata. It was also clear that no immunity would be given to Suesata unless he had some new information concerning the murder of Green. Suesata's attorney indicated that under such circumstances his client would probably take the Fifth; however, since he did not know for sure what the questions would be, he admitted that his client might answer some of them. The judge then refused to force the prosecution to disclose the nature of his questions outside the presence of the jury. Thereafter, Suesata was called and the following occurred:

"Q. Would you state your name to the ladies and gentlemen of the jury, please?

"A. John Lewis Suesata.

"Q. Where do you live?

"A. Salt Lake City, Utah.

"Q. How long have you lived there?

"A. All my life.

"Q. What do you do?

"A. (Brief pause) I refuse to answer on the ground that it may tend to incriminate me.

"Q. Well, is everything that you do, would that incriminate you? Are there some things that you do that wouldn't incriminate you?

"MR. VAN SCIVER: I object to the form of the question.

"THE COURT: Sustained.

"MR. SPENCE: On the grounds that I haven't been shown as a hostile witness yet?

"THE COURT: No.

"MR. SPENCE: May I lead?

"THE COURT: Not yet.

"Q. (By Mr. Spence) All right. Mr. Suesata, you're here because of some arrangements that have occurred or taken place that started with the Federal Grand Jury; is that correct?

"A. (Brief pause) I refuse to answer on the ground that it may tend to incriminate me.

"Q. Well, have you been subpoenaed to a Federal Grand Jury?

"A. (Brief pause) I refuse to answer on the grounds that it may tend to incriminate me.

"Q. Do you know me?

"A. Yes, sir.

"Q. Where did you first meet me and when?

"A. (Brief pause) I refuse to answer on the grounds that it may tend to incriminate me.

"THE COURT: You may now ask leading questions.

"Q. (By Mr. Spence) Thank you. Isn't it true that you first met me yesterday in my office in the morning?

"A. (Brief pause) I refuse to answer on the grounds it may tend to incriminate me.

"Q. And prior to yesterday morning the only other time that you and I had contact was a telephone call when you called Mr. Moriarity at our office in Jackson; isn't that true?

"A. (Brief pause) I refuse to answer on the ground it may tend to incriminate me.

"Q. Do you know Todd Hall?

"A. (Brief pause) I refuse to answer on the ground it may tend to incriminate me." (T.Vol.XII, pp. 1595–1597)

At this point the questioning was stopped while the jury was taken out. Once continued, the witness continued to invoke the Fifth Amendment. Finally the prosecution gave up and the witness was excused. (T.Vol.XII, pp. 1598–1606)

This is a case of first impression in Wyoming. The lodestar in this area is *Namet v. United States*, 1963, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278. In that case the issue before the Supreme Court was whether it was error to permit a prosecutor to ask witnesses incriminating questions concerning their relationship with the accused, with the knowledge that the witness would invoke his constitutional right against self-incrimination. The Court, while grappling with this issue, commented:

"In turning to the petitioner's argument that his conviction must be set aside because of the circumstances described, we emphasize at the outset what this case does *not* involve. No constitutional issues of any kind are presented. The petitioner does not claim any infringement of his Fifth Amendment privilege against self-incrimination. He does not contend that the Kahns were in any way prejudiced by their assertion of this constitutional privilege. All that this case involves, in short, is a claim of evidentiary trial error." (Emphasis in original and footnotes omitted.) 373 U.S. at 185, 83 S.Ct. at 1154, 10 L.Ed.2d at 283.

The Court then observed:

"None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out

of inferences arising from use of the testimonial privilege. * * * A second, theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. * * * " 373 U.S. at 186–187, 83 S.Ct. at 1154–1155, 10 L.Ed.2d 283–284.

Applying this two-pronged test to the facts before it, the Supreme Court concluded: " * * * [R]eversible error was not committed in this case. In the first place, the record does not support any inference of prosecutorial misconduct. It is true, of course, that Mr. Fitzgerald announced that the Kahns would invoke their testimonial privilege if questioned. But certainly the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous. In this case, the prosecutor initially did not believe that the Kahns could properly invoke their privilege against self-incrimination, reasoning with some justification that their plea of guilty to the gambling charge would erase any testimonial privileges as to that conduct. * * *

\* \* \* \* \* \*

"Nor can we find that the few invocations of privilege by the Kahns were of such significance in the trial that they constituted reversible error even in the absence of prosecutorial misconduct. * * * In this case the few claims of testimonial privilege were at most cumulative support for an inference already well established by the nonprivileged portion of the witness' testimony." 373 U.S. at 188–189, 83 S.Ct. 1155–1156, 10 L.Ed.2d 284–285.

The Namet approach has been continuously followed in the federal courts. Some of the more recent cases in which the two-prong test has been applied include: *United States v. Harper*, 10th Cir. 1978, 579 F.2d 1235; *United States v. Castillo*, 9th Cir. 1980, 615 F.2d 878; *Labbe v. Berman*, 1st Cir. 1980, 621 F.2d 26. All of the decisions agree that this is not a constitutional question, but merely an evidentiary one.

Another important case for us to consider is *State v. Cota*, 1967, 102 Ariz. 416, 432 P.2d 428. There, the prosecution called a witness with the knowledge of his intention to invoke his Fifth Amendment right against self-incrimination. The Arizona Supreme Court concluded that this was not error:

"While we do not state here that a case cannot contain such improper behavior on the part of the prosecution in relation to a witness' claim of privilege as to deprive a defendant of a fair trial, we do not feel that the jury herein was improperly influenced by the calling of Valenzuela. The testimony of other witnesses supported the state's theory of a crime jointly perpetrated by Valenzuela and the defendant. * * *

\* \* \* \* \* \*

"The prosecutor did, as the defense points out, repeatedly refer to Valenzuela throughout the trial; further the defendant and Valenzuela were frequently joined so as to be thought of together. However the prosecution went on to show, by testimony, that the defendant and Valenzuela were together with the victim of this crime shortly before the latter's death. Thus to deprive the state of such argument by disallowing the calling and mention of Valenzuela would have in effect disallowed the state's theory of the case—that defendant and Valenzuela together perpetrated the crime of murder.

"For the state to have presented its theory without calling Valenzuela would have meant leaving an obvious step out of its argument. Then the defense could have argued that the state's failure to produce the alleged accomplice meant that no corroboration for its theory would have come from such testimony. *United States v. Gernie* [2nd Cir. 1958, 252 F.2d 664].

"There could have been no testimony more material to the prosecution of this case than that of Valenzuela. Further, since the privilege against self-incrimina-

tion is a personal immunity for the witness and does not disqualify him from being called, we cannot conclude otherwise but that, regardless of its reason to believe that Valenzuela would choose to invoke the privilege against self-incrimination, the state had the right to show that it was presenting all the relevant evidence at its disposal in order to prove its theory of the case.

"As to the prosecution's comment on Valenzuela's failure to testify, while we cannot say that such is desirable or even proper behavior, on the other hand we do not feel that recalling this fact to the jury's attention could cause such prejudice to an otherwise fair trial as to necessitate a reversal." 432 P.2d at 432–433.

Turning to the case before us, we first note that appellant has not raised a constitutional question, but merely an evidentiary one. Further, we agree with the Court in Namet that, when an issue of this type is raised, there exists no hard and fast rules. Each case should be analyzed on the basis of its own facts.

In the present case the prosecutor refused to disclose the nature of his line of questioning in advance, out of the hearing of the jurors. He claimed this was a tactical maneuver so that Suesata would not be able to prepare his testimony in advance. Though here the prosecutor's position is not without merit, we must treat the case as one in which he knew that the witness would refuse to answer; otherwise it would be too easy for prosecutors in the future to bury their heads in order to avoid learning whether a witness will in fact take the Fifth.

However, because of the unique facts of this case we do not conclude that error was committed. Both the State *and the defense* contended that Suesata was involved in wrongdoing. The only dispute was the nature of it. Suesata's refusal to answer the prosecutor's question by invoking his privilege against self-incrimination was consistent with both the State's and defendant's theories. Thus, the witness' silence did not imply his or the defendant's

involvement in murder. Nevertheless, his testimony, or lack thereof, was important in order for the State to demonstrate that it was presenting all the relevant evidence at its disposal. Otherwise the defense could have argued that the State's failure to produce Suesata meant that no corroboration for its theory would have been forthcoming from his testimony.

Appellant's misstatement of the record, notwithstanding, the prosecution did not use Suesata's invocation of the Fifth improperly during its closing. Russell had testified extensively about Suesata and his relationship in the illegal dealings. The prosecutor was left with the necessity of explaining what Suesata had to say. He could not depend upon the defense producing Suesata and he would have been foreclosed as it turned out that no defense was made by the appellant. The prosecutor could not just explain to the jury that Suesata was unavailable. The only mention the prosecutor made of Suesata's appearance on the witness stand was "You saw him. You at least got to look at him." (T. Vol. XIV, p. 1803) On the basis of the unusual facts of this case we find that the trial court did not err in allowing Mr. Suesata to invoke his privilege against self-incrimination before the jury.

## XIII

The thirteenth issue is whether the refusal of the prosecution's witnesses to discuss their testimony with the appellant's counsel was improper. This challenge to the trial is entirely without merit. A witness may refuse to talk to counsel. The remedies available to counsel upon such an occurrence are listed in the Wyoming Rules of Criminal Procedure. In particular under Rule 18(c), he may demand production of reports and statements of witnesses. This was not done here.

Further, the record reflects the trial judge did in fact, upon request of appellant's counsel, inform Jennifer Larchick of her right to talk to counsel as well as her right to refuse to do so; however, she indi-

cated she wanted only to finish her testimony and go home. (T. Vol. XI, p. 1266) The judge also ordered the prosecution to make Kristi King available to the defense for questioning. (T. Vol. XI, p. 1269) There is nothing in the record to suggest this was not done. In fact at the conclusion of her testimony the following transpired:

"THE COURT: All right. May this witness be excused?

"MR. SPENCE: Yes, your Honor.

"THE COURT: Any objection?

"MR. VAN SCIVER: None from her being permanently excused. I would like an opportunity in the next few minutes to talk to her is all.

"MR. SPENCE: The examination is over.

"THE COURT: Wait a minute. I don't understand. You have no objection to her being excused?

"MR. VAN SCIVER: None.

"THE COURT: All right. Miss King, you are permanently excused from subpoena unless you would like to just stay around and I already know how you feel about that. And Mr. Van Sciver informs me that he would like to talk to you and if you would like to do so you may talk to him sometime after you're gone." (T. Vol. XII, p. 1653)

Nothing in the record suggests any impropriety in the conduct of the trial. Accordingly we find no reversible error here.

### XIV

The fourteenth challenge to appellant's trial concerns the propriety of the prosecution's closing argument in the guilt phase of the trial. Appellant claims that the prosecution far exceeded the limits of appropriate argument to the jury. He contends:

" * * * References were made to matters never shown in evidence and to matters specifically excluded from evidence. Appeals were made to the passions, prejudices and sympathies of the jurors. Personal threats to the jurors were implied. Opposing counsel was personally attacked. Statements that the defendant would commit crimes in the future were

made. Perhaps most significantly, a series of remarks were made which could only be taken as comments on the accused's failure to testify. * * * " (Appellant's brief, p. 93)

It should first be observed that this issue involves:

" * * * the fundamental right to a fair trial, free from tainted argument. [Citation] A reversal and remand for a new trial—because of prosecutorial misconduct—will not be ordered as punishment for a prosecutor's misdeeds, but only because such misdeeds denied the accused a fair trial. * * * " *Jones v. State*, Wyo. 1978, 580 P.2d 1150, 1154.

Moreover, in their closing, prosecutors, just like any other counsel, may not only comment on the evidence before the jury but also present inferences to the jury which they argue logically follow from the evidence. The purpose of closing arguments is for counsel to explain the significance of the evidence and how it should be viewed. *Mayer v. State*, Wyo.1980, 618 P.2d 127. Arguments designed to appeal to the juror's prejudice or passion are improper, but the scope of permissible argument as well as the injury caused by misconduct are best determined by the trial judge. We will not reverse his determination absent a showing that it was without a legitimate basis. *Mayer v. State*, supra; *Oldham v. State*, Wyo.1975, 534 P.2d 107.

In particular appellant challenges several of the prosecutor's remarks as improper comments upon Hopkinson's refusal to testify. On page 1781 of Vol. XIV, the prosecutor observed:

" * * * The defendant is given the presumption of innocence. He has the right to a lawyer. He has the right to cross examine witnesses. He has the right to face his witnesses, to look at them straight on in the witness stand. He has the right to bring on his own defense if he chooses. He has no duty to but he has the right to bring on his own defense, to bring on one or a hundred witnesses, to

take one hour or a hundred days if he chooses. It is his right. * * * "

Then on pages 1782–1783 he stated:

"Mr. Van Sciver told you in his opening that we had come here together because the prosecution had prostituted itself. He made fun of our case. He attacked our witnesses. He belittled our efforts and he promised to show you the truth and he promised to come forward with facts and with evidence. Well, why are we all here? I hope, ladies and gentlemen, that we are all here to do justice. Just that simple thing.

"Now, I don't expect that to be perfect because we are all human and the law doesn't demand that it be perfect. Not complete justice, not perfection. That is only a goal that we attempt to achieve. We are here to be reasonable, to honestly prove our case to you, and to ask you for a reasonable and honest decision based on the law. We are here to uphold the law. We are not here to besmerk [sic] it; we are not here to cover it with half truths and twisted arguments and clever smoke screens and empty promises."

And finally on pages 1940–1941 the record reflects the following when the prosecutor read from defense counsel's opening statement:

" * * * From Mr. Van Sciver who now offers that to you as a fact in this case. Then he says, 'Do you know what muling dope means? It's where you get into a car and you drive it, you get paid for driving it, you don't need to sell it or anything like that, just drive it. It is Pepe Remeriz who is the creditor. Mark refuses to let Pepe Remeriz make pressure phone calls to Mariscal.' Have you heard anything like that from this witness stand? 'From his place of business and when Pepe stopped because they are old friends on the highway through to Denver. He sends his goofer,' I don't [know] what a goofer is.

"MR. VAN SCIVER: That's gofer. A gofer.

"MR. SPENCE: Oh, a gofer. I don't know what a gofer is either. 'He sends

his gofer, who happens to be Jeff Green, to take Pepe Remeriz to a couple of phone booths where they can make phone calls into Bridger Valley, because they are acquainted with the Bridger Valley. Ultimately those phone calls are made and they turn into be threatening phone calls, turn into be the phone calls which constitute the essence of the Government's prosecution in the Mariscal case. Mark denies he made the phone calls. Mark admits Jeff was with Pepe Remeriz and Pepe Remeriz may well have made the phone calls and that is new even to the prosecution.'

"That's what he told you. Where is that evidence? Mr. Moriarity objected, you remember, and said he has the duty to produce that evidence.

"MR. VAN SCIVER: Now, wait a minute. We're under no duty. That instruction's been given.

"THE COURT: That's correct. That instruction has been given. The defendant is under no duty to produce any evidence in this court whatsoever. You have been so instructed. I remind you again of that instruction. What counsel says, in any event, is not evidence on either side."

Thereafter the court refused to allow the prosecutor to further discuss the failure of the defendant to present any evidence.

 We do not agree with appellant that these were "a series of remarks which could only be taken as a comment on the accused's failure to testify." (Appellant's brief, p. 94) The remarks focused upon the opening statements of the defense counsel in which he made bald assertions of fact for which no evidence was ever introduced. It was perfectly proper for the prosecution to remind the jury that there was no evidence before it supporting defense counsel's claims. This was merely a means of assisting the jury in sifting through all that had been said during the course of the three-week trial and noting that what defense counsel had stated was not evidence. See *Oldham v. State*, supra. We do not find the prosecution's remarks to have been improper.

Appellant also challenges several of the prosecution's statements as misrepresenting the evidence actually admitted. No objection was made at the time the prosecutor made the comments, though a motion for mistrial was made shortly after the case was submitted to the jury. (T. Vol. XIV, p. 1953) The court denied the motion saying:

" * * * The record will speak for itself with respect to all the evidence in this case and counsel's remembrance of the evidence may be of some importance with reference to the trial of this case, but at this point it really doesn't make any difference to the jury whatsoever, the tryor [sic] of fact. It's what they remember is important and I have told them a hundred times. Anything else?

"MR. VAN SCIVER: No. I have nothing else. Do you think it's all right for us to leave for awhile?"

We agree with the trial judge where, as here, (1) the appellant's counsel did nothing to try and prevent the jury from hearing questionable comments and (2) the judge had repeatedly admonished the jury that "what counsel says is not evidence."

Appellant asserts that a reversal is warranted because the prosecution during his closing made repeated personal attacks upon the character of appellant's counsel. To support this appellant completely misstates the record by taking words out of context and splicing them together in order to produce a distorted image of the prosecution's closing. We find no merit in appellant's argument.

Finally, appellant alleges that the State's closing was improperly designed to appeal to the passions, prejudices, and fears of the jurors. As appellant discusses, there are many cases that have been reversed because of such arguments, however, the numerous statements that appellant challenges here when viewed in context are pale in comparison.[32] We cannot conclude that the trial court erred in its determination to deny appellant's motion for a mistrial because of an improper closing argument; thus we must uphold the trial court's action.

## XV

The fifteenth contention of error is that there was insufficient evidence to convict the appellant on the conspiracy charges. After reviewing all of the evidence in a light most favorable to the appellee and drawing any reasonable inferences therefrom which support the verdict, for appellant to prevail on this challenge, we must conclude that reasonable minds could not believe the defendant guilty beyond a reasonable doubt *McCarty v. State*, Wyo. 1980, 616 P.2d 782; *Jones v. State*, Wyo. 1977, 568 P.2d 837; *Hurst v. State*, Wyo. 1977, 563 P.2d 232.

A criminal conspiracy occurs:

"If two (2) or more persons conspire to (a) commit a felony in the state of Wyoming or to commit an act beyond the state of Wyoming which if done in this state would be a felony, and (b) one (1) or more of such persons do any act, within or without the state of Wyoming, to effect the object of the conspiracy * * *." § 6–1–117, W.S.1977.

As stated in *Jasch v. State*, Wyo.1977, 563 P.2d 1327, 1332:

"A conspiracy is an agreement between two or more persons to do an unlawful

---

**32.** In passing we merely note that the *appellant's* closing may have been designed to appeal to the juror's emotions when it was stated:

" * * * I can invite your compassion and understanding to the problems with which Mark is now charged. But Omar Khayyam probably did it about as well as anybody else and this is what he said about the subject. This is something that I would ask that you bear in mind during the course of your deliberations, and also to think about in terms of the softening of the feeling and attitude which you may have against someone accused of murder, and to soften and to get you to reason in terms of those 500 years of experience based upon the evidence.

" 'So be it written in the book of love, I do not care about the book above. Erase his name or write it as you will, so you be written in the book of love.' Mark Allen Hopkinson. 'Erase his name or write it as you will, so you be written in the book of love.'

"Thank you."

act. The crime of conspiracy is complete when an agreement has been made and overt acts performed to further the unlawful design."

With respect to the conspiracy to murder Vincent Vehar, evidence was introduced through the testimony of Harold James Taylor that (1) Hopkinson contacted Taylor and offered to pay him two hundred dollars to beat up Vehar (T. Vol. VI, pp. 701–704); (2) Hopkinson provided Taylor with Vehar's address and offered to supply a photograph of Vehar (Id.); (3) the arrangement was altered when Hopkinson proposed to pay Taylor six hundred dollars if Taylor would kill Vehar (Id. at 705); (4) after telling Hopkinson he would do the job, Taylor received the money (Id. at 705–707); and (5) Taylor went to Evanston where Vehar lived but afterwards told Hopkinson that Vehar had a guard and that thus he would not be able to do the job. (Id. at 710)

Though Taylor claimed that he never had the intention of murdering Vehar because the circumstantial evidence conflicted with this statement, the jury, while weighing the testimony of Taylor regarding the conspiracy, was free to accept all, part, or none of his story. *Montez v. State*, Wyo. 1974, 527 P.2d 1330. Since Taylor confessed his fears concerning his criminal liability for his actions (T. Vol. VI, p. 750) it was reasonable for the jury to reject his statements that he never intended to carry through on his part of the deal, while accepting the rest of his testimony.

Based upon this testimony, the jury had before it evidence of an agreement and the transfer of money, an overt act, in furtherance of the agreement. Thus, the essential elements of a conspiracy to murder Vehar could reasonably have been inferred from the evidence.

As to the conspiracy to murder William Roitz, evidence was introduced through the testimony of Mike Hickey that (1) Hopkinson asked Hickey if he was capable of blowing up a house or car in order to scare some people for him (T. Vol. VII, p. 913); (2) Hickey said sure (Id. at 914); (3) Hopkinson then decided Hickey would instead have to murder somebody (Id. at

917); (4) Hopkinson offered Hickey two thousand dollars plus expenses to do the job (Id. at 916); (5) several ideas of how to do it were explored (Id. at 917–929); (6) Hopkinson, in May or June, concluded that he wanted William Roitz dead (Id. at 935); (7) a gun was obtained with which to shoot Roitz (Id. at 940–941); (8) Hopkinson and Hickey surveyed the area around Roitz's residence and discussed plans for the murder; and (9) the reason the plan was not carried through was because Hopkinson decided to have Hickey murder Vincent Vehar (Id. at 961).

From this testimony there was evidence of an agreement to do an unlawful act as well as evidence of overt acts performed in furtherance of the agreement. Thus, there was sufficient evidence for reasonable minds to conclude that the defendant was guilty beyond a reasonable doubt.

## XVI

The sixteenth issue also entails a sufficiency of the evidence question; however here the appellant challenges his conviction of murdering Jeff Green. As previously stated, after reviewing the evidence in the light most favorable to the verdict, in order for appellant to prevail we must conclude that a reasonable mind could not believe him guilty beyond a reasonable doubt. *McCarty v. State*, supra; *Jones v. State*, supra. Proof of each element of a crime may be established by either direct or circumstantial evidence. *Dryden v. State*, Wyo.1975, 535 P.2d 483. It is the jury's function to weigh the value of such evidence and draw such reasonable inferences as it sees fit. *Cloman v. State*, Wyo.1978, 574 P.2d 410. We will overturn a jury's verdict only where the jury has acted unreasonably in the performance of this role.

As to Hopkinson's involvement in the Jeff Green murder, the evidence which was adduced at trial included the facts that (1) Jeff Green knew of and was willing to testify about various crimes—including the Wyckhuyse murder, the Mariscal matter, and the conspiracy to murder Vehar—all of which circumstantially evinced Hopkinson's motive to silence Green; (2) Hopkinson had

not only threatened Green personally but also told Jennifer Larchick in March of 1979 that he was "going to get Jeff" (T. Vol. XI, p. 1219); (3) once imprisoned, Hopkinson discovered through phone calls to Jennifer that Green was talking to prosecutors investigating the Vehar bombing (T. Vol. XI, pp. 1224–1226); (4) Hap Russell visited Hopkinson in prison and, according to Russell's testimony, agreed to arrange to buy, for twenty thousand dollars, perjured testimony to be used to get Mark out of jail (T. Vol. XII, p. 1419); (5) Hopkinson called Larchick requesting her to send a photo of Green to Russell, which she eventually did (T. Vol. XI, pp. 1228–1237); (6) Russell, meanwhile, contacted several individuals in Salt Lake City in reference to the job Hopkinson wanted done, gave them Green's photo and became involved in large money transactions with them (T. Vol. XII, pp. 1485, 1500); (7) in the middle of May of 1979 Green went to his grandmother's funeral in Iowa (T. Vol. X, p. 1052); (8) at this time Hopkinson again commenced calling Larchick daily in order to check on Green's whereabouts and see if Jennifer would watch for cars with Utah license plates (T. Vol. XI, p. 1240); (9) Larchick informed Hopkinson that the grand jury investigating the Vehar bombing would be starting and that she was subpoenaed to testify on May 24th (T. Vol. XI, p. 1242); (10) Green turned up missing May 18th (T. Vol. X, pp. 1061–1062); (11) on the same day that Larchick informed him Green was missing, Hopkinson called Kristi King and requested that she allow him to deposit some money in her bank account (T. Vol. XII, p. 1629); (12) after she agreed, on May 21st King received word that fifteen thousand dollars had been deposited in her account (Id.); (13) meanwhile, Green was found dead on the 20th and on the same day Larchick informed Hopkinson of this fact (T. Vol. XI, p. 1245); (14) on May 22nd, King received a phone call from a man who identified himself as "Joe" and demanded that she deliver to him the money, which he claimed should have been twenty thousand dollars, that Hopkinson had sent her (T. Vol. XII, p.

1634); (15) the man also claimed to have gotten her unlisted phone number from Hopkinson (T. Vol. XII, pp. 1617, 1645); (16) King spoke to Hopkinson who begged her to give the money to Joe but when she refused told her to send the money on to his brother, Scott (T. Vol. XII, p. 1648); (17) King did send the money to Scott (Id.); (18) the day before Green was abducted Hopkinson attempted to locate a welder (T. Vol. XI, p. 1243); (19) a welder may have been used to heat the metal object with which Green's killers burned him before his death (T. Vol. X, p. 1163); and (20) Hopkinson had stated once that he had the ability to arrange to have "individuals fucked-up bodily for life." (T. Vol. V, p. 590).

Though Russell claimed that the various money transfers were to buy perjured testimony, there was sufficient circumstantial evidence to impugn this assertion. Thus, because of the conflict in evidence, the jury was entitled to reject that part of his testimony as an attempt to protect himself from a murder charge. *Montez v. State*, Wyo. 1974, 527 P.2d 1330.

Admittedly this evidence only circumstantially implicated Hopkinson in the murder of Green. However evidence is not reduced in value merely because it is circumstantial in nature. *McCarty v. State*, supra at 786. As was stated in *Wells v. State*, Wyo.1980, 613 P.2d 201, 202:

"* * * The law makes no distinction between direct and circumstantial evidence and only requires that the jury, before convicting a defendant, be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case. Circumstantial evidence has both standing and stature. [Citation]"

We conclude that based on the evidence presented in this case, the jury could have reasonably concluded that Hopkinson was guilty beyond reasonable doubt. The appellant received a fair trial in every respect as to all crimes charged.

## XVII

While the court is compelled to reverse the sentence of death, which we will later

explain, and the case will be remanded for a new penalty trial to determine whether the appellant should be sentenced to death or life imprisonment, we will still decide other issues to settle questions surrounding the death penalty phase as well as aid the trial court in its future disposition. There would be no object in remanding the case for a new penalty trial if the Wyoming death penalty statutes are for some reason unconstitutional. We further must pass upon the jury selection process in that the jury is selected in contemplation of it considering the life imprisonment or death after the guilt phase. Different standards apply to jury selection where the death penalty is involved and since a rehearing before a new jury on the matter of sentence is required, the trial court must be reassured of a proper process. It may further be of assistance to consider appellant's claims of error with respect to closing argument in the penalty trial. We, therefore, will cover all issues heretofore set out in the introduction to this opinion.

Appellant challenges the constitutionality of Wyoming's death penalty provisions. The contention is made that Wyoming's procedure is constitutionally inadequate under *Furman v. Georgia*, 1972, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, and its progeny. We disagree.

*Furman v. Georgia*, supra, marked the beginning of a new era in criminal law. The Court there for the first time was faced with the question of whether the death penalty was per se cruel and unusual punishment in this day and age. An extremely fractured Court ruled that, at least under the provisions before it, the death penalty did violate the Eighth and Fourteenth Amendments. However, the five justices reaching this conclusion each wrote his own opinion explaining why, and through these writings it became apparent that the decision was not premised upon a holding that the death penalty was per se unconstitutional. Instead the result turned upon a finding by several of the justices in the majority that the manner in which the death sentence was being imposed was impermissible. As was stated elsewhere:

"The majority rationale in *Furman* was calculated to avoid the traditional sentencing discretion which brings in its train state jury and judge 'pick and choose' elements of emotion, passion, prejudice, parochialism and personal predilections and aberrations. Deep down the rationale of that decision was to remove vindictive vengeance, class or race hatreds and prejudices, and allay the mistaken concept that the death penalty is a meaningful deterrent. In a word, the object of *Furman* was to read the Constitution in terms of the Twentieth Century.

"National standards for imposition of the death penalty pursuant to modern understanding of pertinent provisions of the United States Constitution are necessary for the protection of United States citizens, assuming, of course, any death penalties are to be meted. These standards according to the rationale of Furman should eschew all of the old nuances of passion, vindictive vengeance, parochial or provincial prejudices—as well as the psychological and philosophical predilections of the individual judge which often due to his upbringing affect his judgment as to whether the death penalty should be imposed in the particular case." *Spinkellink v. State*, Fla.1975, 313 So.2d 666, 672 (dissenting opinion).

Following the decision of *Furman*, there was an outcry for the reinstatement of the death penalty. As a result, legislators supporting the death penalty counted heads on the Supreme Court and determined that if done right, they could garner the requisite number of votes necessary for constitutional approval of a death penalty. The idea was to incorporate various safeguards into the sentencing procedure so as to allay the fears which several of the justices voiced in *Furman*. During the four years that followed, thirty-five legislatures enacted new provisions under which the death penalty would again be imposed.[33] In 1976 the Supreme Court was called upon to determine

---

**33.** See *Gregg v. Georgia*, 428 U.S. 153, 179, 96 S.Ct. 2909, 2928, 49 L.Ed.2d 859, 878, fn. 23.

the constitutionality of the sentence procedure found in these newly adopted statutes. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.

Again the court fragmented. In the lead case, *Gregg v. Georgia,* supra, three basic approaches were outlined. But due to the nature of the Court's split—two-three-four—it was upon the approach authored collectively by Justices Stewart, Powell and Stevens that the result in each case turned. Their approach occupied something of a middle ground; in whatever manner a case would be decided under it, enough concurring votes were present to insure that Stewart, Powell and Stevens were in the majority. In all the death penalty cases that have followed, these three justices' votes have been decisive. Therefore, for all practical purposes their opinions must be viewed as establishing the constitutional limitations upon the imposition of the death penalty.

These justices rejected the argument that the death penalty is per se unconstitutional. While reviewing the challenge made in *Gregg,* the three justices noted that:

" * * * the Eighth Amendment has not been regarded as a static concept. As Mr. Chief Justice Warren said, in an oft-quoted phrase, '[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' [Citations] Thus, an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment. * * * [T]his assessment does not call for a subjective judgment. It requires, rather, that we look to objective indicia that reflect the public attitude toward a given sanction.

"But our cases also make clear that public perceptions of standards of decency with respect to criminal sanctions are not conclusive. A penalty also must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' [Citation] This means, at least, that the punishment not be 'excessive.' When a form of punishment in the abstract (in this case, whether capital punishment may ever be imposed as a sanction for murder) rather than in the particular (the propriety of death as a penalty to be applied to a specific defendant for a specific crime) is under consideration, the inquiry into 'excessiveness' has two aspects. First, the punishment must not involve the unnecessary and wanton infliction of pain. [Citations] Second, the punishment must not be grossly out of proportion to the severity of the crime. [Citations]" 428 U.S. at 173, 96 S.Ct. at 2925, 49 L.Ed.2d at 874–875.

But, as the justices further elaborated: " * * * the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts. * * *

 * * * * * *

"Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

"This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' * * * " 428 U.S. 174–175, 96 S.Ct. at 2926, 49 L.Ed.2d at 875–876.

Because of the societal support for the death penalty that was evinced by the large number of jurisdictions adopting it in the four years immediately following Furman

and because of the legitimate state purposes the justices determined were advanced by the imposition of the death penalty, they concluded that:

"* * * the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." 428 U.S. 187, 96 S.Ct. 2932.

We find this logic compelling. Moreover, in *Kennedy v. State*, Wyo.1977, 559 P.2d 1014 [34] when this court struck down Wyoming's previous death penalty statute, the decision was based entirely upon the statute's failure to comport with the standards announced in *Gregg* and its companion cases and in that connection pointed out that those cases:

"* * * demonstrate that to successfully withstand attack upon constitutional grounds there must be provided in the statute standards to guide and control the exercise of discretion by the sentencing authority in its determination of the propriety of the application of the death sentence, or the alternative of a term of life imprisonment. There must further be provided a procedure by which the fact finder can consider and examine any and all aggravating and mitigating circumstances and the character and situation of the individual defendant, upon which the final determination is made. A proper record of the findings which are used as the basis for the infliction of this penalty must be preserved to enable a reviewing court to determine the reasonableness

and the propriety of the application of such sentence. The Wyoming statute under scrutiny does not meet these requirements." 559 P.2d at 1016.

This court in Kennedy did not reach nor did it decide that the death penalty is unconstitutional per se. This court did not hold that Article I, § 14 of the Wyoming Constitution [35] was any more exacting than the Eighth Amendment to the U. S. Constitution.[36] It is, therefore, our opinion that a rigorous examination of a sentence of death, conducted in accord with *Furman* and *Gregg* will satisfy both the U. S. and the Wyoming constitutional requirements.

The Wyoming death penalty statutes [37] require that all persons convicted of first degree murder must be sentenced to either death or life imprisonment. Before an individual can be given the death penalty, a sentencing hearing must be conducted. This hearing, separate from the trial, must be held before the jury unless the trial was to a judge only, the defendant pled guilty, or the right to a hearing before the jury was waived.

During the hearing, the usual exclusionary rules of evidence do not apply. Hearsay is admissible so long as the defendant receives a fair opportunity to rebut it. Prehearing notice of evidence offered to show the existence of aggravating circumstances is a prerequisite for its admissibility. The one further limit on the admissibility of evidence is that it must be relevant to the sentencing; this determination is made by the judge.

**34.** Within a month of this court's decision in that case ruling that the old Wyoming death penalty provisions were unconstitutional, the Wyoming State Legislature adopted a new death penalty scheme. This clearly demonstrates the extent to which this state's contemporary standards have developed.

**35.** Article I, § 14, Wyoming Constitution:

"All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted."

**36.** Eighth Amendment to the U. S. Constitution:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

**37.** Sections 6–4–102 and 6–4–103, W.S.1977. See fns. 1 and 2, supra. For discussion of the statutes, see "McCall, The Evolution of Capital Punishment in Wyoming: A Reconciliation of Social Retribution and Humane Concern?" 13 Land & Water L.Rev. 865 (1978).

Following the submission of the evidence and closing arguments, the judge must consider—or when the hearing is before a jury, instruct the jury to consider—any and all aggravating circumstances or mitigating circumstances. The nature of these circumstances is discussed in the statute.[38] Before the trier of fact can impose the death penalty, it must find in writing that at least one aggravating circumstance exists beyond a reasonable doubt, and that any circumstances so proved outweigh any and all mitigating circumstances. If this conclusion is reached, the death penalty not only can be given but must be; the judge has no ability to overrule the jury's determination, short of finding, as a matter of law, the evidence insufficient to support the jury's conclusion.

A sentence of death is subject to automatic review by this court. We must consider, not only the errors enumerated by way of appeal, but also whether the sentence was the product of any arbitrary factor, the evidence supports the findings of the trier of fact, and the sentence is excessive or disproportionate when compared to similar cases. In addition to affirming or reversing the underlying conviction, we may affirm the sentence of death, set aside the sentence and impose a sentence of life imprisonment, or remand for resentencing by the trial judge.

This statutory scheme was patterned after portions of the Georgia and Florida statutes which received constitutional approval in Gregg and Proffitt, supra. McCall, supra fn. 37, 13 Land & Water L.Rev. at 894. However, as stated by Justices Stewart, Powell and Stevens in Gregg:

"We do not intend to suggest that only the above-described procedures would be permissible under Furman or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of Furman,[46] for each distinct system must be examined on an individual basis. Rather, we have embarked upon this general exposition to

make clear that it is possible to construct capital-sentencing systems capable of meeting Furman's constitutional concerns." (Footnote omitted.)

Footnote 46 provided:

"[46] A system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman could occur." 428 U.S. at 195, 96 S.Ct. at 2935, 49 L.Ed.2d at 887.

Thus we must carefully review appellant's specific challenges to the Wyoming death penalty provisions and insure that they comport with Furman and Gregg.

Appellant's first challenge focuses upon § 6–4–102(h)(vii). There the statute lists as an aggravating circumstance that the murder, for which the defendant has been convicted and is being sentenced, "was especially heinous, atrocious or cruel." Appellant essentially argues that a jury could find any murder to be "especially heinous, atrocious or cruel" and therefore conclude that an aggravating circumstance is present which outweighs all mitigating circumstances and accordingly impose the death penalty. This he contends gives a jury "free rein to decide to sentence a person to death," and denigrates the meaning of Furman and Gregg. Appellant's brief, p. 113.

■ We disagree with appellant's conclusion. The statute does *not* fail to properly channel the jury's sentencing decision and does *not* grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons. First, the statute requires the jury to find the murder to have been "especially heinous, atrocious or cruel." Webster's Third New International Dictionary defines heinous as "hatefully or shockingly evil." Thus the term "especially heinous" is more than just hatefully or shockingly evil. The murder, to be so classified, must demonstrate that the consciencelessness of the defendant is not only an outrage but also a dangerous and unre-

---

**38.** Section 6–4–102(h) and (j), W.S.1977. See fn. 1, supra.

strainable threat to society. Only when this is found can the murder properly be categorized as especially heinous. Since very few murders can be regarded in this manner, the term is *not* impermissible and vague.

■ As to the terms especially atrocious or cruel, we adopt the definition of these terms established in the jurisdiction from whence the state legislature borrowed them. See, *Woodward v. Haney*, Wyo.1977, 564 P.2d 844. In this case the statute was derived from Florida's. Its interpretation of these terms was discussed by Justices Stewart, Powell and Stevens in *Proffitt* as follows:

" * * * In particular, the petitioner attacks the eighth * * * statutory aggravating circumstances, which authorize the death penalty to be imposed if the crime is 'especially heinous, atrocious, or cruel,' * * * §§ 921.141(5)(h), * * * (Supp.1976–1977). These provisions must be considered as they have been construed by the Supreme Court of Florida.

"That court has recognized that while it is arguable 'that all killings are atrocious, * * * [s]till, we believe that the Legislature intended something "especially" heinous, atrocious or cruel when it authorized the death penalty for first degree murder.' *Tedder v. State* [Fla.], 322 So.2d [908], at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.' *State v. Dixon* [Fla.], 283 So.2d [1], at 9. See also *Alford v. State* [Fla.], 307 So.2d 433, 445 (1975); *Halliwell v. State* [Fla.], [323 So.2d 557] at 561.[12] We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases. * * * "

Footnote 12 provided:

"[12] The Supreme Court of Florida has affirmed death sentences in several cases, including the instant case, where this eighth statutory aggravating factor was

found, without specifically stating that the homicide was 'pitiless' or 'torturous to the victim.' See, e. g., *Hallman v. State*, 305 So.2d 180 ([Fla.] 1974) (victim's throat slit with broken bottle); *Spinkellink v. State*, 313 So.2d 666 (1975) ('career criminal' shot sleeping traveling companion); *Gardner v. State*, 313 So.2d 675 ([Fla.] 1975) (brutal beating and murder); *Alvord v. State*, 322 So.2d 533 ([Fla.] 1975) (three women killed by strangulation, one raped); *Douglas v. State*, 328 So.2d 18 ([Fla.] 1976) (depraved murder); *Henry v. State*, 328 So.2d 430 ([Fla.] 1976) (torture murder); *Dobbert v. State*, 328 So.2d 433 ([Fla.] 1976) (torture and killing of two children). But the circumstances of all of these cases could accurately be characterized as 'pitiless' and 'unnecessarily torturous,' and it thus does not appear that the Florida Court has abandoned the definition that it announced in *Dixon* and applied in *Alvord, Tedder,* and *Halliwell.*" 428 U.S. at 255–256, 96 S.Ct. at 2960, 49 L.Ed.2d at 924–925.

■ Further, this construction of our statute is consistent with constitutionally valid state interests behind the death penalty. In particular, we cite Justices Stewart, Powell and Stevens in *Gregg* where they recognized:

"Another purpose that has been discussed is the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future. See *People v. Anderson*, 6 Cal.3d 628, 651 [100 Cal.Rptr. 152, 168], 493 P.2d 880, 896, cert. denied, 406 U.S. 958 [92 S.Ct. 2060, 32 L.Ed.2d 344] (1972); *Commonwealth v. O'Neal*, supra [369 Mass. 242], at 259–260, 339 N.E.2d [676] at 685–686." 428 U.S. at 183, 96 S.Ct. at 2930, 49 L.Ed.2d at 880, fn. 28.

As we read "especially heinous" the thrust of this term is to sanction the death penalty for individuals who not only may, but probably will, kill again. This interest in protecting society is a proper state purpose.

Our inquiry does not end with the conclusion that the statute provides the jury adequate guidance when imposing the death

penalty. We must determine whether there exists a check upon the jury which will insure that the death sentence is not imposed "on a capriciously selected group of convicted defendants." 428 U.S. at 258, 96 S.Ct. at 2969. In the provisions before us, we find sufficient checks. First, the trial judge has the ability, as in all matters submitted to a jury, to rule that the evidence is insufficient as a matter of law to uphold the jury's findings. This is permissible; as stated in *Gregg*:

> "The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." (Footnote omitted.) 428 U.S. at 199, 96 S.Ct. at 2937, 49 L.Ed.2d at 889.

The other check on the jury is the mandatory review which must be conducted by this court. Our job is to insure that the jury's determination is not the product of any arbitrary factors, and that there is consistency among the cases in which the death penalty is given. This inquiry into the propriety of the proceedings below is aided by the report which § 6–4–103(b), W.S.1977 requires the trial judge to prepare. Since we intend to rigorously examine all death sentences, we do not agree with the appellant that the jury has free rein to impose the death penalty.

Further, appellant's reliance upon *Godfrey v. Georgia*, 1980, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, is misplaced. There the issue was whether the Georgia Supreme Court had adopted such a broad and vague construction of "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" [39] so as to violate the constitutional limits recognized in *Furman* and *Gregg*. The U. S. Supreme Court decided that these limits were breached. The opinion of Justice Stewart, in which Justices Blackmun, Powell and Stevens joined stated:

> "Thus, the validity of the petitioner's death sentences turns on whether, in light of the facts and circumstances of the murders that Godfrey was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the phrase 'outrageously or wantonly vile, horrible or inhuman in that [they] involved * * * depravity of mind. * * *' We conclude that the answer must be no. The petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner v. Florida*, 430 U.S. 349, 358 [97 S.Ct. 1197, 1204, 51 L.Ed.2d 393], it 'is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'
>
> "That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. Accordingly, the judgment of the Georgia Supreme Court insofar as it leaves stand-

**39.** Ga.Code Ann., § 27–2534.1(b)(7).

ing the petitioner's death sentences is reversed, and the case is remanded to that court for further proceedings." 446 U.S. at 432–433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409. (Footnotes omitted.)[40]

Our interpretation of "extremely heinous, atrocious or cruel" clearly distinguishes between murder cases and provides a principled way to determine whether the death penalty should be imposed. We will not allow caprice or emotion to become a determinative factor in imposing the death penalty. Thus we conclude *Godfrey* does not require us to hold that our statute is unconstitutional.

Appellant's next challenge to the statutory scheme set forth in § 6–4–102, W.S.1977, is that by removing the judge from the decision making process when the hearing is before a jury the statute has "left out" an important check on the jury. This argument is unconvincing. As in all matters submitted to a jury, it is the judge's role to resolve questions of law and the jury's to resolve questions of fact. If the judge concludes that as a matter of law there is no question of fact to submit to a jury, then he can decide the case; this is true here.

An additional safeguard is present under the statutory scheme; all death sentences are subject to automatic review by this court. It is our role under the statute to guard against jury excesses and to insure that the death penalty is warranted and constitutionally permissible in any particular instance.

In *Gregg v. Georgia*, the U. S. Supreme Court approved a similar sentencing procedure which provided that the trial judge was bound by the jury's recommended sentence. Ga.Code Ann. §§ 26–3102, 27–2514 (Supp.1975). Thus we conclude that this provision is not inherently unconstitutional.

Another challenge the appellant makes to Wyoming's death penalty provision is that the statute does not specifically remove from the scope of a capital offense the concept of felony murder. He contends that this failure violates *Lockett v. Ohio*, 1978, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. First, we do not believe that appellant has standing to raise this issue since his conviction of first degree murder is not premised upon the concept of felony murder, but instead is based upon his being an accessory before the fact. We believe the appropriate time to consider the issue is when a case arises involving it since if it is impermissible the whole statute need not be struck down.

Second, his challenge completely misunderstands *Lockett*. The Supreme Court determined there, that the Ohio provisions unconstitutionally limited the mitigating circumstances which could be considered by the jury. As the plurality opinion of Chief Justice Burger stated:[41] "To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." 438 U.S. at 608, 98 S.Ct. at 2967, 57 L.Ed.2d at 992.

However, appellant's final challenge does raise this point. He argues that "the statute unreasonably narrows the determination of the sentencing authority of

---

**40.** The following Georgia death penalty cases were cited approvingly in footnote 14: *Thomas v. State*, 1977, 240 Ga. 393, 242 S.E.2d 1 (victim was decoyed and robbed at gunpoint, then struck on the head with a hammer, shot with a pistol, jabbed with the cutting point of a shovel and buried alive while pleading for his life); *Stanley v. State*, 1977, 240 Ga. 341, 241 S.E.2d 173 (Thomas' accomplice in preceding case); *Dix v. State*, 1977, 238 Ga. 209, 232 S.E.2d 47 (defendant's former wife was deliberately and methodically tortured by being cut and carved as well as strangled before being killed); *Birt v.*

*State*, 1976, 236 Ga. 815, 225 S.E.2d 248 (defendant hired to burglarize house of victims who he tortured by repeated strangulation and burned with cigarette lighters); *McCorquodale v. State*, 1974, 233 Ga. 369, 211 S.E.2d 577 (seventeen year old victim's genitals were burned and cut, she was then raped and strangled, and finally defendant grabbed her head and twisted it in order to break her neck).

**41.** This portion of the opinion was joined only by Justices Stewart, Powell and Stevens.

mitigating factors to those listed in the statute." (Appellant's brief, p. 120) We, however, do not agree with this reading of the statute. Section 6–4–102(h) specifically limits the aggravating circumstances to those listed, while subsection (j) merely states that "[m]itigating circumstances shall be the following." This means that the jury is free to consider other mitigating factors. And in this case the jury was so instructed. See issue XX, infra. Furthermore, Florida's identically worded statute received approval in *Proffitt*, supra, 428 U.S. at 250, 96 S.Ct. at 2965–66, 49 L.Ed.2d at 922, fn. 8.

Thus, we must conclude that the death penalty provisions adopted by Wyoming and applied in this case are *not* unconstitutional on their face.

## XVIII

The eighteenth issue presented in this appeal concerns the propriety of the voir dire in this, a capital case. Appellant asserts that it was error for the district court to excuse for cause prospective jurors who stated unequivocally that they could not ever impose the death penalty. In support of his argument, appellant has advanced two theories. First, noting that *Sims v. State*, Wyo.1972, 496 P.2d 185, is the lodestar in Wyoming, he claims that it was wrongly decided because it ignores § 7–11–105, W.S.1977, in pertinent part:

"(a) The following shall be good cause for challenge to any person called as a juror on any indictment:

\* \* \* \* \* \*

"(iii) In indictments for an offense, the punishment whereof is capital, that his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death;

\* \* \* \* \* \*

"(b) The same challenges for cause shall be allowed in criminal prosecutions that are allowed to parties in civil cases. \* \* \*"

He argues that (a)(iii) only permits the challenge for cause of a juror if his belief against capital punishment will prevent him from finding the accused *guilty* of murder in the first degree.

We do not construe § 7–11–105(a)(iii) in such a fashion. When the prosecutor makes it clear that the death penalty is being sought, then (iii) by its clear language declares it cause if the prospective juror cannot return the death penalty. Any other construction would be absurd. We will agree that the section is poorly worded in view of the most recent amendment to statutes authorizing the death penalty. This court held in *State v. Aragon*, 1930, 41 Wyo. 308, 316, 285 P. 803, 806 that under such a statute a juror may be challenged for cause if he has conscientious scruples against the punishment of death. However *Aragon* has been superceded by further refinements in *Pixley v. State*, Wyo.1965, 406 P.2d 662, holding that the unwillingness on the part of a juror to inflict the death penalty under any circumstances would be an unwillingness to properly execute the laws of this state. *Sims* finally settles the rule.

We cannot overlook subsection (b) providing that, "The same challenges for cause shall be allowed in criminal prosecutions that are allowed to parties in civil cases." In § 1–11–203(a)(vi), W.S.1977, challenges for cause in civil cases are established as follows:

"(a) Challenges for cause may be taken on one (1) or more of the following grounds:

\* \* \* \* \* \*

"(vi) Having formed or expressed an unqualified opinion or belief as to the merits or the main question of the action. The reading of newspaper accounts of the subject matter before the court shall not disqualify the juror either for bias or opinion."

Whether or not the death penalty will be imposed is one of the main questions in a capital case. An unqualified opinion that under no circumstances could the prospective juror vote for it is a proper ground for a challenge for cause under the statute. *Sims* was correctly decided.

Appellant's second claim advanced during oral argument is that we should reject the reasoning in *Witherspoon v. Illinois*, 1968, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and hold it constitutionally impermissible to allow any jurors to be dismissed from a capital case because they are unequivocally opposed to the death penalty. Appellant's argument is nothing more than "a veiled contention" that we should outlaw capital punishment "by placing totally unrealistic conditions on its use." *Gregg*, supra, 428 U.S. 199, fn. 50, 96 S.Ct. 2937, fn. 50. Under appellant's approach, if the State were unable to peremptorily challenge all prospective jurors adamantly opposed to the death penalty, then the death penalty would not be imposed. If this *always* occurred, then in effect we would have judicially repealed the death penalty.

Another problem arises if the situation were to occur on a less frequent basis. Then the death penalty's imposition would be dependent upon an arbitrary factor which *Furman* and *Gregg* ruled impermissible.

▆▆ Thus, since we cannot accept either possibility, we must reject appellant's argument and rule that *Witherspoon* provides the governing standards. As was stated in *Adams v. Texas*, 1980, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581, which reaffirmed *Witherspoon*, "We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." 100 S.Ct. at 2529.

Appellant also claims that even under *Witherspoon* the voir dire was conducted improperly in that two jurors who indicated that they would be reluctant to impose the death penalty were excused for cause. Appellant's brief, p. 20. However, appellant misrepresents the record. With regard to the first prospective juror the following occurred:

"MR. SPENCE: How do you feel, Mr. Becker, about the death penalty?

"MR. BECKER: I've never been sure. As you said, a double standard, I feel if I suffered a loss perhaps I would think it was justified but in my position I think it would be very, very difficult for me to hand down that particular sentence.

\* \* \* \* \* \*

"[MR. SPENCE:] \* \* \* Now, supposing and I don't like to say supposing but let's say the facts and the circumstances are such that you find the defendant guilty of first degree murder on one or more of the four counts of murder and you find one or more of the aggravating circumstances to exist. Could you then return the death penalty?

"MR. BECKER: I don't know. I honestly don't. I don't know whether I could or not.

\* \* \* \* \* \*

"THE COURT: Let me ask you a question, Mr. Becker, would you vote against the imposition of the death penalty no matter what the evidence might reveal?

"MR. BECKER: No, sir.

"MR. SPENCE: Am I hearing you correctly that under some circumstances you might vote for the death penalty?

"MR. BECKER: I say I might, but as I say this is a real touchy situation for me. If you were to ask me emphatically no way on the face of this earth that I would ever vote for it I would have to say that I would, perhaps.

"MR. SPENCE: Would perhaps?

"THE COURT: I understand the problem.

"MR. BECKER: I'm trying to be as clear as I can.

"THE COURT: I understand." (T.Vol.I, pp. 112–115)

Then, after the court refused to excuse the juror for cause, at a sidebar conference:

"MR. SPENCE: All right. I am going to tell him how it is and just lay it out to him and deal with it because we have to deal with it. I can't deal with him on an unequivocal basis. He has to fall one way or another.

"MR. VAN SCIVER: The guy's been wrestling with it and having a tough time emotionally. To continue with him alone

seems to me—I mean, he's going to get around to saying it. He's tried his best to answer. I think he ought to move on to someone else. I don't think that the distinction's been made about finding first degree as one process of the trial and that the recommendation of the penalty is another.

"MR. SPENCE: I'll try to do that for you and try to conduct it in a way that will suit both of us.

"THE COURT: Do this for me. Go to another juror for awhile.

"MR. SPENCE: Okay.

"THE COURT: Right now. I'll not excuse him for cause.

"MR. SPENCE: Okay." (T.Vol.I, pp. 116–117)

When the prosecutor returned to Mr. Becker, the following transpired:

"MR. SPENCE: Okay. Now, we are back to Mr. Becker. Have you had a chance, Mr. Becker, to sort of think about this?

"MR. BECKER: Yes, sir.

"MR. SPENCE: Give me the bottom line.

"MR. BECKER: The bottom line is I understand the legality but I really feel that I could not. I just couldn't. And that's my honest opinion.

"MR. SPENCE: Despite what the evidence is?

"MR. BECKER: Despite the evidence. Life imprisonment, fine. Ten consecutive life sentences, whatever, but I just don't feel that I could come with the death penalty.

"THE COURT: Regardless of the evidence?

"MR. BECKER: The death penalty, regardless of the evidence, I could not do it.

"THE COURT: All right. Step down." (T.Vol.I, pp. 140–141)

We find no error in this. The juror, after having been left alone for a period of time, concluded that he could not give the death penalty regardless of the circumstances. Under *Witherspoon, Sims* and *Adams* it was proper to excuse him for cause.

The second juror whose excusal for cause appellant challenges as improper was a cook in a hospital. As to her dismissal the record reflects the following:

"MR. SPENCE: The test as to whether or not you can be excused is irrespective of what the evidence is on the death penalty phase of the case. We passed the first degree murder stage and we are now down here on the second part.

"The test is: Irrespective no matter what the testimony was or the evidence was, is it true you could not return the death penalty?

"MS. ANDERSEN: I don't think I could.

"MR. SPENCE: Thank you, your Honor.

"THE COURT: Well, that's equivocal.

"MR. SPENCE: The word you're hung up on is 'I don't think.' Could you or couldn't you?

"MS. ANDERSEN: No, I couldn't.

"MR. SPENCE: Thank you. I ask she be excused.

"MR. VAN SCIVER: Just a minute. Let me ask it this way: Under any circumstances you could not return it? Or before you answer let me say this: You understand that you will receive evidence and Mr. Spence suggested aggravating and mitigating circumstances which is really simply saying good or bad.

"MS. ANDERSEN: Right.

"MR. VAN SCIVER: Even if there were no good and they were all bad, are you saying you could not?

"MS. ANDERSEN: There should be another way. I wrestled with this all night, believe me. I could not.

"MR. VAN SCIVER: Okay. Could you find—maybe I should ask it this way: You know, there are several degrees of murder or homicide. It might be broken down into first degree murder, second degree murder, manslaughter and another degree of manslaughter.

"Would you feel that you could not convict on first degree murder because you might have to impose a death penalty

and, therefore, never find a verdict of first degree murder?

"MR. SPENCE: I think that question is now immaterial, your Honor.

"THE COURT: Well, counsel has a right to ask those questions in a case like this. Ms. Andersen, let's see if I understand how you feel.

"Yes, you could return a verdict of first degree murder if the evidence indicated to you under the law that that was a proper verdict; is that correct?

"MS. ANDERSEN: Yes.

"THE COURT: But having done so when you went back in the jury room, if that should happen, you would not vote for the death penalty no matter what the evidence; is that correct?

"MS. ANDERSEN: Maybe I sound like I'm contradicting myself. I don't know. But to me I think everyone is entitled to life. I don't believe anyone is entitled to take a life which I would be doing if I voted for the death penalty.

"THE COURT: The motion to excuse this juror for cause is denied. She's unequivocal [equivocal] about it. She stays on.

\* \* \* \* \* \*

"MR. SPENCE: And with your concern about the death penalty wouldn't it be fair to say you don't feel you would be a very good juror in this case?

"MS. ANDERSEN: I don't think I would.

"MR. SPENCE: You think it would be difficult, if not impossible, for you to give both sides a fair trial just because of that; isn't that true?

"MS. ANDERSEN: Yes.

"MR. SPENCE: Thank you. Now, may I approach the Bench?

"THE COURT: No.

"MR. SPENCE: All right. I again renew my motion made at the Bench.

"THE COURT: What's your position, Mr. Van Sciver?

"MR. VAN SCIVER: I would object to it or except to the request that she be excused.

"THE COURT: All right. You're excused.

"MS. ANDERSEN: Thank you. (Leaves courtroom)" (T.Vol.II, pp. 255–257, 263)

■ We find that based on the record, Ms. Andersen was properly excused. It appears clear that under no circumstances would Ms. Andersen have voted for the death penalty nor could she have been fair and impartial. Thus we conclude that no error was present in the voir dire examination of the jurors because of the capital nature of the case.

XIX

The next challenge to the proceedings that we consider is whether the prosecution's closing in the penalty phase was improper. Appellant alleges that the prosecutor, during his closing in the penalty stage, referred to phone calls Jim Taylor received from the mysterious Joe. While carefully examining every word of the transcript of the prosecutor's closing, we were unable to discover any mention of Joe. Thus we can find no merit in his argument in that regard.

Appellant also argues that:

"In the penalty phase all semblance of proper argument was dropped. The information the jury was given which is pertinent to this point on appeal was that the case 'affected the lives of our staff and the fear and problems that have arisen as a result of this case' (Transcript, Vol. XV, p. 2003). 'Is it reasonable that if Mr. Hopkinson is sentenced to prison he will use the prison as a plotting ground for future murders?' (Id., p. 2012.)

"The State continued by stating 'we' all weeped together on this case and then went on to give a personal opinion on the death penalty (Id., pp. 2025–2028).

" 'We have been in fear, my family and I. My wife, my children \* \* \* whole communities of people who have been put in fear \* \* \* the case has something to do with little children having difficulty to sleep, nightmares in the night. (Id., pp. 2029–2030.)

" 'I haven't been free nor my family. We have been captives and we have a right to be free. I have been a captive along with my staff and my family, their families, of fear. We have the right to go places without guards. * * * We have been deprived of those rights. You have similar rights. (Id., p. 2031.)' "The defendant 'will kill one and all anytime.' (Id., p. 2033.) 'If he's in prison for a lifetime he has * * * an opportunity to arrange murders as you have found he has done in this case * * *. If he is spared, others will be sacrificed.' (Id., pp. 2033–2034.) The jury was told they had a right to live and be free from fear and go to bed at night and know they would awaken unharmed. (Id., pp. 2035–2036). They were told that 'Mark Hopkinson would destroy us' and that he must be killed 'to save and defend life' (Id., pp. 2039–2040). The 'pain and horror' of the Vehars and Greens was discussed (Id., p. 2046), as were the economic costs of the trial and the economic losses caused by the victims' deaths (Id., pp. 2046, 2049). Finally, he told the jury that there were those in the defendant's family who might avenge his death (Id., p. 2047). Essentially, the theme of the State was that the defendant was to be put to death to spare future lives. * * *" Appellant's brief, pp. 104–105.

We disagree with appellant's contention that the closing was improper. In order to demonstrate the fallacies in his position, we will quote extensively from the prosecutor's closing in the penalty phase:

"Now, I want to start out, ladies and gentlemen, by commenting a little bit about our system. It's called an adversary system. We are combatants in a ring. We are adverse to each other. You have seen that in the courtroom. Each supports his own side; each puts it all in and then the jury weighs and balances even to the point of deciding life and death. You are called upon in an adversary system to make judgments, to weight [sic] the evidence. And now to weigh the mitigating against the aggravating and it's the duty of all of us, both sides, to be a good advocate and to put it all in and to fight fully for the cause of our clients, and to do anything else would be wrong. It would be like a fighter throwing a fight. And there's been many a football player, ladies and gentlemen, who have fought and played hard for coaches and owners who they didn't like or who they didn't believe in.

"And now, you know, you are entitled to know something of me as a person. Not as an advocate. I want to talk to you about Gerry Spence for just a moment as a person because to the same extent that you bring your personhood in this case as jurors, to the same extent that Mr. Hopkinson brings his personhood in here as a defendant, I bring my personhood in here as an attorney. * * * But the time has come for me to come out, I think, from behind my advocate role and to let you know how I feel as a person. And the reason I do that is because I think you're entitled to that. I have asked you personal questions. I asked you those first before you were even chosen as jurors in this case. You told me personally how you were. I want you to know, ladies and gentlemen, and I am going to say it to you just as straight as I can, that I am now and have always been opposed to the death penalty. I have never seen a man like Mark Hopkinson before who in a way is arrogant and with respect to his victims unfeeling; with respect to his victims insensitive; with respect to those who crossed him vindictive. I have never seen a man who has come from a background of hate and who will kill for as little concern as almost as if he were involved in a backgammon game.

"I have not believed ever in killing to avenge killing. Mostly I have despised the death penalty because it shows no respect for life. It asks to take life for life. It asks to take life for having taken life. It argues that to save life we take life. And those arguments simply haven't been proven to me.

"Recently I have thought of the death penalty in another way. You know we learn things from our experience. We have

been in fear, my family and I. My wife, my children—

"MR. VAN SCIVER: I'm going to object to that.

"THE COURT: On what ground?

"MR. VAN SCIVER: There's no evidence of that and that's not proper argument.

"THE COURT: Overruled.

"MR. SPENCE: And, you know, the members of our family, and I only talk to you about our family because I only know about my family and I'm talking to you as a person as compared, say, to a community like Ft. Bridger where there are whole communities of people who have been put in fear. And I never experienced what that was like before in this case, before this case. And it has something to do with waking up and wondering and worrying, being concerned, being afraid, little children having difficulty to sleep, nightmares in the night. And so out of that whole thing comes another issue to me. For the first time an issue came that I have never thought about before as an attorney or as a person and that is the issue of survival. It was the same issue of survival for old Mr. J. R. Goo and for all of the people in this case that have in one way or another drug up their courage sufficiently to testify from this witness stand and they have been frightened people. On the issue of survival, not the issue of punishment. Not on the issue of punishment but on the issue of survival on the right to survive which is an inate [sic] right of all beings, of all living things. Whether it's a dandelion that hugs the ground to get the warmth of the ground and to save itself from the fall frost so that it can bloom, or whether it is a rabbit running from a coyote or whether it's you or me, the right to survive is an inate, [sic] God given natural right that all of us have.

"And society, ladies and gentlemen, every society in the world from our tribal beginnings have had the right to kill our enemies so that we can survive. We have the right to survive. We have the right to kill germs, to kill mad dogs, to kill snakes, to fight disease. We have as a nation have killed rightfully to survive as a nation, hundreds of thousands of people in order to survive. You heard Mr. Moriarity call that a right to self defense. Society's right to self defense. It belongs to everyone of us. It belongs to you and it belongs to me.

"Now, we haven't been free, none of us. I haven't been free nor my family. We have been captives and we have a right to be free. I have been a captive along with my staff and my family, their families, of fear. We have the right to go places without guards, go to movies, live our lives, to go to the grocery store, to go to the office, to go to work, to go to bed. Those are rights that belong to us. We have been deprived of those rights. You have similar rights. The people in Bridger Valley have similar rights.

"You know, unless we can, as a society, have laws and rules and order and protect ourselves we cannot as a society survive. None of us. *And I want you to hear me say to you that I am not talking now about Mark Hopkinson. I am talking about the very basic underlying right of an entire society to survive and unless that right is somehow protected and if people don't have the courage to protect it, then we have no right to survive.* [Emphasis added.]

"Now, I want to point out to you that I am talking to you still as Gerry Spence. As I talk to you as a person my ideas about this may not meet yours. And I have always respected contrary opinions on this subject and I would respect yours if they are different from mine, and I respected the people who had different ideas than mine when they walked out of this courtroom and were excused from jury duty, and I want you to know in matters as fundamental as life and death everyone of us have our own particular right to our own particular opinion and nobody should criticize that. But to me, for Gerry Spence, killing for punishment is different from killing to survive. One cannot punish Mark Hopkinson by killing him. That's silly. To be punished implies that one has to live. One doesn't punish the dead. And so it's obvious to me that the death penalty, as we

call it, is a misnomer. It's not punishment at all. It has to be seen as something else. I have never been able to understand how people thought that they could stop killing by punishing by killing. I never have understood how we could condemn killers and then become killers ourselves in the name of punishment. I have not understood how we could respect life and then show respect for life by killing. I have seen killers as I see Mark Hopkinson as our product. He is our product. Our mistake. Our society's reject. A little boy who didn't get what he needed to grow up straight and strong and who was fed the wrong nourishment. As a child the nourishment of hate and of hurt and of distrust and of fear, instead of love and security. And I don't blame his mother and his father. It can happen. It does happen. None of us know why. None of us for sure understand but he is our product. Whether we like it or not he is the child of our society and he's a killer and he's a liar and a criminal, and he is a man without morals, without principals [sic] and values and he's empty of feelings for those who he destroys and he knows very little of love and he will kill one and all anytime—

"MR. VAN SCIVER: Your Honor, that's not proper.

"*MR. HOPKINSON: Let him go. I would like him to say what he wants to say, your Honor.* [Emphasis added.]

"MR. SPENCE: For very little provocation. And so what do we do with him? What do we do with our product? There is an old saying, and it's true, an old cliche that says something about: Don't tell me who you are, don't tell me what you'll do, show me what you've done and then I will know you. If he's in prison for a lifetime he has, as Mr. Moriarity pointed out, an opportunity to arrange murders as you have found he has done in this case. He has already done that. He has already shown you he will do that.

"* * * Well, in that context and in that context alone I can and I do, both as an advocate and as a person, condone killing to survive. For self defense. It's always been a natural, inate, [sic] inherent right of ev-

ery man and every beast as I have said, and so as you can see I have been in conflict for a long time in this case. I think the death penalty as a penalty is a mockery. It's not a penalty and I'm against it as a penalty. It's misnamed. It should not be called a penalty. It's a penalty when you call it a penalty and it calls up false arguments about deterring others from doing the same. I have heard people say, if we kill Mark Hopkinson that will prevent others from doing the same. It didn't prevent him for doing it. He killed four persons in face of the death penalty. It just added to the risk. Why do people climb mountains? It's because of the thrill, the risk of death. The death penalty never deterred a single person and in my judgment, ladies and gentlemen of the jury it makes hypocrites of us all when we kill others in the name of a penalty. It makes us the tool of vengence [sic] against those who have been vengeful. * * * What I do subscribe to and what I believe is the most important thing in this world is life. The right to live. In my case it's my right to live, my family's right to live, Eddie's right and his children. And in your case it's your right to live, and in society's case it's the member of each society's right to live. And not only their right to live, ladies and gentlemen, but their freedom. Most particularly the freedom from fear. Our right to live in peace. I think that's a very important right. I think that's a very important right. And it's a right that trenscends any individual. It is a right that rises above Mark Hopkinson, surely. It's a right that rises above Eddie and me. It's a right that rises above everybody else and every individual. It's a right that belongs to all of us. It's the right to go to bed at night and know you will, God willing, awaken unharmed in the morning. It was a right that was taken from Vincent and his family. And those who threaten that right, who kill while we are asleep, who by death while we innocently go about our lives are our enemies. They are our enemies. And our right to live under the circumstances of this case is supreme to theirs. It's that simple.

"And again you are called upon to weigh and to make judgments, to weigh things in the balance. And now when you retire you'll be called upon to weigh the right of society and the individuals in society to live against the right of Mark Hopkinson. That is the score that has to be determined and the decision that has to be made by you.

\* \* \* \* \* \*

"And so then, to me, ladies and gentlemen, the process not a process of punishment, it's not an act of revenge, it's not an act done to deter others, it's not an act even done in anger or hate or vengence [sic]. It is to me the fulfillment of the rights of other men to live. My right and yours, our neighbors, and that I say it again is a superior right.

"I want you to hear me say to you very carefully—judgment—and my request to you to return death in this case is not to be a judgment on the morals or the values of the defendant. That is something for someone else or some other being other than us to judge. But when the rules of our society, which rules permit us to live in peace and when the defendant demonstrates that he will violate them, even from prison and will kill at will, then his rights come in conflict with mine and yours and ours, and under the circumstances of this case the right of hundreds of thousands of people is a superior right.

\* \* \* \* \* \*

"Now, I believe Mark Hopkinson is a threat to survival and I don't ask for his life for any other reason except that. I want you to hear me, that as Gerry Spence standing before you, I'm not asking for his life to avenge the deaths of my friends. My friends were more beautiful and more valuable than that. And I would not desecrate their memory with the request for vengence [sic]. Vince Vehar would not have stood for it for a moment. He would have fought for Mark Hopkinson's life to keep from spoiling his own with the blood of vengence [sic]. I don't ask for Mark Hopkinson's life out of hate or anger, although I despise what he's done. And I have a deep anger that has slowly turned to sadness and I feel sad and I'm sure you do. I don't feel bitter but I feel sad. I say to you the act of violence spoiled the lives of so many and the time for anger is over. Please hear me say that again to you. To me the time for anger is over, but the sorrow and the weeping will continue. It won't end not even when his life is given up. His death will only exacerbate that and make worse our own sorrow. I don't ask for his life out of some false hope that his death will stand as an example for others and will prevent others from like murders. I don't believe it will. And if Mark Hopkinson were put to death by us upon the belief that it would deter murder in the future, in my opinion, personally it would waste his life. I find the argument that we should kill because he is worthless and because it costs the tax payers [sic] money to maintain him, which is an argument I have heard so many times, I find that argument disgusting. It's the argument of men who have no respect for human life, which no matter [what] it costs is the most valuable thing of all.

\* \* \* \* \* \*

" \* \* \* Some of you may agree with my sole reason. Some of you may well disagree with me strongly. That's why we have laws because we couldn't exist in a system—please hear this—I think it will bring you some comfort and some foundation for your thinking. We couldn't exist in a system where men could be put to death on the whim or individual reason of a single person. This reason for you and that reason for me, upon this reason today and that reason tomorrow, because even we change with respect to our reasons. One day it's this reason and the next day it's another reason. And so the law says our own individual ideas about the death penalty, our reasons for the death penalty are immaterial. They belong and are personal to all of us. Your reason is personal to you, mine is personal to me and each of you on the jury is entitled to your own reasons. It makes no difference. If I abide by reason 'A' and you insist on reason 'B', we don't have to agree on the reason. The law gives us

order and it gives us substance, and it gives a test and it gives us a balancing test. And it's a test—everyone of you please hear this—it's a test that transcends, rises above the individual reasons and arguments of each of us. And I think there is a certain comfort in the law of right and wrong. It's the law, it's been created by our elected Legislators and it's been tested for fairness, for due process by our courts, by the highest courts in the United States, our Supreme Court. * * *

 * * * * * *

"Now, I don't tell you that this law is right. Only God can tell us that. I make no representations for the law. I only represent the obvious that it is the law. That it's the best law that our men, the finest men our country can find that we elect and our Judges have been put together. And the same extent that I am unsecure and unsure and awed and frightened by this thing that I say to you that to me the law is a comfort for me who is a lawyer, who is a law abiding citizen and who believes in the law. That's all we have.

 * * * * * *

"Now, I have told you at the beginning that I am sorry. I am sorry for him. I am sorry for his mother, I am sorry for his brother who loves him so much, I am sorry for the misery and agony and the pain and the horror of the Vehars and the Greens. The giving of the life of Mark Hopkinson isn't going to change any of that. But the law has to be made to work. And the law has to protect us. It's not for the dead— please hear me—it's not for the dead that I ask for the life of Mark Hopkinson, but for the living, for the people of this state. I want to tell you what's wrong with killing as a solution to social problems. I want to talk to you about that before I sit down because then I will have said it all. The killing of the Vehars brought on more killing. It brought on the killing of Jeff Green and that brings on further killing that arises from the death penalty. There are those, I suppose, in the defendant's family who would feel motivated to go further and to avenge further—

"MR. VAN SCIVER: That's objected to, your Honor.

"THE COURT: Sustained. The jury will disregard that remark.

"MR. SPENCE: What I wish to tell you is that killing goes on. It brings on more trials, more death penalties, more sorrow, more fear, more hate—

"MR. VAN SCIVER: That's improper. He asks [acts] as if there is going to be a series of events flowing from this and that is speculation and it's improper.

"THE COURT: Approach the Bench.

"(Whereupon, a brief discussion was had at the Bench off the record.)

"MR. SPENCE: I was saying that in my judgment killing begets killing. It goes on. The death penalty is no exception to that. What I wish I had, ladies and gentlemen of the jury, is the power to erase all of the hurt. I wish I had that power. I wish I could erase all the hurt from everybody, from everyone. I would if I could reach into the hearts and souls of the Vehars and the Greens and the Hopkinsons and you. They have suffered from different places and different ways, but it's been grief and pain and if I could take it away I would and if I could stop the hurt of a mother and a brother I would do that. And so there is a state of mind I hope that we can achieve here and that is a state of mind that approaches some sort of grace. *I told you before and I say it once more, to return the death penalty with hate and in anger and vengence [sic] is only to call up human emotions that never permit the matter to rest. And if each of you can't cast your vote for the death penalty in this case in the state of mind that's clear of hate, that is clear of hatred, then I say you ought to vote against it. And your vote must, in my humble opinion and my humble judgment in this case, be one based on the law on a careful balancing of the mitigating and aggravating circumstances and on the need of society for law and order and respect for the law and peace and protection.* [Emphasis added.]

"Now, no one escapes the pain of Mark Hopkinson from his acts that have brought on this pain and sorrow and grief to scores of people. Nobody escapes that pain. His family, all of the family, the whole community. The people by the scores that have been consumed. His acts have cut gargantuan economic losses. Can you imagine the economic loss of Vincent Vehar's life and Beverly and Jeff Green? Think of the economic loss to himself. The economic loss of the cost of this trial, the cost of the investigation, it has been astounding. And yet that economic loss is the least that Mark Hopkinson's acts have incurred. They have taken a toll in the lives of scores of innocent people. *And I say to you I think in closing that your vote in the jury room has to come not out of hate, because hate begets hate and not out of vengence [sic] but out of duty and out of law and out of the need of a simple system to survive and defend itself.* [Emphasis added.]

"There is no joy, ladies and gentlemen, in this work and I know there won't be any joy in yours. It's a terrible burden that's been placed on you. I know how you feel. I think we all feel with you. We felt it through these many months and I feel it now. And, you know, these acts of this man have sort of touched us all. There have been several sides of the courtroom. We have sat on different sides but the grief that we have all felt has been the same. It's been the same grief to everyone." (T.Vol.XV, pp. 2027–2049) (No objections have been edited.)

▮ Prosecutors cannot and should not be muzzled. It must be kept in mind that the prosecuting attorney is a representative of the State whose obligation is to govern impartially, whose aim is not that it win a case but that justice be done. It is his mission that guilt shall not escape or innocence suffer. He is duty bound to prosecute with earnestness and vigor. While he may strike hard blows, he is not free to strike foul ones. *Singer v. United States*, 1965, 380 U.S. 24, 85 S.Ct. 783, 791, 13 L.Ed.2d 630; *Berger v. United States*, 1935, 295 U.S. 78, 55 S.Ct. 629, 633, 79 L.Ed. 1314.

▮ It is necessary to examine the arguments of counsel in their entirety and not take sentences and phrases out of the context of the complete picture being presented by the prosecutor. *Mayer v. State*, Wyo. 1980, 618 P.2d 127. When we examine the criticized statements in that light, it is apparent that the evidence of quadruple murders justified the prosecutor's appeal and he was within the philosophy that the death penalty has as one of its purposes the incapacitation of dangerous criminals and consequent prosecution of crimes they may otherwise commit in the future within the social purposes of retribution and deterrence of capital crimes by prospective offenders, *Gregg v. Georgia*, 96 S.Ct. at 2929–2930. As said in *Gregg*, "capital punishment is an expression of society's outrage at particularly offensive conduct." The prosecutor was expressing that fear and outrage of the public.

We find no prejudice; the prosecutor's argument was hard, but he is expected to be partisan.

We find the argument consistent with the valid State purpose of protecting society from a dangerous and unrestrainable threat. The argument was proper.

## XX

▮ We do not address appellant's final argument that the instructions given the jury in the death penalty phase of the proceeding were inadequate because of our reversal. However, we do observe that on remand the jury should not only have the statutory language more thoroughly explained to it, but also it should not be presented with the option of finding aggravating circumstances for which no evidence has been presented. For example, the fourth aggravating circumstance concerns whether:

"The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnap-

ping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb." Section 6–4–102(h)(iv), W.S. 1977.

In this case there was no evidence that robbery, rape, sexual assault, arson, burglary, kidnapping, or aircraft piracy was involved; therefore, no opportunity should have been given the jury to consider them. On the other hand if evidence was received which went toward establishing the presence, say a kidnapping, then the jury should be instructed as to the legal meaning of the term. We realize it is a difficult task for the district court to instruct a jury in conformity with such a complex statute which heretofore had not been construed by this court. However, we have attempted in this opinion to provide future guidance to the district courts in completing that endeavor. We would also suggest that the district court instruct the jury that if they find an "other" mitigating circumstance besides those specifically spelled out, then they must articulate it so as to aid this court in determining whether any arbitrary factors have been present in the sentencing process.

## XXI

Finally we must, in accord with § 6–4–103(d), W.S. 1977 conduct our own independent review of the sentence of death.

We must consider whether the evidence supports the jury's findings. The court presented to the jury and the jury marked where indicated (x) and returned a form of verdict as follows:

"We, the jury, duly empaneled and sworn to try the above cause *do find the existence of the following aggravating circumstances at the time of the murders*: [Emphasis added.] (Check as many spaces and Items 1 through 8 as you find, or check Item 9 only.)

"1. ( ) The murder was committed by a person under sentence of imprisonment.[42]

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

"2. ( ) The Defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

"3. ( ) The Defendant knowingly created a great risk of death to two or more persons.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"4. ( ) The murder was committed while the Defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempt to commit any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

42. We do not understand why the jury failed in all instances to check the circumstance as well as its applicability when it so found.

"5. ( ) The murder was committed for the purpose of avoiding or preventing a lawful arrest of [or] effecting an escape from custody.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"6. ( ) The murder was committed for pecuniary gain.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"7. ( ) The murder was especially heinous, atrocious or cruel.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

"8. The murder of a judicial officer, former judicial officer, county attorney, or former county attorney during or because of the exercise of his official duty.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"9. ( ) No aggravating circumstances.

"The jury finds the existence of the following mitigating circumstances at the time of the murder: (Check as many spaces and Items 1 through 8 as you find.)

"1. ( ) The Defendant has no significant history of prior criminal activity.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

"2. ( ) The murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

"3. ( ) The victim was a participant in the Defendant's conduct or consented to the act.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"4. ( ) The Defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"5. ( ) The Defendant acted under extreme duress or under the substantial domination of another person.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"6. ( ) The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"7. ( ) The age of the Defendant at the time of the crime.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"8. ( ) Any other mitigating circumstances.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"( ) Applicable to the death of Jeff Green.

"The jury finds and recommends as follows:

## "CHARGE I

### "(Murder of Vincent Vehar)

"1. ( ) That as to Charge I sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the Defendant be sentenced to death.

"2. (x) That as to Charge I sufficient mitigating circumstances do exist to outweigh the aggravating circumstances and the jury recommends the Defendant be sentenced to life imprisonment.

## "CHARGE II

### "(Murder of Beverly Vehar)

"1. ( ) That as to Charge II sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the Defendant be sentenced to death.

"2. (x) That as to Charge II sufficient mitigating circumstances do exist to outweigh the aggravating circumstances and the jury recommends the Defendant be sentenced to life imprisonment.

## "CHARGE III

### "(Murder of John Vehar)

"1. ( ) That as to Charge III sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the Defendant be sentenced to death.

"2. (x) That as to Charge III sufficient mitigating circumstances do exist to outweigh the aggravating circumstances and the jury recommends the Defendant be sentenced to life imprisonment.

## "CHARGE IV

### "(Murder of Jeff Green)

"1. (x) That as to Charge IV sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the Defendant be sentenced to death.

"2. ( ) That as to Charge IV sufficient mitigating circumstances do exist to outweigh the aggravating circumstances and the jury recommends the Defendant be sentenced to life imprisonment."

It is at this point we find error though not called to our attention by appellant. The opening words of the verdict form, "do find the existence of the follow-

ing aggravating circumstances *at the time of the murders*" (emphasis added) is not under the circumstances of this case a proper introduction to the second aggravating circumstance:

"2. ( ) The Defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green." [43]

■■■■ "At the time of the murder[s]" of Jeff Green, the appellant-defendant had not been *convicted* of the murders of Vincent, Beverly, and John Vehar nor had he been convicted of conspiring to murder Vincent Vehar nor conspiring to murder William Roitz. Counsel for the State, very briefly argued aggravating circumstance number "2" in only the following words:

"Second, 'The defendant was previously convicted of another murder in the first degree or a felony involving the use of threat of violence to the person.' It's clearly applicable in this case as well on the Green situation, and also on the Vehar situation. You have found there was 6 counts, 2 of which dealt with a conspiracy to kill Vince Vehar and the conspiracy to kill William Roitz. <u>Those were crimes prior to the murder of Vince Vehar, prior to the murder of Beverly Vehar and John Vehar, and prior to the</u>

murder of Jeff Green." (Emphasis added.) (T.Vol.XV, p. 2008)

The underlined language of the argument does not describe aggravating circumstances falling within the ambit of § 6–4–102(h)(ii): "The defendant was previously *convicted* of another murder in the first degree or a felony involving the use or threat of violence to the person." (Emphasis added.) The statute refers to "previous conviction" of another murder or felony involving a threat, not the previous commission of those crimes.

■■ An effort has been made to apply the appellant's Federal court conviction of a felony involving the interstate transportation of explosives to intimidate or destroy a motor vehicle belonging to George Mariscal as a conviction which would fall within the court's instruction *and* the aggravating circumstance of a previous conviction of "a felony involving the use or threat of violence to the person." The prosecutor and appellant stipulated to past convictions in referring to the Mariscal conviction but did not stipulate that it was a conviction of "a felony involving the use or threat of violence [44] to the person." There was never presented to the jury any adequate proof that the Mariscal felony conviction "involved the use or threat of violence to the person." Not even the indictment or the judgment and sentence of the United States District Court wherein the conviction took place was in evidence. The only evidence of the federal prosecution was a statement by a federal agent:

"A. The trial involved an interstate transportation of destructive device

---

**43.** Even though not proper, this instruction became the law of the case. *Matter of Estate of Mora*, Wyo.1980, 611 P.2d 842, 846, and cases therein cited. The proof did not support the findings of the jury under the instruction.

**44.** "MR. MORIARITY: Your Honor, we have discussed the matter with defense counsel and rather than present further evidence we would at this time offer a stipulation that even with the matter that this jury has not heard that in 1971–72, the defendant was charged with conspiracy to deliver controlled substances, to-wit, marihuana, and the delivery of controlled substances. He was

charged in the United States District Court in New Hampshire, was convicted, and as a result to that received a sentence of which he served between late 1973 and mid 1975 approximately 18 months in a Federal Correctional Institution; that he was on parole up to and including the times that the incidences, the matters involved in this trial were concerned, and that in addition to the Mariscal conviction which has been made known to the jury he was convicted of parole violation for violating the parole on the marihuana conviction." (T. Vol. XV, pp. 1992–1993)

which is in fact this bomb, for purposes of intimidating an individual in Phoenix, Arizona." (T. Vol. VIII, p. 1361)

When the death sentence is considered by the jury, the proof must be more absolute than that. "Intimidate" and "threat of violence to the person" are not necessarily synonymous. They may be, but there is no proof of conviction of a crime falling within the contemplation of § 6–4–102(h)(ii).

■ The irony of the error is that it did not need to exist. Wyoming's § 6–4–102(h)(ii) is almost identical to § 921.-141(5)(b), Florida Statutes (1975) which provides as an aggravating factor:

"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person."

In *Lucas v. State*, Fla.1979, 376 So.2d 1149, 1152–1153, it was held that felony convictions involving attempted murders entered contemporaneously with the conviction of murder in the first degree are entered "previous" to sentencing and therefore may be appropriately considered as an aggravating circumstance. We hold that previous convictions within the statute may occur contemporaneously in the same prosecution in which the death penalty is recommended by the jury.

■ The jury found other aggravating circumstances relative to the murder of Jeff Green falling within § 6–4–102(h), i.e.,

"1. ( ) The murder was committed by a person under sentence of imprisonment.

"( ) Applicable to the death of Vincent Vehar.

"( ) Applicable to the death of Beverly Vehar.

"( ) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

\* \* \* \* \* \*

"4. ( ) The murder was committed while the Defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempt to commit any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

\* \* \* \* \* \*

"7. ( ) The murder was especially heinous, atrocious or cruel.

"(x) Applicable to the death of Vincent Vehar.

"(x) Applicable to the death of Beverly Vehar.

"(x) Applicable to the death of John Vehar.

"(x) Applicable to the death of Jeff Green.

\* \* \* \* \* \* "

When it made its findings of aggravating circumstances, it then was required to balance them against the mitigating circumstances and make a recommendation of sentence to the judge. Section 6–4–102(d)(i). Since its findings under the court's instructions as to "previous convictions" as instructed by the trial judge was not supported by the evidence, it was an erroneous finding and should not have been considered in the balancing process. We, therefore, are unable to conclude that in the absence of the finding of the improper aggravating circumstance the jury would have found the aggravating circumstances outweighed the mitigating circumstances and returned a sentence of death. When we do not know whether the result of the weighing process would have been different had the impermissible aggravating factor not been present and where a man's life is at stake, we must return the case to the trial

court for a new sentencing trial. *Elledge v. State*, Fla.1977, 346 So.2d 998, 1003.[45] We agree with the reasoning of the Florida court that:

" * * * This result is dictated because, in order to satisfy the requirements of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the sentencing authority's discretion must be 'guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' *Proffitt v. Florida*, 428 U.S. 242, 258, 96

S.Ct. 2960, 2969, 49 L.Ed.2d 913." (Emphasis omitted.)

▮▮▮▮ We affirm all the convictions but set aside the sentence of death and remand to the district court for a new sentencing trial[46] as to the murder of Jeff Green to be held in accordance with the views here expressed.

ROSE, Chief Justice, dissenting in part and concurring in part.

I will concur with the majority's conclusion that we must remand for the reason that the trial court erred in instructing the Green sentencing jury with respect to aggravating and mitigating circumstances.[1] I

**45.** For other cases which may be instructive to the trial judge and counsel on retrial of the penalty phase, see *Shriner v. State*, Fla. 1980, 386 So.2d 525; *Brown v. State*, Fla. 1980, 381 So.2d 690; *Lewis v. State*, Fla. 1979, 377 So.2d 640; *Mikenas v. State*, Fla. 1978, 367 So.2d 606; *Menendez v. State*, Fla. 1979, 368 So.2d 1278; *Riley v. State*, Fla. 1978, 366 So.2d 19.

**46.** Section 6–4–102(g), W.S.1977:

"If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment."

The guarantee against double jeopardy, secured by the Fifth Amendment to the Constitution of the United States and § 11, Article I, Wyoming Constitution, does not prohibit a remand to the trial court for a redetermination of sentence. *United States v. DiFrancesco*, 1980, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328. In death penalty cases the U. S. Supreme Court has authorized remanding for a resentencing hearing where the death penalty was imposed originally but because of some defect in the proceeding has been reversed on appeal. *Estelle v. Smith*, 1981, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d ——. Only where a judge or a jury refused to impose the death penalty in the first instance is a state barred from seeking it a second time. *Bullington v. Missouri*, 1981, – · U.S. ——, 101 S.Ct. 1852, 68 L.Ed.2d 270. There can be no new penalty trial as to the Vehar murders in that the jury failed to impose the death penalty as to those crimes.

**1.** Section 6–4–102, W.S.1977, provides:

"Presentence hearing for murder in the first degree; mitigating and aggravating circumstances.

"(a) Upon conviction of a person for murder in the first degree the judge shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. The hearing shall be conducted before the judge alone if:

"(i) The defendant was convicted by a judge sitting without a jury;

"(ii) The defendant has pled guilty; or

"(iii) The defendant waives a jury with respect to the sentence.

"(b) In all other cases the sentencing hearing shall be conducted before the jury which determined the defendant's guilt or, if the judge for good cause shown discharges that jury, with a new jury impaneled for that purpose.

"(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible.

"(d) Upon conclusion of the evidence and arguments the judge shall give the jury appropriate instructions, including instructions as to any aggravating or mitigating circumstances, as defined in subsections (h) and (j) of this section, or proceed as provided by paragraph (ii) of this subsection:

"(i) After hearing all the evidence, the jury shall deliberate and render a recommendation of sentence to the judge, based upon the following:

"(A) Whether one (1) or more sufficient aggravating circumstances exist as set forth in subsection (h) of this section;

"(B) Whether sufficient mitigating circumstances exist as set forth in subsection (j) of this section which outweigh the aggravating circumstances found to exist; and

"(C) Based upon these considerations, whether the defendant should be sentenced to death or life imprisonment.

also agree that the jury's sentencing verdict in the Green case was in error, as was the judgment of the court which was entered upon the verdict.

Even though I will separately concur in the result contained in the majority's hold-

ing with respect to the Green death-sentence proceeding, which holding says that it was error to permit sentencing-jury consideration of aggravating circumstances unsupported by the evidence,[2] I must dissent from other aspects of the majority's opinion

"(ii) In nonjury cases, the judge shall determine if any aggravating or mitigating circumstances exist and impose sentence within the limits prescribed by law, based upon the considerations enumerated in (A), (B) and (C) of this subsection.

"(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foremen of the jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.

"(f) Unless the jury trying the case recommends the death sentence in its verdict, the judge shall not sentence the defendant to death but shall sentence the defendant to life imprisonment as provided by law. Where a recommendation of death is made, the court shall sentence the defendant to death.

"(g) If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"(vii) The murder was especially heinous, atrocious or cruel;

"(viii) The murder of a judicial officer, former judicial officer, county attorney, or former county attorney, during or because of the exercise of his official duty.

"(j) Mitigating circumstances shall be the following:

"(i) The defendant has no significant history of prior criminal activity;

"(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(iii) The victim was a participant in the defendant's conduct or consented to the act;

"(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

"(v) The defendant acted under extreme duress or under the substantial domination of another person;

"(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

"(vii) The age of the defendant at the time of the crime."

2. This court's authority with respect to the review of the death sentence is contained in § 6-4-103, W.S.1977, which provides:

"Review of death sentences.

"(a) The judgment of conviction and sentence of death is subject to automatic review by the supreme court of Wyoming within sixty (60) days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed thirty (30) days by the supreme court for good cause shown. Such review by the supreme court shall have priority over all other cases.

"(b) Within ten (10) days after receiving the transcript, the clerk of the trial court shall transmit the entire record and transcript to the supreme court of Wyoming together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a statement of the judgment, the offense and punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the supreme court of Wyoming.

"(c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.

"(d) With regard to the sentence, the court shall determine if:

"(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

and I also find it necessary to raise issues not considered by the majority.

## AGGRAVATING AND MITIGATING CIRCUMSTANCES

### Separate Concurring Opinion

Mr. Justice White, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), spoke to the obligation of the Supreme Court of Georgia to oversee the application of the statutory standards in a manner which would comport with the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163. He said:

"In considering any given death sentence on appeal, the Georgia Supreme Court *is to determine whether the sentence imposed was consistent with the relevant statutes—i. e., whether there was sufficient evidence to support the finding of an aggravating circumstance. * * *"* (Emphasis added.) 428 U.S. at 223, 96 S.Ct. at 2948.

Here is what the jury did in the sentencing phase of the Hopkinson trial with respect to their findings concerning aggravating and mitigating circumstances.

As a *first* aggravating circumstance, the jury found the Green murder to have been committed while Hopkinson was "under a prison sentence"—which is true.[3] There is therefore at least one aggravating circumstance of record proven beyond a reasonable doubt, concerning which no issue can be taken.

As a *second* aggravation, the jury found the defendant to have "previously" been

"convicted of another murder in the first degree or a felony involving the use or threat of violence to the person."

This is *not* true. This finding is not supported by the evidence, and the majority agree that this aggravating circumstance should not have been submitted to the sentencing jury for its infusion into the weighing and balancing process.

This is so because the words "previously convicted of another murder," perforce must refer to a murder other than any of those with which he is charged in the instant case because it is provided in the jury-sentencing verdict:

"We, the jury, duly empaneled * * * do find the existence of the following aggravating circumstances *at the time of the murders * * *."* (Emphasis added.)

Hopkinson had not "previously" been convicted of murdering the three Vehars when he was tried for the murder of Green, because he was tried for all four murders at the same time. There is no evidence of record that the defendant had ever been charged with or convicted of any murder except those with which this appeal is concerned. Furthermore, the record does not disclose that he had "previously" been convicted of a felony involving "the use or threat of violence to the person."

It is true that Hopkinson had previously been indicted in federal court and convicted for various offenses relating to an explosive

---

"(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances;

"(iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, may:

"(i) Affirm the sentence of death;

"(ii) Set the sentence aside and impose a sentence of life imprisonment; or

"(iii) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel." (Bracketed material in original.)

3. At the time of trial for the murder of the three Vehars and Jeff Green, Mark Hopkinson was in prison at Lompoc, California in response to a federal jury's guilt verdict having to do with bomb charges concerning an Arizona lawyer named Mariscal. In any resentencing proceeding, court and counsel will want to make certain that proof of this fact is in the record.

bomb (*not the Vehar bombings*). Count I charged *transportation* in violation of 18 U.S.C. §§ 884(d) and 884(a). Count II charged *possession* in violation of 26 U.S.C. §§ 5861(d) and 5871. Count III charged *concealment* in violation of 18 U.S.C. §§ 842(h) and 844(a). Count IV charged *making* in violation of 26 U.S.C. §§ 5861(f) and 5871. Count V charged *possession* in violation of 18 U.S.C. §§ 5861(i) and 5871. Count VI charged *conspiracy* in violation of 18 U.S.C. § 371.

None of these charges involved "the use or threat of violence to the person" of anyone.

As a *third* aggravating circumstance, the jury was given the opportunity to and did decide that Green was murdered when Hopkinson

"* * * was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb."

There is no evidence to support such a finding. The only included criminal offense which could even be fantasized as the one to which the jury could have had reference is "kidnapping." There is not one shred of evidence in this record—circumstantial or otherwise—that Hopkinson either was privy to an arrangement to have Green kidnapped or that Green was in fact kidnapped. The fact that Green was the victim of a torture-murder does not supply the inference that the evil deeds were done under circumstances which would warrant the jury's assumption that Hopkinson was an accomplice to a crime or crimes which involved the kidnapping of Green. In fact—in my judgment—there is no evidence in the record to justify a conclusion that Hopkinson was a party to a plan or conspiracy to torture Green.

It is, in my opinion, impermissible (given the state of the record) to permit the jury to speculate that Green's killer, whose identity to this day remains unknown, kidnapped Green before torturing and murdering him. Especially is this so when the statutory definition of kidnapping is taken into account.[4]

Section 6–4–201, W.S.1977, Wyoming's kidnapping statute, provides:

"Whoever shall willfully, maliciously, fraudulently, forcibly or unlawfully seize, confine, inveigle, decoy, kidnap, abduct, entice away or carry away by any means whatsoever and hold or detain any person, *for ransom, reward, or robbery*; or whoever shall transport or aid or abet in transporting any person, knowing such person to have been willfully, maliciously, fraudulently, forcibly or unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, enticed away or carried away by any means whatsoever to be held or detained *for ransom, reward, or for robbery*, shall, upon conviction, be punished by death if the verdict of the jury so recommend, provided that the sentence of death shall not in any case be imposed by the court if, prior to the commencement of the trial of the case in which the defendant is charged, the kidnapped person has been liberated unharmed. If the death penalty shall not apply or be imposed the convicted person shall be punished by imprisonment in the state penitentiary for a period of not more than twenty (20) years." (Emphasis added.)

The record in this case is devoid of evidence that Green was abducted and/or kidnapped for purposes of holding him for "ransom, reward, or robbery" and there is no evidence that Green was *transported* anywhere to be held or detained against his will for "ransom, reward, or robbery" and no evidence exists to support a finding that Hopkinson was an aider or abetter in such a scheme. Therefore, the elements of the crime of kidnapping have *not* been proven.

---

4. I note in passing that § 6–4–102, W.S.1977 being a mandatory death-sentencing statute is unconstitutional under *Furman v. Georgia*, su-pra, and this court's holding in *Kennedy v. State*, Wyo., 559 P.2d 1014 (1977).

For the reasons given this aggravating circumstance should not have been made available to the jury's consideration because there is no evidence to support it.

### The Murder "was especially heinous, atrocious or cruel"
### Section 6–4–102(h)(vii), W.S.1977

Given the facts presently of record in this case, I would agree with the appellant that the "especially heinous, atrocious or cruel" aggravating circumstance should not have been given to the jury because when applied to the evidence—i.e., *as construed*—it is vague and overbroad. I would remand for this additional reason with the hope that before this aggravating circumstance is submitted to any future sentencing authority, the matter would first be given careful consideration.

The aggravating circumstance assigned to the killing of Green with which I am concerned here, says that this murder was "especially heinous, atrocious or cruel." Note should be taken of the fact that the jury also found this aggravating circumstance applicable to the Vehar murders. The United States Supreme Court has recently held, in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), that, as construed, the offense described as " 'outrageously or wantonly vile, horrible or inhuman' " was so vague as to violate the Eighth and Fourteenth Amendments to the United States Constitution.[5]

The majority opinion at p. 153 says: "Appellant's first challenge focuses upon § 6–4–102(h)(vii). There the statute lists as an aggravating circumstance that the murder, for which the defendant has been convicted and is being sentenced, 'was especially heinous, atrocious or cruel.' Appellant essentially argues that a jury could find any murder to be 'especially heinous, atrocious or cruel' and therefore conclude that an aggravating circumstance is present which outweighs all mitigating circumstances and accordingly impose the death penalty. This he contends gives a jury 'free rein to decide to sentence a person to death,' and denigrates the meaning of *Furman* and *Gregg*. Appellant's brief, p. 113."

The majority then reason and conclude: " * * * The statute does *not* fail to properly channel the jury's sentencing decision and does *not* grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons. * * * " (Emphasis added.) Majority Opinion at p. 153.

I would agree that the condition of the law presently is that the language of § 6–4–102(h)(vii), supra, is not *facially* in violation of the Eighth and Fourteenth Amendments to the Federal Constitution.

In *Gregg v. Georgia*, supra, 428 U.S. at 201, 96 S.Ct. at 2938, the appellant had attacked the submission of the Georgia aggravating-circumstance language which provides that the murder is

" * * * 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim,' * * * "

as being over-broad in that if fails to provide such standards as are required by *Furman*, and thus the dangers of arbitrariness

---

**5.** The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The corollary in the Constitution of Wyoming is Art. 1, § 14, which provides:

" * * * Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted."

The Fourteenth Amendment to the United States Constitution provides:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The corollary in the Constitution of Wyoming is Art. 1, § 6, which provides:

"No person shall be deprived of life, liberty or property without due process of law."

and caprice in the sentencing process are not removed.

The Court held, however, that—*on its face*—the language did not render the statute violative of the Eighth and Fourteenth Amendments as being arbitrary and capricious as proscribed by *Furman.*

The same contention was made in *Proffitt v. Florida,* decided the same day as *Gregg v. Georgia,* i.e., July 2, 1976. See *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In this case the aggravating-circumstance language was the same as ours, i.e., the death penalty is authorized where the crime is " 'especially heinous, atrocious, or cruel.' "

In *Proffitt,* the United States Supreme Court said:

"That court [the Supreme Court of Florida] has recognized that while it is arguable 'that all killings are atrocious, * * * [s]till, we believe that the Legislature intended something "especially" heinous, atrocious or cruel when it authorized the death penalty for first degree murder.' *Tedder v. State,* 322 So.2d, at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.' *State v. Dixon,* 283 So.2d, at 9. See also *Alford v. State,* 307 So.2d 433, 445 (1975); *Halliwell v. State,* supra [323 So.2d], at 561. *We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases. See Gregg v. Georgia,* ante, at 200–203 [96 S.Ct. at 2937–2939]." (Footnote omitted.) (Emphasis and bracketed material added.) 428 U.S. at 255–256, 96 S.Ct. at 2968.

The *Gregg v. Georgia* language referred to in the *Proffitt* quote, supra, is:

"The petitioner attacks the seventh statutory aggravating circumstance, which authorizes imposition of the death penalty if the murder was 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim,' con-tending that it is so broad that capital punishment could be imposed in any murder case. It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be *construed* in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction. In only one case has it upheld a jury's decision to sentence a defendant to death when the only statutory aggravating circumstance found was that of the seventh, see *McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974), and that homicide was a horrifying torture-murder." (Footnotes omitted and emphasis added.) 428 U.S. at 201, 96 S.Ct. at 2938.

These *Gregg* and *Proffitt* interpretations were addressed to fact situations where the capital crime was pitiless and torturous. The Supreme Court was therefore able to find that—*as construed*—the aggravating-circumstance standard could not be held to be unconstitutional upon its face.

Having concluded that Green's was a torture-murder engineered by Hopkinson, the majority apply the aforementioned rules of *Gregg* and *Proffitt* in order to uphold giving to the sentencing jury this aggravating circumstance for its consideration.

I do not find it permissible, under the facts of record in this case, to give this aggravating circumstance to the jury for its consideration.

The record does not contain such evidence as will permit the conclusion by court or sentencing jury that Hopkinson conspired in the *torture* killing of Green. For the purpose of making the point, I am assuming, arguendo, that there *is* sufficient circumstantial evidence to allow for the conclusion that Hopkinson is guilty of conspiring to kill Green. The only evidence that Hopkinson had anything to do with Green's torture is the fact that Green was in fact tortured. This is insufficient.

In effect, then, we have a situation in which the jury—without explanatory instruction of any kind—has returned a find-

ing that the murder was "especially heinous, atrocious or cruel" upon a record which is totally void of torture evidence. The question then becomes whether the submitted aggravating circumstance is so vague and overboard as to violate the requirements of *Furman*. In this connection, it must be remembered that, without court explanatory instruction, the jury found the bombing of the Vehars—who are presumed to have been killed instantly—to have also been murdered under conditions which were "especially heinous, atrocious or cruel."

Conspiracy in a plot to murder Green without evidence of torture participation and the conspiracy bombing resulting in the instant death of the Vehars, does not, *as a matter of law*, permit sentencing-jury consideration of such an aggravating circumstance as that with which we are concerned, i.e., "[t]he murder was especially heinous, atrocious or cruel." This conclusion is dictated by United States Supreme Court interpretive decisions handed down since *Gregg*, supra, and *Proffitt*, supra.

In the instructions given to the jury prior to deliberation in the sentencing phase, the court submitted only the bare statutory aggravating circumstances, without explanation of any kind. More particularly, the court did not instruct the jury that the especially heinous, atrocious or cruel aggravation could not be found to exist beyond a reasonable doubt under the facts of this case unless the jury was able to also find beyond a reasonable doubt that Hopkinson conspired to *torture* Green as well as murder him. The jury was thus left without the guidance required by *Furman* to construe and apply this aggravating circumstance as best it could, and, in consequence, did it in a manner which violated Hopkinson's Eighth and Fourteenth Amendment rights.

We are thus confronted with a question which is identical with that considered by the United States Supreme Court in *Godfrey v. Georgia*, supra. Mr. Justice Stewart who, in *Godfrey*, wrote for the court in reversing a death penalty after observing that the *Gregg* court had found no *facial*

unconstitutionality in an aggravating circumstance where murder is committed under conditions which are described by the statute as

" * * * ' * * * outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim,' "
said:

" * * * The issue now before us is whether, in affirming the imposition of the sentences of death in the present case, the Georgia Supreme Court has adopted such a *broad and vague construction* of the § (b)(7) aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the United States Constitution." (Footnote omitted and emphasis added.) 446 U.S. at 423, 100 S.Ct. at 1762.

In *Godfrey*, the defendant, without warning, shot his mother-in-law and ex-wife and they both died instantly. In this case, there is no evidence of Hopkinson's participation in Green's torture—only circumstantial evidence that he conspired with others to kill—and did kill—him. Even so, the sentencing jury found beyond a reasonable doubt Hopkinson's murder of Green *and* the instantaneous killings of the Vehars to be "especially heinous, atrocious or cruel."

Now, the question is not whether you or I think these murders were "especially heinous, atrocious or cruel," but whether these words—when a proper construction is adopted—furnish such a specific standard as will accommodate the defendant's constitutional guarantees under the mandate of *Furman* which says that there may be no standardless sentencing in a way that permits a substantial risk of arbitrary and capricious infliction of the death penalty without violation to the Eighth and Fourteenth Amendments to United States Constitution.

The *Gregg* Court reaffirmed the *Furman* concept when it said:

" '[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion

must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' 428 U.S., at 189 [96 S.Ct. at 2932], (opinion of STEWART, POWELL, and STEVENS, JJ.)." 446 U.S. at 427, 100 S.Ct. at 1764.

And then the *Godfrey* Court said:

"A capital sentencing scheme must, in short, provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' Id., at 188 [96 S.Ct. at 2932], quoting *Furman v. Georgia*, supra [308 U.S.], at 313 [92 S.Ct. at 2764]. (White, J., concurring)." (Bracketed material in original.) 446 U.S. 427–428, 100 S.Ct. at 1764.

According to the rule of *Godfrey*, it is impossible for me to see how the Hopkinson sentencing jury could have construed the "especially heinous, atrocious or cruel" test in a way which would satisfy the mandates of *Furman* and *Gregg*, when it is remembered that the record contains no evidence that Hopkinson conspired to torture Green and when it is recalled that the jury found this aggravating circumstance to exist in *both* the Vehar and the Green murders. The difficulty remains for me even if it is assumed (for sake of argument and without evidentiary support) that Hopkinson participated in a conspiracy to torture as well as murder Green. I say this because the very verdicts themselves are proof of the proposition that the jury, operating without adequate channeling standards and instructions, was forced to the conclusion that, in its view of things, *all of the murders* were "especially heinous, atrocious or cruel." These responses say to me that this jury, without adequate channeling instruction, would have found any murder of which Hopkinson had been found guilty to have been "especially heinous, atrocious or cruel." If so, the aggravating-circumstance language, as construed, fails to provide such standards as are required by *Furman*.

In explanation of its position the *Godfrey* Court said:

"This means that if a State wishes to authorize capital punishment it has a con-

stitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of the State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' *Gregg v. Georgia*, supra [428 U.S.], at 196, n. 47 [96 S.Ct. at 2936 n. 47]. See also *Proffitt v. Florida*, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913]; *Jurek v. Texas*, 428 U.S. 262 [96 S.Ct. 2950, 49 L.Ed.2d 929]. It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' As was made clear in *Gregg*, a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' 428 U.S., at 195, n. 46 [96 S.Ct. at 2935, n. 46]." (Footnotes omitted and bracketed material in original.) 446 U.S. at 428, 100 S.Ct. at 1764–1765.

In my judgment, this is the very thing that happened in the case at bar.

In addressing the immediate issue relative to the aggravating-circumstance language of " 'outrageously or wantonly vile, horrible and inhuman' " the *Godfrey* Court said:

"In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' *There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so,*

*their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms . In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation."* (Footnotes omitted and emphasis added.) 446 U.S. at 428–429, 100 S.Ct. at 1765.

The Court went on to find that the case must be remanded because—under the facts of the case—the language of the statute was vague and overbroad. That is, the Court found that the defendant's constitutional rights were not preserved as the Georgia Supreme Court had *construed* the statutory language in application to the facts before it.

The majority opinion at pp. 153–154, in the case at bar, seeks to legitimize the aggravating circumstance "[t]he murder was especially heinous, atrocious and cruel" in the following way:

"We disagree with appellant's conclusion. The statute does *not* fail to properly channel the jury's sentencing decision and does not grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons. First, the statute requires the jury to find the murder to have been 'especially heinous, atrocious or cruel.' Webster's Third New International Dictionary defines heinous as 'hatefully or shockingly evil.' Thus the term 'especially heinous' is more than just hatefully or shockingly evil. The murder, to be so classified, must demonstrate that the consciencelessness of the defendant is not only an outrage but also a dangerous and unrestrainable threat to society. Only when this is found can the murder properly be categorized as especially heinous. Since very few murders can be regarded in this manner, the term is *not* impermissible and vague.

"As to the terms especially atrocious or cruel, we adopt the definition of these terms established in the jurisdiction from whence the state legislature borrowed them. See, *Woodward v. Haney*, Wyo. 1977, 564 P.2d 844. In this case the stat-ute was derived from Florida's. Its interpretation of these terms was discussed by Justices Stewart, Powell and Stevens in *Proffitt* as follows:

"' * * * In particular, the petitioner attacks the eighth * * * statutory aggravating circumstances, which authorize the death penalty to be imposed if the crime is "especially heinous, atrocious or cruel," * * * §§ 921.141(5)(h), * * * (Supp. 1976–1977). These provisions must be considered as they have been construed by the Supreme Court of Florida.

"'That court has recognized that while it is arguable "that all killings are atrocious, * * * [s]till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." *Tedder v. State*, 322 So.2d at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon*, 283 So.2d, at 9. See also *Alford v. State*, 307 So.2d 433, 445 (1975); *Halliwell v. State*, [323 So.2d 557] at 561. *We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases. * * '"* (Footnote omitted; emphasis added.)

In addressing the significance of the *Godfrey v. Georgia* opinion, the majority at p. 155 say:

"Further, appellant's reliance upon *Godfrey v. Georgia*, 1980, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, is misplaced. There the issue was whether the Georgia Supreme Court had adopted such a broad and vague construction of 'was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim' so as to violate the constitutional limits recognized in *Furman* and *Gregg*. The U.S. Supreme Court decided that

these limits were breached. * * * " (Footnote omitted.)

And then the majority at page 156 say:

"Our interpretation of 'extremely heinous, atrocious or cruel' clearly distinguishes between murder cases and provides a principled way to determine whether the death penalty should be imposed. We will not allow caprice or emotion to become a determinative factor in imposing the death penalty. Thus we conclude *Godfrey* does not require us to hold that our statute is unconstitutional."

I find fault with the majority's analysis and rationale in these various respects.

In the first place, I would hold that— without court explanation and clarification—the language "[t]he murder was especially heinous, atrocious or cruel" is so broad as to invite the jury in every murder sentencing decision to impose the death sentence. I take it to be the rule of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978 at 2991–2992, 49 L.Ed.2d 944 (1976), and *Godfrey* that *it is the discretion of the sentencer that must be properly channeled—not the after-the-fact judgment of the appellate court.* (See also, *Gregg v. Georgia*, supra, 428 U.S. at 189, 96 S.Ct. at 2932–2933, opinion of Stewart, Powell, and Stevens, JJ.; *Westbrook v. Balkcom*, 449 U.S. 999, 101 S.Ct. 541, 66 L.Ed.2d 298 (1980), Stewart, J., dissenting from denial of certiorari.

As has been noted, the *Godfrey* Court says that the legislature must furnish the *sentencer* with a statute that will accomplish the following:

" * * * It [the definition of crimes for which death may be the sentence] must channel the *sentencer's* discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing the sentence of death.' " (Footnotes omitted.) 446 U.S. at 428, 100 S.Ct. at 1764.

The *Woodson* Court held that the requirements of *Furman* could only be satisfied by replacing the sentencer's

" * * * arbitrary and wanton jury discretion with objective standards to guide, regularize, *and make rationally reviewable* the process for imposing a sentence of death." (Emphasis added.) 428 U.S. at 303, 96 S.Ct. at 2991.

If this is the law, and if this is the test, I do not see how an uninstructed sentencing jury can be aided with an after-the-fact decision by an appellate court to the effect that *it* will always be able to interpret the words "heinous, atrocious or cruel" in a way which will guarantee that the jury did not indulge in standardless sentencing—that is—did not indulge in sentencing that could be categorized as having been applied in a manner which would avoid the arbitrary and capricious infliction of the death penalty. While the powers of appellate courts may be awesome, those powers do not include the ability to take a retroactive trip back inside the heads of the various jurors in order to conclude that the standard was, at the time of jury consideration, so clear as to preclude an arbitrary and capricious sentence. Especially is this true in the face of *Godfrey*, where the Court held, concerning language no more vague or indefinite than that contained in the Wyoming statute, that "[a] person of ordinary sensibility could fairly characterize almost every murder as" falling within the disputed aggravating-circumstance language.

I would further criticize the majority's approval of the submission of this particular aggravating circumstance in this case in view of the fact that there is no evidence of record that Hopkinson conspired to torture-murder Green. Furthermore, *there is no finding that the jury believed that Hopkinson was part and parcel of the torture.* Recalling that the jury found this particular aggravating circumstance to also apply to the Vehar bombings, it is perfectly logical to conclud that it did not either know or feel it had to know whether Hopkinson participated in a plan to make torture a part of the killing in order to conclude that the "heinous, atrocious or cruel" aggravating circumstance was applicable. It is reasonable and logical to believe that, absent court instruction and direction, the jury

found the aggravating circumstance to apply even though its members had no idea whether Hopkinson conspired with others to torture Green or not. After all, that is the conclusion they reached in the Vehar murders and—under *Godfrey*—had the jury found that Hopkinson should suffer the death sentence for the Vehar murders, such a sentence would (in my opinion at least) be unconstitutional as being arbitrary and capricious death sentencing, in violation of the Eighth and the Fourteenth Amendments.

For the reasons set out above, I would hold the "heinous, atrocious or cruel" aggravating circumstance to be *facially* in violation of the Wyoming Constitution, Art. 1, § 14 and Art. 1, § 6, and—*as applied* and under the authority of the *Godfrey* decision—I would find the submission of this aggravating circumstance to be in violation of the cruel-and-unusual clauses of the Federal and State Constitutions, and the due-process clauses of the Federal and State Constitutions.

*The Law Pertaining to the Submission of Aggravating Circumstances Which Are Unconstitutional, Otherwise Illegal, or Lack Evidentiary Support* [6]

In sum, we find the sentencing jury saying to Hopkinson:

Defendant Hopkinson, you will be put to death on purely circumstantial evidence for the Green murder, but not the bombing murders of the three Vehars because—even though, as mitigating circumstances with respect to all four, we find, first off, that you have no "significant history of prior criminal activity" (which says that the jury either did not consider the bombing attempt in the *Mariscal* case, for which Hopkinson was serving a prison term to be "significant" or did not know about it) and even though the Green and Vehar murders were committed while you were "under the influence of extreme mental or emotional dis-

turbance," these mitigating factors, existing at the time of the commission of all four murders, will not overcome the following aggravating circumstances which we find to have also existed at the time all four murders were committed, namely:

(1) You were under a prison sentence.

(2) You were previously convicted of another felony involving the use or threat of violence to the person of another, even though there is no evidence of this.

(3) The murders were committed while you were

"engaged, or [were] an accomplice in the commission of or an attempt to commit or flight after committing or attempt to commit any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb," (see statutory language n. 1, supra)

even though, as to Green, there is no evidence that—at the time of his murder—you were engaged or were an accomplice in the commission of any crimes enumerated in the last above-quoted statute.

And, lastly—all of the murders were "especially heinous, atrocious or cruel."

According to § 6–4–102(e), W.S.1977, it is the duty of the jury to find such aggravating circumstance upon which it relied to be proved "beyond a reasonable doubt." The State must prove each aggravating circumstance beyond a reasonable doubt. *Williams v. State*, Fla., 386 So.2d 538, 542 (1980), reh. denied, citing *Alford v. State*, Fla., 307 So.2d 433 (1975), cert. denied 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976); *State v. Dixon*, Fla., 283 So.2d 1 (1973), reh. denied, cert. denied 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The work product of this jury testifies to the impossibility of fulfillment of this statu-

---

6. I am in the debt of Professor Anthony Amsterdam of Stanford University School of Law for many thoughts and citations concerning the law pertaining to the consideration of mitigating and aggravating circumstances in the sentencing phase, as those authorities were presented by Professor Amsterdam to the Conference of Chief Justices in a meeting at Houston, Texas, February 4–5, 1981.

tory and precedential mandate since the jury, by its verdict, found aggravating circumstances to be present with respect to which there was no supporting evidence at all and, in my judgment, aggravating circumstances which are unconstitutionally vague absent specific court explanatory instruction.

It thus becomes this court's task to decide whether or not, given the mitigating circumstances found by the jury, the defendant may be put to death where the jury admittedly balanced, against these mitigating circumstances, various statutory aggravating circumstances, some of which were either unconstitutional (under my analysis) or admittedly not supported by the evidence.

It is upon this issue that the majority have held remand to be necessary. I feel, however, that the subject should be more thoroughly indulged, and I therefore add these concurring thoughts.

The United States Court of Appeals for the Fifth Circuit has recently considered the question of whether or not it is plain error to allow a jury to consider impermissible aggravating circumstances and has responded in the affirmative. In the Fifth Circuit case, the jury, in the penalty phase, was charged with the task of weighing permissible aggravating circumstances against relevant mitigating circumstances and, based upon this weighing process, was asked to come to its verdict on the question of whether death or life imprisonment was the appropriate sentence for the defendant. *Stephens v. Zant*, 631 F.2d 397 (5th Cir. 1980). It was clear to the Fifth Circuit that in case any one of the aggravating circumstances was improperly considered by the sentencing authority, it would not then have been possible for the appellate court to say that the jurors would have imposed the death penalty if they had weighed only legitimate aggravating circumstances in discharging their balancing obligations. Even in a case of noncapital sentencing by a judge, the intrusion into a discretionary sentencing judgment of factors which the sentencer wrongly believes that it may

properly consider deprives the sentence of the integrity necessary to sustain it on appeal. See, e.g., *United States v. Tucker,* 404 U.S. 443, 447–449, 92 S.Ct. 589, 591–593, 30 L.Ed.2d 592 (1972). When the death sentence has been imposed by a jury, it is unacceptable for an appellate court to indulge the assumption that the improper sentencing consideration had no impact upon the final outcome. The Fifth Circuit framed and decided the issue as follows:

"The question presented, then, is whether the death penalty was invalid under the Constitution because it was imposed when one of the aggravating circumstances was later held to be unconstitutional even though there were two other aggravating circumstances, either of which by itself would be legally sufficient to permit the jury to impose the death penalty and as to both of which there is no uncertainty.

"In *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931), the Supreme Court held that if the jury has been instructed to consider several grounds for conviction, one of which proves to be unconstitutional, and the reviewing court is thereafter unable to determine from the record whether the jury relied on the unconstitutional ground, the verdict must be set aside. Accord, *Bachellar v. Maryland*, 397 U.S. 564, 570–71, 90 S.Ct. 1312, 1315–16, 25 L.Ed.2d 570 (1970); *Street v. New York*, 394 U.S. 576, 585–88, 89 S.Ct. 1354, 1362–63, 22 L.Ed.2d 572 (1969); *Yates v. United States*, 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957). This settled principle of law applies with particular force in cases in which the death penalty has been imposed. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), held that the death penalty may not be imposed under sentencing procedures that create a substantial risk that the penalty will be inflicted in an arbitrary and capricious manner. The Constitution requires that the sentencer's discretion be channeled by clear and objective standards that 'make rationally reviewable the process for im-

posing a sentence of death.' *Woodson v. North Carolina*, 428 U.S. at 303, 96 S.Ct. at 2990 (opinion of Stewart, Powell and Stevens, JJ.).

"It is impossible for a reviewing court to determine satisfactorily that the verdict in this case was not decisively affected by an unconstitutional statutory aggravating circumstance. The jury had the authority to return a life sentence even if it found statutory aggravating circumstances. It is possible that even if the jurors believed that the other aggravating circumstances were established, they would not have recommended the death penalty but for the decision that the offense was committed by one having a substantial history of serious assaultive criminal convictions, an invalid ground. The presence of the unconstitutionally vague circumstance also made it possible for the jury to consider several prior convictions of petitioner which otherwise would not have been before it. The instruction on the invalid circumstance may have directed the jury's attention to those convictions. It cannot be determined with the degree of certainty required in capital cases that the evidence of those convictions together with the instruction, did not make a critical difference in the jury's decision to impose the death penalty.

"We hold that the jury's discretion here was not sufficiently channeled, see *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and that the process in which the death penalty was imposed in this case was not 'rationally reviewable.' *Woodson v. North Carolina*, 428 U.S. at 303, 96 S.Ct. at 2990. See also *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393. Petitioner's death sentence therefore cannot stand." Supra, 631 F.2d at 406.

The North Carolina Supreme Court has also acknowledged the impropriety of affirming a death sentence after one aggravating circumstance submitted to the sentencer is invalidated. *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), cert. denied 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796

(1980). The court there held that in the sentencing hearing of a defendant convicted of felony-murder, the jury had improperly been permitted to consider the underlying felony as an aggravating circumstance. Holding that the error required resentencing, the court noted:

"We are unable to say that under the circumstances of this particular case the trial judge's submission of the issue concerning the underlying felony constituted harmless error. Had the jury not considered the underlying felony as an aggravating circumstance, it may well have decided that the remaining aggravating circumstances were not sufficiently substantial to call for imposition of the death penalty." Id., 257 S.E.2d at 568.

See also *Bufford v. State*, Ala.Cr.App., 382 So.2d 1162, 1174–1175 (1980), cert. denied, Ala., 382 So.2d 1175 (1980).

In *Bufford v. State*, supra, 382 So.2d at 1174, the court said:

"There has been some confusion as to whether a remandment and a new sentencing hearing is required where a trial court finds one or more proper aggravating circumstances, but likewise bases its sentence on one or more improper aggravating circumstances. Compare *Mack v. State*, Ala.Cr.App., 375 So.2d 476 (1978), affirmed, Ala., 375 So.2d 504 (1979), with *Johnson v. State*, Ala.Cr.App. [399 So.2d 859] [Ms. May 22, 1979], reversed, Ala. [399 So.2d 873] [Ms. December 7, 1979]. *Johnson* is the latest expression of the supreme court on this issue. In that case there were at least two aggravating circumstances which were valid and one which was found invalid by that court. A remandment to the circuit court for a new sentencing hearing was mandated by that decision." (Bracketed material in original.)

Similarly, the Florida Supreme Court has said that where one aggravating circumstance is invalidated,

" * * * regardless of the existence of other authorized aggravating factors we must guard against any unauthorized ag-

gravating factor going into the equation which might tip the scales of the weighing process in favor of death.

\* \* \* \* \* \*

"Would the result of the weighing process by both the jury and the judge have been different had the impermissible aggravating factor not been present? We cannot know. Since we cannot know and since a man's life is at stake, we are compelled to return this case to the trial court for a new sentencing trial at which the [improper] factor \* \* \* shall not be considered. See *Miller v. State*, 332 So.2d 65 (Fla.1976); *Messer v. State*, 330 So.2d 137 (Fla.1976). This result is dictated because, in order to satisfy the requirements of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the sentencing authority's discretion must be 'guided and channeled by requiring examination of *specific factors* that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' (Emphasis supplied) *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913" (Bracketed material added.) *Elledge v. State*, Fla., 346 So.2d 998, 1003 (1977), reh. denied.

See also *Menendez v. State*, Fla., 368 So.2d 1278, 1282 (1979):

"There is, therefore, only one properly found aggravating circumstance and one mitigating circumstance. Since the trial judge has committed error in considering matters outside the permissible range of legal standards set by the statute, and because it is impossible for us to evaluate the weight given by the trial judge to those factors which were proper to consider in imposing the death penalty, we can only vacate the sentence of death and remand the case for resentencing."

We have, in this appeal, a situation in which the jury found two mitigating circumstances and various aggravating circumstances, one of which, as I have said, violates the *Furman* standards requirement and some of which are not supported by the evidence and thus should not have been given to the jury for its consideration. Given these factors, we are unable, as a reviewing court, to determine whether, in imposing the death sentence, the jury relied upon an unauthorized aggravating circumstance or not. Since this is so, we find ourselves in the same dilemma as that with which the Fifth Circuit was concerned in *Stephens v. Zant*, supra, and are forced to the same conclusion for the same reasons, i.e.:

"We hold that the jury's discretion here was not sufficiently channeled, see *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and that the process in which the death penalty was imposed in this case was not 'rationally reviewable.' *Woodson v. North Carolina*, 428 U.S. at 303, 96 S.Ct. at 2990. See also *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393. Petitioner's death sentence therefore cannot stand." *Stephens v. Zant*, supra, 631 F.2d at 406.

I would therefore concur with the majority and hold that error was committed in the sentencing phase in that unauthorized aggravating-circumstance options were made available to the jury for its consideration, and, thus, on this point, the case must be returned to the district court for the purpose of undertaking a full resentencing procedure in a manner which is not inconsistent with the reason and authority recited and reviewed herein and in the majority opinion wherein this issue is considered.

## THE UNANIMITY INSTRUCTION

### Sentencing Phase

I would remand for yet another reason.

The Wyoming statute, § 6–4–102(e), W.S. 1977 provides:

"\* \* \* If the jury [in the sentencing phase] cannot, within a reasonable time, agree upon the punishment to be imposed, the judge shall impose a life sentence." (Bracketed material added.)

At the close of the argument in the sentencing phase of the case and before the jury retired to decide the life-or-death fate of the defendant, the judge read instructions and ruled on motions. The instruc-

tions included the admonition to the jury that the verdict must be unanimous. That is, if the jury believed the defendant should be sentenced to death, the verdict should *unanimously* reflect that decision, and, if the jury believed the defendant should receive a life sentence, its verdict should *unanimously* reflect that decision. In fact, at one juncture, the judge, believing that the unanimity admonition had not been made clear, deviated from the written instruction to say that the sentencing instructions should be read with all other instructions which had been submitted, and

> "Your decision with reference to this portion of the trial must be unanimous."

Defense counsel indicated that he was not pleased with this instruction on unanimity, and was given the opportunity to prepare and submit one which would satisfy him and to return it to the court after the lunch hour, with the representation that it would be considered on its merits for purposes of either giving or refusing to give the submitted instruction to the jury. Defense counsel then prepared and offered the following instruction to the court:

> "In order for the defendant to receive the death penalty in this case the jury must unanimously recommend the death penalty. If the jury is unable to unanimously agree upon the penalty within a reasonable time, or if the unanimous recommendation is a life sentence, the court will sentence the defendant to life imprisonment."

The trial judge refused this instruction on such grounds as contemplated the fact that it was not offered timely; was erroneous; it told the jury they must hurry; it tended to force a decision by the court; it would have had the effect of interfering with the jury process; it was not carefully thought out; and for other reasons.

I suggest that the offered instruction was not only proper, it was absolutely essential and states the law accurately and succinctly. It stated a part of the applicable Wyoming statute that goes to the very soul of defendant's fair-trial rights. By its refusal the defendant was denied due process under the Fourteenth Amendment and the corollary Wyoming constitutional amendment proviso.

*Furman v. Georgia*, supra, held that the imposition of the death penalty under statutes which gave the jury (or judge) unbridled sentencing discretion violated the Eighth and Fourteenth Amendments to the United States Constitution. The Court said that a death statute, in order to pass constitutional muster, must be suitably direct and limited so as to minimize the risk of wholly arbitrary and capricious action. In *Lockett v. Ohio*, 438 U.S. 586, 599, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) the Court summarizes the *Furman* holding as follows:

> " * * * In separate opinions, the three concluded that discretionary sentencing, unguided by legislatively defined standards, violated the Eighth Amendment because it was 'pregnant with discrimination,' id., at 257 [92 S.Ct. at 2735] (Douglas, J., concurring), because it permitted the death penalty to be 'wantonly' and 'freakishly' imposed, id., at 310 [92 S.Ct. at 2763] (STEWART, J., concurring), and because it imposed the death penalty with 'great infrequency' and afforded 'no meaningful basis for distinguishing the few cases in which it [was] imposed from the many cases in which it [was] not,' id., at 313 [92 S.Ct. at 2764] (WHITE, J., concurring). * * * See *Gregg v. Georgia*, 428 U.S. 153, 195–196, n. 47 [96 S.Ct. 2909, 2935–2936, n. 47, 49 L.Ed.2d 859] (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.)."

In *Lockett*, the Court discussed the plurality views in *Gregg v. Georgia*, supra, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, where the Court spoke to the requirement for channeling and limiting discretion in death cases. The *Lockett* court said:

> "The joint opinion [*Gregg*, supra] reasoned that, to comply with *Furman*, sentencing procedures should not create 'a substantial risk that the death penalty [will] be inflicted in an arbitrary and capricious manner.' *Gregg v. Georgia*, supra, at 188 [96 S.Ct. at 2932]. In the view of the three Justices, however, *Fur-*

*man* did not require that all sentencing discretion be eliminated, but only that it be 'directed and limited,' 428 U.S. at 189 [96 S.Ct. at 2932], so that the death penalty would be imposed in a more consistent and rational manner and so that there would be a 'meaningful basis for distinguishing the * * * cases in which it is imposed from * * * the many cases in which it is not.' Id., at 188 [96 S.Ct. at 2932]. * * *" 438 U.S. at 601, 98 S.Ct. at 2963.

I read the United States Supreme Court opinions following *Furman* to say that not only must the statutes not be arbitrary and capricious with unbridled sentencing discretion, but, additionally, a proper statute may not be utilized in a manner which would bring on arbitrary, capricious and unbridled sentencing-discretion results.

The plurality in *Gregg* recognized the necessity of instructing the jury in a way which will give effect to a valid statute when the Court said:

"But the provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury. Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given. See American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures, § 1.1(b), Commentary, pp. 46–47 (Approved Draft 1968); President's Commission on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, Task Force Report: The Courts 26 (1967). To the extent that this problem is inherent in jury sentencing, it may not be totally correctable. It seems clear, however, that the problem will be alleviated, if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision.

"The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition. Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be virtually unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law. See *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 498 [51 S.Ct. 513, 514, 75 L.Ed. 188] (1931); Fed.Rule Civ.Proc. 51. When erroneous instructions are given, retrial is often required. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." (Footnote omitted.) 428 U.S. at 192–193, 96 S.Ct. at 2934.

The lesson in *Gregg*, then, is that not only must the protection against untrammeled discretion in the death-pronouncing process be structured in the statutes, but these statutes must also be *applied* in a way which precludes such results as were found to be unacceptable in *Furman*.

I would hold that for the court, in addition to giving the unanimous-verdict instructions, to refuse to give the jury the statutory alternative of returning a less-than-unanimous verdict, which verdict the court would have been bound to accept by statute and the result of which would be to insure for the defendant, a life rather than a death sentence, was to deny to the sentencing process a vital third option.

How substantive is the failure to give this offered instruction?

In order to put the issue into more vivid perspective in this case, it is proper to note that, during the sentencing deliberations, a message was delivered to the judge in which a juror expressed a change of heart as to guilt or innocence, and believed Hopkinson to be guilty—not of first-degree murder but of second-degree murder or manslaughter—and the juror asked that she be given the opportunity to change her vote to reflect her decision on the issue of guilt

or innocence. The judge refused to permit the reopening of the guilt or innocence phase of the bifurcated trial for this purpose and advised the juror that the only matter under consideration was

"* * * the death penalty or life imprisonment *as set forth in the instructions previously given you on that matter.*" (Emphasis added.)

This said to the juror, who now believed Hopkinson *not guilty* of first-degree murder and thus not subject to capital punishment, but who, later, together with 11 other jurors, cast a unanimous vote for death, that in order to bring back a verdict of *any kind*, the vote had to be unanimous. This was her instructed belief even though the *law* gave her and all other jurors another alternative—a "third option"—about which she and her fellows were not apprised, that is: *If any one of them had not wanted to vote with the majority for the death-sentence unanimity, such juror or jurors could have refused to so vote, the effect of which would be that the judge would have been obligated under the law to sentence Hopkinson to life imprisonment.* I emphasize— just one juror could have had this effect— but the jury was not so informed; all of them believed that their verdict had to be unanimous, i.e., neither the juror who wrote to the judge nor any other juror knew that *one person* voting against 11 who were death-sentence inclined, could save Hopkinson's life—even though this is the statutory law of the state of Wyoming.

How does this all come out from Hopkinson's point of view?

His most obvious concern must have its genesis in the fact that he had a juror who, in the sentencing stage, thought him to be *not guilty* of a capital crime punishable by death, but who, under peer pressure coupled with erroneous unanimous-verdict instructions, or for whatever reasons, wound up voting that he be put to death anyway. But the defendant's underlying anxiety— which would be the concern of any defendant in similar circumstances—was that *none* of his sentencing jurors were informed of the "third option"—i.e., the effect of a

nonunanimous verdict. Thus I utilize the example of the mind-changing juror solely for the purpose of pointing up the vividness of the error in this case. For me, the failure or refusal to give the jury the third-option information would be plain error in any circumstance.

And what will the law say about this? Even if it can be argued that this particular juror could have changed her mind again between the time when she sent the note and when she voted for death, the fact still remains that *she did not know* (and the other jurors did not know) that she had a "third option" which contemplated that she, or any other single juror, or any greater number of jurors, could have refused to vote for a unanimous death verdict, in which event the judge would have been obligated by law to sentence Hopkinson to life imprisonment.

The "third option" issue was discussed in *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), wherein the question was whether the death sentence could be constitutionally imposed when the jury was denied the right to consider the "third option"—in this case a lesser-included-offense instruction which was precluded from consideration in a death case by statute.

Remembering the admonitions of *Furman* that

"* * * the Court held unconstitutional a Georgia statute that vested the jury with complete and unguided discretion to impose the death penalty or not as it saw fit, on the ground that such a procedure led to the 'wanton' and 'freakish' imposition of the penalty," 447 U.S. at 639, 100 S.Ct. at 2390,

the *Beck* Court found that the unavailability of the "third option" led to the interjection of irrelevant considerations into the fact-finding process. In the case at bar the unavailability of the "third option", which would have permitted even one juror to swim against the current and hold out for something less than the death sentence, has the effect of denying the jury a choice which was absolutely essential to the statu-

torily structured life-and-death decision-making process. Its withholding from the jury's consideration resulted in a decision which was not in contemplation of Wyoming law and therefore was arbitrarily imposed in violation of due process and § 6–4–103(d)(i), W.S.1977.

It would not do to argue that there was a third option for this jury in the nature of mistrial. The *Beck* Court did not think mistrial answered the defendant's "third option" contention.

Mistrial may be another option, but its offerings are certainly a far cry from the advantages furnished by a jury instructed that

" * * * If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge *shall* impose a life sentence." (Emphasis added.) § 6–4–102(e), supra.

In a mistrial, the defendant is tried again and his life is again on the line. In a trial where the jury is properly instructed concerning the "third option", the defendant's life is saved, should the jury—*or a juror* —decide to exercise it.

I would hold, then, that to fail to give the jury an instruction apprising them of this statutory third alternative to a unanimous verdict—and to instruct that its decision in this part of the trial "must be unanimous" —was to fail to comply with the requirement of *Furman,* which says that the sentencing authority must not leave juries with untrammeled discretion to impose or withhold the death penalty. Such failure amounts to a violation of the Wyoming statutes (§ 6–4–102(e), supra), which in turn amounts to a violation of the Eighth and Fourteenth Amendments to the United States Constitution and corollary provisions of the Wyoming Constitution, i.e., Art. 1, § 14 and Art. 1, § 6.

### Plain Error

I would hold the failure to instruct as requested by defendant to be of plain-error

magnitude. I offer the following as the law of plain and harmless error in capital cases.[7]

In 1948, *Andres v. United States,* 333 U.S. 740, 752, 68 S.Ct. 880, 886, 92 L.Ed. 1055 (1948), the Court said:

" * * * In death cases [with regard to the prejudicial effect of trial error] doubts * * * should be resolved in favor of the accused. * * *." 333 U.S. at 752, 68 S.Ct. at 886.

This thought is italicized where the Court in *Woodson v. North Carolina,* supra, 428 U.S. at 305, 96 S.Ct. at 2991, says:

" * * * the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (Footnote omitted.)

See also, e.g., *Lockett v. Ohio,* supra, (plurality opinion); *Beck v. Alabama,* supra.

In *Gardner v. Florida,* 430 U.S. 349, 357–358, 97 S.Ct. 1197, 1204–1205, 51 L.Ed.2d 393 (1977), the Court said:

"First, five Members of the Court have now expressly recognized that death is a different kind of punishment from any other which may be imposed in this country. *Gregg v. Georgia,* 428 U.S. 153, 181–188 [96 S.Ct. 2909, 2928–2932, 49 L.Ed.2d 859] (opinion of STEWART, POWELL and STEVENS, JJ.); see id., at 231–241 [96 S.Ct. at 2973–2977] (MARSHALL, J., dissenting); *Furman v. Georgia,* 408 U.S., at 286–291 [96 S.Ct. at 2982–2985] (BRENNAN, J., concurring), 306–310 [96 S.Ct. at 2992–2994] (STEWART, J., concurring); see id., at 314–371 [92 S.Ct. at 2764–2794] (MARSHALL, J., concurring).

---

**7.** The plain-and-harmless-error discussion in this opinion is aided in a material way by the paper discussed with the Conference of Chief Justices at their mid-year meeting in Houston, Texas, February 4–5, 1981, by Anthony Amsterdam, Professor of Law at Stanford University, Palo Alto, California.

From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."

In *Woodson v. North Carolina*, supra, 428 U.S. at 304–305, 96 S.Ct. at 2991, the plurality said:

" * * * [W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles*, 356 U.S. [86,] at 100 [78 S.Ct. 590, 597, 2 L.Ed.2d 630] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. * * * "

Courts must be very careful not to regard error as harmless in capital cases, see *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881, 885 (1961).

"Thus '[w]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death.' *Irving v. State*, 361 So.2d 1360, 1363 (Miss.1978), cert. den., 441 U.S. 913 [99 S.Ct. 2014, 60 L.Ed.2d 386] (1979). Accord, *Pait v. State*, 112 So.2d 380, 385 (Fla.1959). Because death is different from all other penalties, errors occurring during a capital trial are subjected to the most exacting scrutiny. See *Gardner v. Florida*, 430 U.S. 349 [97 S.Ct. 1197, 51 L.Ed.2d 393] (1977)."

To the extent that any error

" * * * creates 'a substantial risk that [the death penalty will] * * * be in-

flicted in an arbitrary and capricious manner,' *Gregg v. Georgia*, 428 U.S. 153, 188 [96 S.Ct. 2909, 2932, 49 L.Ed.2d 859] (1976) (plurality opinion), it arises to constitutional proportions, [whereupon] * * a reviewing court must satisfy itself * * that the error was harmless * * *."[8]

In the instant case where the court refused to give an instruction which I think was mandated by the statute, the issue becomes one of due process of law. The question asks whether the refusal to give the defendant an instruction incorporating the part of the statute which would save his life in circumstances where the verdict was other than unanimous, is or is not harmless error. The harmless-error query is resolved in this setting by asking and answering the question of whether or not the failure to give a proper instruction or the giving of an erroneous instruction creates a reasonable possibility that the court's action in this regard "might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), quoting from *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). It is said in *Chapman*:

" * * * We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. Connecticut*, 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171]. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86–87 [84 S.Ct. at 230]. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. At the same time, however, like the federal harmless-error statute, it emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party. * * *

\* \* \* \* \* \*

---

8. From the paper of Professor Amsterdam to the Chief Justices, supra n.6.

" * * * We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case." (Footnotes omitted.) 386 U.S. at 23–24, 87 S.Ct. at 827–828.

Applying the *Chapman* rule to the instruction issue here, I would think it impossible for any appellate judge to come to the conclusion "beyond a reasonable doubt" that the failure to incorporate the statutory language in an instruction or the giving of the unanimity instruction without the "third option" did not in any way contribute to the jury's death-sentence decision.

At the Conference of Chief Justices (see notes 6 and 7), Professor Amsterdam concluded and summarized as follows:

> " 'Thus *any* such substantial error in the penalty trial may have affected the result; it is "reasonably probable" that in the absence of such error "a result more favorable to the appealing party would have been reached." '

"*People v. Hines* [61 Cal.2d 164, 37 Cal. Rptr. 622, 626], 390 P.2d 398, 402 ([Cal.] 1964). See also *People v. Hamilton* [60 Cal.2d 105, 32 Cal.Rptr. 4, 23], 383 P.2d 412, 431 ([Cal.] 1963); *People v. White* [69 Cal.2d 751, 72 Cal.Rptr. 873, 879], 446 P.2d 993, 999 ([Cal.] 1968).

> " 'To attempt to assess the effect of error in this legal vacuum is to superimpose one untestable surmise upon another. We must not pile conjecture upon conjecture and posit the decision of life or death upon a pyramid of guesses.'

"*People v. Terry* [61 Cal.2d 137, 37 Cal. Rptr. 605, 616], 390 P.2d 381, 392 ([Cal.] 1964), cert. den., 379 U.S. 866 [85 S.Ct. 132, 13 L.Ed.2d 68] (1964).

"Fundamental fairness requires that 'any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion,' *Gardner v. Florida*, 430 U.S. 349, 358 [97 S.Ct. 1197, 1205, 51 L.Ed.2d 393] (1977) (plurality opinion), and that sentencing courts not act upon 'surmise or suspicion,' *Harris v. United States*, 382 U.S. 162, 167 [86 S.Ct. 352, 355, 15 L.Ed.2d 240] (1965) (noncapital case). These requirements would be defeated if, subsequent to the imposition of the death penalty at the trial level, reviewing courts were to affirm death sentences on the basis of the necessarily speculative conclusion that no one of twelve trial jurors might have been affected by an error when he or she came to make the most serious, intractable, and unfathomable decision known to the law. The 'uncertain consequences' of any legal error in the penalty phase of a death case are 'too obvious' to allow for affirmance. *Davis v. State* [236 Ga. 804], 225 S.E.2d 241, 247 ([Ga.] 1976) (Ingram, J., dissenting), rev'd, 429 U.S. 122 [97 S.Ct. 398, 50 L.Ed.2d 339] (1976)." (Emphasis in original.)

In any future penalty-phase hearing, I would advise that the offered instruction *must* be given to the sentencing jury.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### Sentencing Phase

I would remand for a third reason.

Even though it has not previously been raised, I would remand for the resentencing of Hopkinson for the reason that the defendant did not, in the penalty phase, have such effective assistance of counsel as would insure his constitutional rights under the Sixth and Fourteenth Amendments to the Federal Constitution. I do not raise the issue to embarrass counsel, but it is done because scrupulous care should be given to the end that an ineffective-assistance-of-counsel error is not committed should the district court and counsel find that the death-penalty phase of this case must again

be submitted to a jury rather than, for example, agreeing that Hopkinson should be sentenced to a fourth consecutive term of life imprisonment.

The statutes of this and other states have long taken into account the special nature of the capital defendant's need for unusual protection. See § 6–4–102 and § 6–4–103, W.S.1977.

In early recognition of the unusual-protection concept, the United States Supreme Court first held that capital criminal defendants have a constitutional right to be represented by counsel. *Powell v. Alabama*, 287 U.S. 45, 72, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932). This right was guaranteed to all felony defendants. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

It is now universally conceded that since *Furman v. Georgia*, supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, a constitutional concept has emerged which stands for the proposition that capital cases—in all respects—stand upon a different constitutional footing than other criminal matters. Among other unique features, this special consideration demands careful and meticulous procedural inquiry.

In *Woodson v. North Carolina*, supra, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, the plurality rejected North Carolina's mandatory death statute because it failed to take into account the particular circumstance of the offense, thus violating the Eighth and Fourteenth Amendments. The holding was bottomed principally in the Eighth Amendment, taking into consideration the difference between the death penalty and any other penalty with respect to which courts have the power to impose. That is, the court held that death is so manifestly different from other penalties that it required special procedural treatment.

The *Woodson* plurality opinion says:

"A third constitutional shortcoming of the North Carolina statute is its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death. In *Furman*, members of the Court acknowledged what cannot fairly be denied—that death is a punishment different from all other sanctions in kind rather than degree. See 408 U.S., at 286–291 [92 S.Ct. at 2750–2753] (BRENNAN, J., concurring); id., at 306 [92 S.Ct. at 2760] (STEWART, J., concurring). A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

"This Court has previously recognized that '[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.' *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 [58 S.Ct. 59, 61, 82 L.Ed. 43] (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York*, 337 U.S., at 247–249 [69 S.Ct. at 1083–1084]; *Furman v. Georgia*, 408 U.S., at 402–403 [92 S.Ct. at 2810–2811] (BURGER, C. J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles*, 356 U.S., at 100 [78 S.Ct. at 597] (plurality opinion), requires consideration of the character and record of the individual offender and the

circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (Footnote omitted.) 428 U.S. at 303–305, 96 S.Ct. at 2991.

Two years later Chief Justice Burger, writing for a three-justice plurality in *Lockett v. Ohio*, supra, said:

" * * * We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. * * *

* * * * * *

" * * * When the choice is between life and death, that risk [that the death penalty will be imposed in spite of factors which may call for a less severe penalty] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." 438 U.S. at 604–605, 98 S.Ct. at 2964–2965.

The Court has since applied this principle to impose stricter procedural protection in capital cases. See *Gardner v. Florida*, supra, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393; *Beck v. Alabama*, supra, 447 U.S. at 625, 100 S.Ct. at 2382.

The strict procedural-scrutiny standard for capital cases was brought into play in *State v. Myles*, La., 389 So.2d 12 (1980), when the Louisiana Supreme Court focused upon the issue of whether to reverse or affirm a death sentence where ineffective assistance of counsel was in question. The Louisiana court, reacting to a petition for rehearing, reversed and remanded for another sentencing hearing. The court said:

"In determining the proper standard of competence to be applied, we are ever mindful that this is a capital case. We *must* not only select a standard of substance, but also give close scrutiny to insure adherence to this standard. The penalty of death is qualitatively different from a sentence of imprisonment. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the jury's determination that death is the appropriate punishment in a specific case. *Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989 (1978); *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393, 405 (1977) (White, J., concurring); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976). This necessary reliability is undermined unless it appears that the defendant received the competent assistance of an attorney acting as a diligent, conscientious advocate for his life. See *United States v. DeCoster*, 487 F.2d 1197 (D.C.Cir.1973); *People v. Pope*, 23 Cal.3d 412, 152 Cal. Rptr. 732, 590 P.2d 859 (Cal.1979)." (Footnotes omitted and emphasis added.) 389 So.2d at 30.

In seeking a standard for effective assistance of counsel, the court rejected the "farce and mockery of justice" test. Even though one circuit and a very few of the states continue to adhere to this test, it has been severely criticized and the trend is unerringly away from it. These following standards are presently utilized by the courts in this country. The Seventh Circuit has referred to "assistance which meets a minimum standard of professional representation," *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 641 (7th Cir. 1975); the Fourth Circuit, to "representation within the range of competence demanded of attorneys in criminal cases," *Marzullo v. Maryland*, 561 F.2d 540, 543 (4th Cir. 1977); the Fifth Circuit, to "counsel reasonably likely to render *and rendering* reasonably

effective assistance," (emphasis in original) *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960); and the Third Circuit, to "[t]he standard of normal competency," *Moore v. United States*, 432 F.2d 730, 737 (3rd Cir. 1970). Like these formulations is that adopted by the District of Columbia Circuit, "*reasonably competent assistance of an attorney acting as [a]* * * * *diligent conscientious advocate.*" (Emphasis in original.) *United States v. DeCoster*, 487 F.2d 1197 (D.C.Cir.1973), reh. denied. In the D.C. Circuit the *DeCoster* court went on to incorporate therein the duties and obligations imposed upon defense counsel by the ABA's Standards for the Defense Function. 487 F.2d at 1203.

Until very recently the Wyoming Supreme Court had not settled upon a standard for ascertaining ineffective assistance of counsel. To be sure, in the decision-making process, we have quoted cases in which it was held that ineffective assistance of counsel was "such as to make a mockery, a sham or a farce of the trial." This quote was utilized in *Galbraith v. State*, Wyo., 503 P.2d 1192 (1972), quoting *Bottiglio v. United States*, 431 F.2d 930 (1st Cir. 1970), and *Rivera v. United States*, 318 F.2d 606, 608 (9th Cir. 1963), and was referred to again in *Ash v. State*, Wyo., 555 P.2d 221 (1977). Even so, in *Galbraith v. State*, supra, 503 P.2d at 1196, we also said:

"* * * As has been remarked, the assertion that 'my lawyer was incompetent' should be carefully scrutinized. The scrutiny of such an objection is properly based upon a background as suggested in *United States v. Rubin*, 5 Cir., 433 F.2d 442, 444, certiorari denied 401 U.S. 945, 91 S.Ct. 961, 28 L.Ed.2d 228, where it was said:

"'Taking a hindsight view, many convicted defendants may condemn their counsel as ineffective. But the command of the constitution is for a battle, not a victory, as Judge Goldberg pointed out for us in *Odom v. United States*, 5 Cir., 1967, 377 F.2d 853, 859. The standard was articulated by Judge Wisdom in *MacKenna v. Ellis*, 5 Cir., 1960, 280 F.2d 592, 599: "*We interpret the*

*right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.*" We have never deviated from these principles. * * *'" (Footnotes omitted and emphasis added.)

It can therefore be observed that we have also cited with approval the holding of courts wherein effective assistance of counsel is thought about as being "the right to effective counsel", wherein "counsel," within such a definition, is not "errorless," or an attorney "judged ineffective by hindsight,"

"but counsel reasonably likely to render *and rendering* reasonably effective assistance." (Emphasis added.)

In this court's recent decision in *Hoskovek v. State*, Wyo., 629 P.2d 1366 (1981), we said:

"* * * The standard which we have established to determine whether or not the assistance of counsel is effective is one of 'reasonableness.' Is the assistance rendered by counsel that which would reasonably be rendered by a reasonably competent attorney under the facts and circumstances of the case? If it is, it is effective. If it is not, it is ineffective. *Galbraith v. State*, Wyo., 503 P.2d 1192 (1972); *Ash v. State*, Wyo., 555 P.2d 221 (1977); *Johnson v. State*, Wyo., 562 P.2d 1294 (1977); *Adger v. State*, Wyo., 584 P.2d 1056 (1978). * * *"

The only issue present on rehearing in *Myles*, supra, was the ineffective assistance of counsel's representation during the penalty phase. John Wilson Reed, commenting on *State v. Myles*, supra, and writing in Death Penalty Reporter for January, 1981, comments as follows:

"* * * The issue, and thus the standard that develops, is different when the focus is upon the penalty phase alone. In the guilt phase, it may indeed often be the case that the law and the facts are such that it may be said beyond a reasonable doubt that no matter what the fail-

ing of counsel they could not have affected the verdict.

"The overwhelming reality of certain cases may make a finding of guilt inevitable. That inevitability, however, is never the case at the penalty hearing. At that stage, there is no set of facts and no set of legal principles that in any given case requires a rational person to vote for the death penalty. Given the vast spectrum of individual opinions and feelings about the appropriateness of the death penalty, and given the basic humanity of every defendant no matter how heinous his crime, there is in every case a rational basis for a juror to vote for life imprisonment. Since, in Louisiana at least, a hung jury at the penalty stage automatically results in a sentence of life imprisonment,[9] it can never be said beyond a reasonable doubt that the performance of counsel did not affect the sentencing proceedings. Thus understood, the fact that the Louisiana Supreme Court's formulation did not include the element of prejudice is not surprising. The nature of the sentencing proceeding is such that upon a finding of ineffectiveness of counsel, prejudice may, and indeed must, be assumed.

"The court in *Myles* applied its test strictly to the record before it. It set aside the death penalty essentially on a finding that, during the penalty phase, counsel had failed to advocate his client's cause, his right to live, in any material way. The record revealed that at the penalty stage, counsel had waived an opening argument, had submitted no evidence whatsoever (and none had been submitted at the guilt phase), that he had made a closing argument, less than a page in length, that was at best 'lackluster.' 389 So.2d at 30. The court did not suggest precisely what counsel should have done during the sentencing phase, but it made clear that the sentencing phase was the key portion of the trial and in some way

and to some degree counsel was obliged to use his adversarial and advocacy skills to present a case for the defendant's life. Counsel's failure in any way to do that rendered his assistance ineffective.

" 'Applying this standard [as set forth above], we conclude that the omissions by defendant's counsel established that the assistance afforded at his sentencing hearing was constitutionally inadequate. The advocacy for Myles' life was tepid and virtually non-existent.

\* \* \* \* \* \*

" 'The practice of law is a partisan endeavor requiring those who engage in it to represent their clients vigorously even in the face of overwhelming adversity.

\* \* \* \* \* \*

" 'However, when counsel's acts and omissions reduce his role to one approaching that of a neutral observer, a defendant is denied the effective assistance of counsel.' 389 So.2d at 30–31. "The sentencing hearing is the key element of the capital trial; it is at that point that the jury determinations must be made with special reliability to meet the standards of the Eighth and Fourteenth Amendments. Under the adversary system, it is the role of counsel to use his skills to influence that determination. Under *Myles*, supra, the Louisiana Supreme Court has made it clear that the standard of effective representation during the sentencing hearing is one of unswerving, vigorous, advocacy and that, if that standard is not met, prejudice will be assumed and a death sentence will be summarily reversed." (Bracketed material in original and footnotes omitted.)

In attempting to answer questions having to do with the constitutionality of § 6–4–102, W.S.1977, I am left with a very uncomfortable and bothersome feeling in regard to the sentencing hearing conducted in this

---

**9.** As it does in Wyoming under § 6–4–102(e), W.S.1977, where the statute says:

" \* \* \* If the jury cannot, within a reasonable time, agree on the punishment to be

imposed, the judge shall impose a life sentence."

case. In an effort to track down this discomfiture, I have again looked to *Furman v. Georgia*, supra, 408 U.S. at 309–310, 92 S.Ct. at 2762, where the United States Supreme Court mandated that the death penalty could not be imposed under sentencing procedures which created a substantial risk that such imposition would be made in an arbitrary and capricious manner. The *Furman* court rejected a sentencing procedure which had resulted in the infliction of the death penalty being "so freakishly" and "so wantonly" determined that it violated the Eighth and Fourteenth Amendments. The proposition was again recognized in *Gregg v. Georgia*, supra, 428 U.S. at 188, 96 S.Ct. at 2932.

In what must be assumed was an attempt to comply with the *Gregg* and *Furman* opinions, the Wyoming legislature passed § 6–4–102, W.S.1977, providing for eight "limited" aggravating circumstances and a proviso that "[m]itigating circumstances shall be the following." Seven such mitigating circumstances are provided. This same statutory scheme of aggravating and mitigating circumstances was held to be facially adequate as applied in *Proffitt v. Florida*, supra, with six of the justices concluding that the list of mitigating factors was not exclusive. See *Lockett v. Ohio*, supra.

The Florida and Wyoming statutes differ in one major respect which I regard as singularly significant, namely, in Florida the jury's recommendation as to whether death shall be imposed is just that—a recommendation, while *in Wyoming*, although denominated a "recommendation," *the jury's determination is binding on the judge.* Section 6–4–102(f), W.S.1977. Unlike the judge in Florida who, as the final sentencing authority, must weigh and balance the aggravating and mitigating circumstances and may go outside of the record to determine whether other mitigating circumstances exist, the judge in Wyoming is left with no such discretion. Once the jury has delivered its "recommendation," the judge is effectively denied any option of invoking Rule 33, W.R.Cr.P., to ascertain any factors in mitigation which may exist outside of the court's record.[10]

Although the Supreme Court has implied that judicial sentencing is preferred because of the greater experience of the trial judge and because of the likelihood that greater consistency in sentencing may be achieved, *Proffitt v. Florida*, supra, 428 U.S. at 252, 96 S.Ct. at 2966, the Court has not explicitly rejected jury sentencing. In fact, the Court has continued to recognize that the jury's participation in the sentencing process serves a valuable societal function, *Witherspoon v. Illinois*, 391 U.S. 510, 519, n.15, 88 S.Ct. 1770, 1775–76, n.15, 20 L.Ed.2d 776 (1968); and jury sentencing under a Georgia statute similar to that of Wyoming, making the jury's recommendation binding, has been upheld by the United States Supreme Court. *Gregg v. Georgia*, supra.

---

**10.** Rule 33, W.R.Cr.P., provides in pertinent part:

"(a) *Sentence.*
"(1) Imposition of Sentence.—Sentence shall be imposed without unreasonable delay. Pending sentence the court may commit defendant, continue or alter the bail. Before imposing sentence the court shall afford counsel an opportunity to speak and shall address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of the punishment.

\* \* \* \* \* \*

"(c) *Presentence investigation.*
"(1) When Made.—The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation unless the court otherwise directs.

"(2) Report.—The report of the presentence investigation shall contain any prior criminal record of the defendant and such information about his characteristics, his financial condition and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation, or in the correctional treatment of the defendant, and such other information as may be required by the court. The court, before imposing sentence, shall disclose to the defendant or his counsel all of the material contained in the report of the presentence investigation and afford an opportunity to the defendant or his counsel to comment thereon. The material disclosed to the defendant or his counsel shall also be disclosed to the attorney for the state."

The Wyoming jury is a sentencing jury, and as such provides a constitutionally permissible, though not constitutionally required, function. *Proffitt v. Florida*, supra, 428 U.S. at 253, 96 S.Ct. at 2967. As with the sentencing judge in Florida, the jury in Wyoming is the body with the authority to exercise the Rule 33, W.R.Cr.P., prerogatives; that is to say, the Wyoming sentencing jury may go outside of the record and outside of the statutory list of seven mitigating circumstances to view other factors in mitigation which may be presented to them. Hence, in a capital case in Wyoming, the sentencing hearing is tantamount to the presentence investigation which the court may otherwise order under Rule 33(c), W.R. Cr.P.,[11] in noncapital cases.

In the present case, the jury was in fact instructed to invoke the Rule 33(c) prerogatives, i.e., they were instructed to consider "[a]ny other mitigating circumstanaces." The sentencer here—the jury—was therefore not

" * * * precluded from considering *as a mitigating factor*, any aspect of [the] defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. * * * " (Footnote omitted and emphasis in original.) *Lockett v. Ohio*, supra, 438 U.S. at 604, 97 S.Ct. at 2964.

Yet, in this case, the jury was effectively deprived of the opportunity to fulfill that duty, which deprivation—in my judgment— resulted in a constitutionally deficient sentencing hearing.

Having analyzed the procedure provided in § 6–4–102, W.S.1977, in light of *Proffitt,*

*Gregg* and *Lockett*, I am left with the conclusion that the sentencing hearing in this case is constitutionally deficient. It did not fail because of an unconstitutional statute, but because of the ineffective assistance of counsel. Effective representation is constitutionally guaranteed the appellant at this stage of his trial.[12]

In particular I am convinced that appellant was denied his Sixth Amendment right to effective assistance of counsel when it is remembered that he stood before the court threatened with the most severe penalty known to mankind—the death penalty. Notwithstanding this grim and real possibility—perhaps even probability—Hopkinson found himself represented by an attorney who chose to speak but "[t]wo minutes" in his behalf.[13]

Ineffective assistance of counsel is not easy to prove; in fact, this court has held that,

"There is a presumption that counsel was competent and performed his duty, [citations]; and because of this presumption a heavy burden rests on the one asserting ineffective assistance of counsel, [citations]. * * * " *Johnson v. State*, Wyo., 562 P.2d 1294, 1300 (1977).

Any allegation of incompetency of counsel must be carefully scrutinized. *Galbraith v. State*, supra, 503 P.2d at 1196.

Although usually deciding ineffective assistance of counsel on a case-by-case basis, see, e.g., *Adger v. State*, Wyo., 584 P.2d 1056 (1978), this court has consistently recognized that there are but three areas in which a defense attorney is "governed by

11. See n. 10, supra.

12. I do not here address nor make any judgments with regard to the competency of counsel during the guilt phase of the trial.

13. Prior to convening the sentencing stage of the trial, counsel for both the State and the defendant, and the defendant himself, met in chambers with the trial judge. In response to the judge's inquiry as to the length of time needed by each party in the sentencing hearing, appellant's counsel responded:

"Two minutes. I'm serious. I have been in this position probably more than anybody in this room multiplied by 5, okay, and there ain't nothing you can say. They will do what they want and there is no point."
In point of fact, appellant's counsel probably kept to his designated time limit; his entire statement on behalf of the appellant consists of less than three pages of transcript. It was supplemented only by a somewhat rambling, quasi-apologetic statement by the appellant who professed his innocence to the crimes for which he was found guilty.

the wishes and commands of his client": "Should he plead guilty? Should he waive a jury trial? Should he take the stand and testify?" *Gallup v. State*, Wyo., 559 P.2d 1024, 1026 (1977); see also, *Johnson v. State*, supra, 562 P.2d at 1300. In all other areas the attorney is considered "the master of the proceedings." *Gallup v. State*, supra, 559 P.2d at 1027. In the case at bar, the guilt phase of the trial had been completed and the determination as to how to proceed at sentencing fell solely to the discretion of the appellant's attorney.

Concerning the evidentiary portion of the sentencing hearing, counsel for the State and for the defendant stipulated that all evidence entered at the first stage of the trial, in addition to some rather general statements about prior convictions of the appellant, would constitute the evidence on sentencing. The court then moved to the Rule 33(c) portion of the sentencing hearing, or that part of the hearing where statements and evidence in mitigation of punishment could be made and introduced.

The appellant first made an ineffective, ill-advised and uncounseled statement in his own behalf. The appellant's attorney then took it upon himself to address the jury and said he would not "bother to waste [the] time" of the jury, saying to them that he believed they had already determined what the penalty would be and that no amount of his talking would convince them otherwise.[14]

And what did appellant's counsel say to the jury about mitigating circumstances? He first referred to the statutory mitigating circumstance which contemplates minor participation in the crime by the accused,[15] and then told them that Mark Hopkinson had not "physically placed a bomb; not physically lighted a fuse; not physically tortured or not physically shot anyone." Of course, he had not been charged with doing these deeds—only that he procured that they be done. Looking outside of the record, appellant's counsel then suggested to the jury that "any other mitigating circumstance means you just plain don't think the death penalty fits."

Counsel said he would not attempt to influence the jury about the issue of capital punishment, and suggested that the jury had already made up their minds about that. He said that Mark Hopkinson did not want to die, but he did not think anything he said would affect the jury with respect to their attitude about whether Hopkinson should die or not. He talked about the definition of and penalty for first-degree murder, but did not draw any relevant conclusions—that I can see, at least. There was a Biblical challenge thrown to the jury about the quotation " 'Thou shalt not kill,' " and counsel quoted another phrase, " 'Father, forgive them for they know not what they do.' " But it was not connected up with anything.

The lawyer said that his comments would be brief because he did not expect to change the jury's minds. Mr. Hopkinson's attorney then wound up an argument which occupies only two and one-half double-spaced pages of the record by saying Hopkinson did not want to die and that his counsel did not want him to either.

I cannot imagine a more inept plea for a man's life! Although counsel professed that he was not giving up, the record reflects that this is precisely what occurred. Appellant's counsel exhibited a total disregard for the plight of his client by failing to offer even the most meager of presentations in mitigation of his client's actions. Could anything in our judicial system be more of a farce? Did not appellant's counsel reduce the sentencing hearing itself to a "mockery of justice"? The answers to these questions, in light of the above facts, are painfully obvious.

14. Counsel was nearly proved wrong about this. In this quadruple-murder conviction, the jury returned a life imprisonment in three of them, and the death sentence in the one in which proof of conspiracy to kill was wholly circumstantial and the most tenuous.

15. "The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor * * *." § 6–4–102(j)(iv), W.S.1977.

Counsel not only denied his client his proper day in court, but he also denied the jury their opportunity to view the mitigating and aggravating circumstances on a fully informed basis. As such, I can only conclude that at the sentencing stage of his trial the appellant was not accorded constitutionally mandated effective assistance of counsel pursuant to the Sixth and Fourteenth Amendments.

## "CRUEL OR UNUSUAL PUNISHMENT" IN WYOMING [16]

The *Green* case should be remanded for resentencing to life imprisonment because the penalty of death is unconstitutional under the Constitution of the state of Wyoming.

In the debates upon the Murder Bill of 1965 (which abolished the death penalty in England), Lord Chancellor Gardiner declared:

"When we abolished the punishment for treason that you should be hanged, and then cut down while still alive, and then disembowelled while still alive, and then quartered, we did not abolish that punishment because we sympathized with traitors, but because we took the view that it was a punishment no longer consistent with our self-respect." [17]

For my part, the death penalty itself is constitutionally cruel and/or unusual and thus violates the self-respect of humanity in this so-called enlightened age. Because it offends contemporary standards of human decency, this barbaric sanction is disappearing from the lists of acceptable criminal punishments among the various civilized cultures of the world. I find great discomfiture in the thought that the social order of which I am a member can find no better way to address its atrocities than to compound them by committing more of the same. I question the level of moral sophistication of a society that is forced to the admission that its only response to murder is murder. It frightens me to hear it argued that, since the vilest and most depraved criminal has killed four people, the most civilized and humane response that the state of Wyoming can think of, in discharging its punishment obligations to society, is to kill the killer while pretending that the act of state murder is not offensive to her people's sense of decency.

I wonder how many capital victims would, if they could, tell us that the murders perpetrated upon them were not cruel—were not unusual—and therefore (within the ambit of these constitutional proscriptions) society could, so far as they were concerned, proceed to murder murderers.

In *Gregg v. Georgia*, supra, Mr. Justice Brennan dissenting from a holding that the death penalty—in certain circumstances—is constitutional, said:

"The fatal constitutional infirmity in the punishment of death is that it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded. [It is] thus inconsistent with the fundamental premise of the Clause that even the vilest criminal remains a human being possessed of common human dignity.' * * * " (Bracketed ma-

---

**16.** Art. 1, § 14 of the Wyoming Constitution provides:

"Bail; cruel and unusual punishment.—All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted."

Art. 1, § 15 of the Wyoming Constitution provides:

"Penal code to be humane.—The penal code shall be framed on the humane principles of reformation and prevention."

The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The Fourteenth Amendment to the United States Constitution provides:

" * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**17.** 268 Hansard, Parliamentary Debates (5th Series) (Lords, 43rd Parl., 1st Sess., 1964–1965) 703 (1965).

terial in original.) 428 U.S. at 230, 96 S.Ct. at 2972.

The Justice went on to quote from the plurality opinion authored by Chief Justice Warren in *Trop v. Dulles*, 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 659 (1958), where the Chief Justice said:

> " * * * As such it is a penalty that 'subjects the individual to a fate forbidden by the principle of civilized treatment guaranteed by the [Clause].' * * *" (Bracketed material in original.) 428 U.S. at 230, 96 S.Ct. at 2972.

In rejecting a mandatory death statute in *Woodson v. North Carolina*, supra, 428 U.S. at 304, 96 S.Ct. at 2991, the plurality said that a statute such as that with which the Court was concerned

> " * * * treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death."

In reiterating the thought from *Trop v. Dulles*, 356 U.S. at 100, 78 S.Ct. at 597, that a civilized society demands underlying respect for humanity and individual consideration of the personhood of the defendant along with the circumstances of the offense, the *Woodson* Court said:

> "This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. * * *" 428 U.S. at 305, 96 S.Ct. at 2991.

Within the framework of these humanitarian pronouncements, I would hold the electrocution of Mark Hopkinson to be cruel or unusual punishment under the Constitution of the state of Wyoming.[18] That is, I would hold that death is too cruel by constitutional standards (see *District Attorney for Suffolk District v. Watson*, —— Mass. ——, 411 N.E.2d 1274 (1980)) and it is unusual by constitutional standards. See *People v. Anderson*, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (1972).

### An Historical Background

It is necessary to briefly sketch the legal history of capital punishment in this country in order to sort out the precepts which guide me as I seek to justify my position on this issue.

The Eighth Amendment to the United States Constitution was adopted to insure against barbarous punishment and torture,[19] and for two centuries before *Furman v. Georgia*, supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, it was assumed that the death penalty did not violate this amendment. In *Wilkerson v. Utah*, 99 U.S. 130, 25 L.Ed. 345 (1878),[20] where the defendant was ordered to be " 'publicly shot until * * * dead,' " Mr. Justice Clifford, writing for the Court, said:

> "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, * * * and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution. [Citations.]" 99 U.S. at 135–136.

While finding that shooting was not cruel and unusual, the opinion nevertheless speaks to the proposition that unnecessary cruelty, in whatever form, is no more permissible than torture.

In *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890), where

---

18. The United States Supreme Court has held that the death penalty is not per se cruel and unusual punishment under the Eighth Amendment to the Federal Constitution. *Furman v. Georgia*, supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346; *Gregg v. Georgia*, supra, 428 U.S. 153, 179–180, n.23, 96 S.Ct. 2909, 2928, n.23, 4 L.Ed.2d 859 (1976).

19. *Gregg v. Georgia*, supra.

20. The first case in which the United States Supreme Court squarely faced the job of interpreting the cruel-and-unusual-punishment language of the Eighth Amendment.

the power of the state to take a life by electrocution was challenged, the Court said:

"* * * Punishments are cruel where they involve torture or lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. * * *"

In *Kemmler*, the Court found electrocution "unusual" but not "cruel".[21] The *Kemmler* Court holds that a punishment is not necessarily unconstitutional simply because it is unsual so long as the legislature has a humane purpose in selecting it. (See *Furman v. Georgia*, supra, 408 U.S. at 324, 92 S.Ct. at 2769–2770, Marshall, J., concurring.) For perspective purposes, it is well to recall just here that the relevant clause in the Wyoming Constitution is in the disjunctive. "[C]ruel *or* unusual"—not "cruel *and* unusual." (Emphasis added.)

Ground was broken for *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) when, in *O'Neil v. Vermont*, 144 U.S. 323, 12 S.Ct. 693, 36 L.Ed. 450 (1892), O'Neil was found guilty of 307 offenses of illegal sale of intoxicants, sentenced to pay an aggregate fine of $6,140.00 and, if not paid,

"* * * he should be confined at hard labor, in the house of correction at Rutland, for the term of 19,914 days." Id., 144 U.S. at 330, 12 S.Ct. at 696.

The Court declined to consider whether this sentence was cruel and unusual because it was not raised and because the Eighth Amendment had then not been held to apply to the states, but Justice Field, dissenting, said of the Eighth Amendment:

"* * * The inhibition is directed, not only against punishments of the character mentioned, but against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted. * * *"

Id., 144 U.S. at 339–340, 12 S.Ct. at 699–700.

The Justice concluded:

"* * * It is against the excessive severity of the punishment, as applied to the offences for which it is inflicted, that the inhibition is directed." Id., 144 U.S. at 364, 12 S.Ct. at 709.

In delivering the opinion of the Court in *Weems v. United States*, supra, 217 U.S. at 364, 30 S.Ct. at 548, Mr. Justice McKenna, for the Court, was concerned that a defendant who falsified a public document would receive a sentence which condemned him to 15 years of hard and painful labor—wear chains at the ankles and the wrists and suffer "civil interdiction" which would deny him the rights of

"'* * * parental authority, guardianship of person or property, participation in the family counsel, marital authority, the administration of property, and the right to dispose of his own property by acts *inter vivos*. * * *'"

Further, the prisoner was condemned to "surveillance" during his entire lifetime.

In holding the sentence to violate the Eighth Amendment, the Court pitted the penalty against the evil to reach the conclusion that the same result could be attained by the imposition of a lesser punishment.

In utilizing the Eighth Amendment in this way, the *Weems* Court recognized that not only the *mode* of inflicting punishment but the *extent* of the severity of the punishment is subject to Eighth Amendment examination. The Court said:

"Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to

21. See n. 16, supra.

meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' * * * In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. * * *" 217 U.S. at 373, 30 S.Ct. at 551.

Justice Arthur J. Goldberg, late of the United States Supreme Court, in his address delivered for the Arizona Law Review Symposium at the University of Arizona College of Law February 19, 1973, said of *Weems*:

"* * * In light of its antecedents, it may be read as recognizing the following tests for determining the constitutionality of state imposed punishment:

"(1) Giving full weight to reasonable legislative findings, a punishment is cruel and unusual if a less severe one can as effectively achieve the permissible ends of punishment such as deterrence, isolation, rehabilitation or whatever the contemporary society considers the permissible objective of punishment.

"(2) Regardless of its effectiveness in achieving the permissible end of punishment, a punishment is cruel and unusual if it offends the contemporary sense of decency.

"(3) Regardless of its effectiveness in achieving the permissible ends of punishment, a punishment is cruel and unusual if the evil it produces is disproportionately higher than the harm it seeks to prevent." (Footnotes omitted.) 15 Ariz.L. Rev. 355, 359–360.

In *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the Court held that the Eighth Amendment is applicable to the states and, in a fact situation which saw the electrician's power fail and the state undertake to electrocute the defendant the second time, said that

"* * * [t]he traditional humanity of modern Anglo-American law forbids the

infliction of unnecessary pain * * *." 329 U.S. at 463, 67 S.Ct. at 376.

The proportionality concept was described in *Trop v. Dulles*, supra, 356 U.S. at 100–101, 78 S.Ct. at 597–598. Emphasizing the flexibility inherent in the phrase "cruel and unusual", Chief Justice Warren, in a plurality opinion, wrote that denaturalization, as a sanction, was indeed cruel and unusual. He said:

"* * * It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. * * *" *Troop v. Dulles*, supra, 356 U.S. at 101, 78 S.Ct. at 598.

In so holding, the Chief Justice announced the doctrine which asserts that the underpinning of the Eighth Amendment is the dignity of the human being. He said that this foundational concept finds its meaning in the

"* * * evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, supra, 356 U.S. at 101, 78 S.Ct. at 598,

thus proposing that:

"a form of punishment thought to be permissible in an early day, is not necessarily acceptable to modern society." [22]

This is to say, we must look to the public attitude toward the nature of sanctions for a given criminal offense, but

"* * * our cases also make clear that public perceptions of standards of decency * * * are not conclusive. A penalty also must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'" *Trop v. Dulles*, supra, at 100, 78 S.Ct. at 597–598 (plurality opinion). * * *" *Gregg v. Georgia*, supra, 428 U.S. at 173, 96 S.Ct. at 2925.

While in *Trop* a majority of the Court could not agree that loss of citizenship was a cruel and unusual punishment, four years later a majority did agree in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8

---

**22.** See McCall, The Evolution of Capital Punishment in Wyoming: A Reconciliation of Social Retribution and Humane Concern? 13 Land and Water L.Rev. 865 (1978).

L.Ed.2d 758 (1962) that a sentence of 90 days imprisonment for violation of a statute making it a crime to be addicted to the use of narcotics was cruel and unusual. Writing for the Court, Mr. Justice Stewart allowed—as did the Court in *Weems*, supra, and the Chief Justice in *Trop*, supra—that the clause was not static but one that must continually be re-examined "in the light of contemporary human knowledge."

In summary, these opinions say that the meaning of the term "cruel and unusual" must be drawn from contemporary standards, i. e., from

" * * * the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, supra, 356 U.S. at 101 [78 S.Ct. at 598]. See also *Weems v. United States*, supra, 217 U.S. at 373, 30 S.Ct. at 551; *Robinson v. California*, supra, 370 U.S. at 666, 82 S.Ct. at 1420.

While refusing to come to grips with the per se death-penalty question in *Furman v. Georgia*, supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the Court did hold in a per curiam that the imposition of the death penalty under statutes permitting the sentencing judge or the jury uncontrolled and unbridled discretion violated the Eighth and Fourteenth Amendments to the Federal Constitution.

In *Gregg v. Georgia*, supra, while holding the death penalty not to be unconstitutional per se, the Supreme Court said that, when a type of punishment in the abstract (the death penalty) is under consideration, the Eighth Amendment will not permit it to be either painful or excessive. In finality, the Court said:

" * * * [W]e must consider whether the punishment of death is disporitionate in relation to the crime for which it is imposed. There is no question that death as a punishment is unique in its severity and irrevocability. *Furman v. Georgia*, 408 U.S., at 286–291 [92 S.Ct. at 2750–2753] (BRENNAN, J., concurring); id., at 306 (STEWART, J., concurring). When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed. *Powell v.*

*Alabama*, 287 U.S. 45, 71 [53 S.Ct. 55, 65, 77 L.Ed. 158] (1932); *Reid v. Covert*, 354 U.S. 1, 77 [77 S.Ct. 1222, 1262, 1 L.Ed.2d 1148] (1957) (HARLAN, J., concurring in result). But we are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes." (Footnote omitted.) Id., 428 U.S. at 187, 96 S.Ct. at 2931–2932.

The Court then held:

" * * * that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." 428 U.S. at 187, 96 S.Ct. at 2932.

In reaching the conclusion that the death penalty was not per se violative of the Eighth Amendment, the Supreme Court said, in *Gregg:*

"The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

" 'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' *Furman v. Geor-*

*gia, supra,* at 308, 92 S.Ct. at 2761 (STEWART, J., concurring).

" 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York,* 337 U.S. 241, 248 [69 S.Ct. 1079, 1083–84, 93 L.Ed. 1337] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men." (Footnotes omitted.) *Id.,* 428 U.S. at 183, 96 S.Ct. at 2930.

Therefore, Justice Stewart, for the plurality, finds the Eighth Amendment to justify the death penalty because two social purposes are served—first, *retribution* and, second, *deterrence.*

### The Wyoming Constitution

In addressing the constitutionality of a Wyoming death-penalty statute, this court has said that it is indeed necessary that the applicable legislative enactments in fact contain

" * * * standards to guide and control the exercise of discretion by the sentencing authority in its determination of the propriety of the application of the death sentence, or the alternative of a term of life imprisonment * * * ." *Kennedy v. State,* Wyo., 559 P.2d 1014, 1016 (1977).

In so holding, we observed that this lesson was learned from *Gregg, supra; Roberts v. Louisiana, supra,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida, supra,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913.

I have previously observed that our Constitution, Art. 1, § 15, provides:

"The penal code shall be framed on the humane principles of *reformation* and *prevention* " (emphasis added),

and the state may not inflict cruel *or* unusual punishment under the proscription of Art. 1, § 14. I then assume "reformation and prevention" to be the standard for all criminal legislative enactment in Wyoming.

In an effort to understand what the framers of Wyoming's Constitution had in mind when they said that the standards of the penal code must be founded in "the humane principles of reformation and prevention," as that provision is read with the language of Art. 1, § 14 which prohibits "cruel or unusual" punishment, it is well for us to look to Wyoming history in an effort to obtain a feeling for the intent of the legislature.

The Wyoming Constitution, unlike the Eighth Amendment to the Federal Constitution, phrases the prohibition in the alternative. Use of the disjunctive in the Wyoming phrasing is important since it says that a punishment may be void under the state Constitution if it is *either* "cruel" or "unusual."

This usage was intentional. The Wyoming Constitutional Convention of 1889 had access to the constitutions of all the states then admitted to the Union as well as those of the five unadmitted territories.[23]

"The debates include references to the constitutions of Colorado, Kansas, Illinois, Missouri, Nebraska, Pennsylvania, Texas, and Washington, but the greatest obligation of the Wyoming Constitution's makers appears to have been the constitutions of North Dakota, Montana, and Idaho."[24]

North Dakota and Kansas had disjunctive forms of the cruel/unusual-punishment ban in their Constitutions, while Idaho, Montana, Missouri, and Nebraska used a conjunctive form.[25] Although the debates do not unequivocally demonstrate the source of Art. I, § 14, the text of the prohibition was the product of debate, and a motion to delete the word "unusual" was rejected[26]:

---

**23.** T. A. Larson, History of Wyoming (1965), at 247; Frances Birkhead Beard (ed.), Wyoming: From Territorial Days to the Present (1933), at 434.

**24.** Larson, id., at 247.

**25.** The Constitutions of Pennsylvania and Washington contain a ban on "cruel punishments."

**26.** I am indebted to Dean John Ackerman of the National College for Criminal Defense, Houston, Texas, for this historical material.

"MR. COFFEEN: I wish to call attention to the last line of Sec. 14. 'Nor shall any cruel or unusual punishment be inflicted.' To some people hanging might be considered an unusual form of punishment. This might prevent any such punishment for crime. I therefore move to strike it out.

"MR. BAXTER: I think that the proper construction of that is that unusual means something unheard of, some punishment that the law does not contemplate. If the legislature should provide for punishment by electricity or something else, I have no idea there would be any objection to it under this.

"MR. CHAIRMAN: The question is on the motion to strike out 'unusual' in the third line of Sec. 14. Are you ready for the question? All in favor of the motion will say aye; contrary no. The noes have it; the motion is lost." [27]

Competent authority verifies the proposition that the use of the word "or" means that a punishment may be unconstitutional under Wyoming law if it is either "cruel" *or* "unusual." [28]

In California, where the disjunctive "or" is used instead of the conjunctive "and," the impact of this fact was discussed in *People v. Anderson*, supra, 493 P.2d at 885–886, and the court said:

"The fact that the majority of constitutional models to which the delegates had access prohibited cruel or unusual punishment, and that many of these models reflected a concern on the part of their drafters not only that cruel punishments be prohibited, but that disproportionate and unusual punishments also be independently proscribed, persuades us that the delegates modified the California provi-

sion before adoption to substitute the disjunctive 'or' for the conjunctive 'and' in order to establish their intent that both cruel punishments and unusual punishments be outlawed in this state. In reaching this conclusion we are mindful also of the well established rules governing judicial construction of constitutional provisions. We may not presume, as respondent would have us do, that the framers of the California Constitution chose the disjunctive form 'haphazardly,' nor may we assume that they intended that it be accorded any but its ordinary meaning. (*Los Angeles Met. Transit Authority v. Public Util. Com.* (1963) 59 Cal.2d 863, 869, 31 Cal.Rptr. 463, 382 P.2d 583; *Lockhart v. Wolden* (1941) 17 Cal.2d 628, 631, 111 P.2d 319.)" (Footnotes omitted.)

The intent of the framers of the Wyoming constitutional provision pertaining to punishment was clearly stated, and it left no room for court interpretation:

" * * * The primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law. * * * Such intent, however, is that which is embodied and expressed in the statute or instrument under consideration. * * If the language employed is plain and unambiguous, there is no room left for construction. It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared. * * * * * * * We are not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of

27. Journal and Debates of the Constitutional Convention of the State of Wyoming (Cheyenne: The Daily Sun, 1893), at 719.

28. See *District Attorney for Suffolk District v. Watson*, supra, where Justice Liacos, concurring in an opinion that holds the death penalty unconstitutional per se, says:

" * * * I would go further and state that article 26 [the Massachusetts Constitution cruel *or* unusual clause] stands on its own footing, for reasons similar to those expressed in *Anderson*, supra (*People v. Anderson*, supra). I would further hold that a punishment may not be inflicted if it be either 'cruel' or 'unusual'. * * * " Supra, 411 N.E.2d at 1289.

language.' * * * " *Rasmussen v. Baker*, 7 Wyo. 117, 50 P. 819, 821 (1897).

Quoting *State v. Stern*, Wyo., 526 P.2d 344, 346 (1974), we said in *Kennedy v. State*, supra, 559 P.2d at 1017.

" * * * When the constitutionality of a statute is in question 'the plain, ordinary, and usual meaning of words used in a statute controls in the absence of clear statutory provisions to the contrary' [citation]."

This court has never decided the question of whether the death penalty is unconstitutional under Art. 1, § 14, although dicta in certain of the court's opinions, see, e. g., *Jenkins v. State*, 22 Wyo. 34, 135 P. 749 (1913), and *Kennedy v. State*, supra, appears to assume that this punishment is constitutionally permissible.[29] But the court has emphasized the evolutionary nature of the Clause, declaring that it prevents the imposition of "*obsolete*, painful, and degrading punishments," (emphasis added) *In re MacDonald*, 4 Wyo. 150, 33 P. 18, 21 (1893); cf. *Trop v. Dulles*, supra. See also *Fisher v. McDaniel*, 9 Wyo. 457, 64 P. 1056, 1061 (1901); *Owens v. State*, Wyo., 398 P.2d 556 (1965); *Cavanagh v. State*, Wyo., 505 P.2d 311 (1973).

### Is Death Cruel?

In *People v. Anderson*, supra, the court considered a constitutional challenge to the death penalty under Art. I, § 6 of the California Constitution, the language of which is for all relevant purposes the same as Art. 1, § 14 of the Wyoming Constitution, and which provides:

" * * * Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted."

In emphasizing that the clause was not "static" and, in the process of interpreting its contemporary application, the court remarked that it was not bound by "[j]udgments of the nineteenth century as to what constitutes cruelty, * * * " 493 P.2d at 893.

The court said:

"Were the standards of another age the constitutional measure of 'cruelty' today, whipping, branding, pillorying, severing or nailing ears, and boring of the tongue, all of which were once practiced as forms of punishment in this country, might escape constitutional proscription, but none today would argue that they are not 'cruel' punishments. Thus, although respondent argues that the standard of cruelty today is not different from what it was when article I, section 6, was adopted, our responsibility demands that we must construe that provision in accordance with contemporary standards. * * * " 493 P.2d at 893.

Wyoming no longer permits vigilante justice, flogging or public hanging. These punishments have, since territorial days, come to offend our evolving and contemporary standards of decency which mark the progress of Wyoming's modern society. Assuming, then, that we have, in this social structure, traveled far enough so that these kinds of punishment offend us, i.e., that they are "no longer consistent with our self-respect," are we not now ready to say that death itself is a punishment which offends and insults our collective personhood? In our Constitution, the cruel-or-unusual language was intended to include not only those punishments with which the framers were familiar, but those forms of punishment which, at any given time in the future, were no longer consistent with con-

---

**29.** Prior to *Furman v. Georgia*, supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the United States Supreme Court had never squarely ruled upon the Eighth Amendment constitutionality of the death penalty, although numerous decisions of the Court appeared to presume its constitutionality under the societal standards of "decency" then prevalent. See, e.g., *Wilkerson v. Utah*, supra, 99 U.S. 130, 25 L.Ed. 345; *In re Kemmler*, supra, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519; *Louisiana ex rel. Francis v. Resweber*, supra, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422; *Trop v. Dulles*, supra, 356 U.S. at 100 n.32, 78 S.Ct. at 597 n.32 (dictum.)

temporary standards of decency and the self-respect of society.

I realize that at the time of its adoption, Art. 1, § 14 of the Wyoming Constitution was not intended to prohibit the penalty of death. However, like the Eighth Amendment, Art. 1, § 14

" * * * must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, supra, 356 U.S. at 101, 78 S.Ct. at 598.

And, as I have previously quoted the Supreme Court from *Weems*, supra, a constitutional provision

" * * * is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. * * * " 217 U.S. at 373, 30 S.Ct. at 551.

The California Supreme Court expressed the following thought in *People v. Anderson*, supra, which is reiterated in *District Attorney for Suffolk District v. Watson*, supra, when it was said:

" * * * Clearly, '[t]he framers of our Constitution, like those who drafted the Bill of Rights, anticipated that interpretation of the cruel or unusual punishments clause would not be static but that the clause would be applied consistently with the standards of the age in which the questioned punishment was sought to be inflicted.' * * * " 411 N.E.2d at 1281.

Within the framework of these observations, the court, in *District Attorney for Suffolk District v. Watson*, supra, concluded:

" * * * Therefore, if the death penalty is indeed unacceptable under contemporary moral standards, it is tantamount to those punishments barred since the adoption of art. 26 [the Massachusetts cruel and unusual punishment clause], and it is our responsibility to declare it invalid." 411 N.E.2d at 1281.

If our Art. 1, § 14 is not static, then the judgments of those who sought to eradicate known evils when the clause was adopted cannot bind this court. Were the standards of other years to be regarded as the constitutional measure of cruelty today, then the public hangings and floggings of vigilante days would be acceptable. But all would agree that such punishments are indeed cruel according to today's standards.

The argument is heard that the state's punishment by death does not, in fact, affront contemporary standards of decency, and statistics are cited to the effect that most states have death-penalty statutes, and public polls indicate public opinion to sanction this form of punishment.

I concede that there is no unanimity of opinion either favoring or opposing the death penalty. But while public opinion is a proper consideration in deciding whether the penalty offends contemporary standards of decency, it is not the only factor to be considered. Justice Brennan, concurring in *Furman*, supra, quoted from *Goldberg and Dershowitz*, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773, 1782 (1970), as follows:

" * * * If the judicial conclusion that a punishment is 'cruel and unusual' 'depend[ed] upon virtually unanimous condemnation of the penalty at issue,' then, '[l]ike no other constitutional provision, [the Clause's] only function would be to legitimize advances already made by the other departments and opinions already the conventional wisdom.' We know that the framers did not envision 'so narrow a role for this basic guaranty of human rights.' Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773, 1782 (1970). * * * " 408 U.S. at 268, 92 S.Ct. at 2741.

It is my judgment that *what we actually do* is more telling than our representation

to the pollsters as to *what we would do* if we had the chance. Even though 143 defendants have been found guilty of first-degree murder since 1912, Wyoming has executed but 14 male prisoners, of which nine were hanged and five were executed by gas. No women have been executed. Of those executed, six were other than of Caucasian origin. The Wyoming justice system has executed only *two* persons in the last 37 years [30].

This says to me that those responsible for the criminal-justice system have, themselves, generally found punishment by death less and less acceptable. Until now we have not had a death by execution in this state since December 10, 1965—almost 17 years ago.

I would submit that the infrequency and the decline in the usage of death as a penalty in Wyoming comes about out of recognition of the fact that state-inflicted death is cruelty which is dehumanizing for not only the convicted, the executioner, the executing authority, i.e., the courts, the governors, and the legislatures, but, perhaps most importantly, it is shattering to the self-respect of Wyoming's people as a whole.

The universally declining usage of death as a penalty is well exemplified by these following extracts and tables from *People v. Anderson*, supra, 493 P.2d at 898–899. While the tables are not up to date, they show vividly that the peoples of the world are refusing to longer sanction state murder. The opinion in *People v. Anderson* says:

"Not only have nine states, Puerto Rico and the Virgin Islands totally abolished capital punishment, but New Mexico, New York, North Dakota, Rhode Island and Vermont have limited its application to exceptional circumstances. Among those American jurisdictions which permit it at all, 14 have not conducted an

**30.** Cleveland Brown, Jr., executed November 17, 1944, and Andrew Pixley, executed December 10, 1965.

execution since 1960, 19 have had none since 1961, 24 have had none since 1962, 30 have had none since 1963, and 35 have had none since 1964. In 1967 California and Colorado each executed one person. Prior to 1967 California had not had an execution since 1963 when one person was executed. The increasingly unusual nature of capital punishment in the United States is readily apparent in the following chart:

"Total Number of Executions in the United States

| | | | |
|---|---|---|---|
| 1930 | – 155 | 1963 | – 21 |
| 1935 | – 199 | 1964 | – 15 |
| 1940 | – 124 | 1965 | – 7 |
| 1945 | – 117 | 1966 | – 1 |
| 1950 | – 82 | 1967 | – 2 |
| 1955 | – 76 | 1968 | – 0 |
| 1960 | – 56 | 1969 | – 0 |
| 1961 | – 42 | 1970 | – 0 |
| 1962 | – 47 | 1971 | – 0 |

"The observation of the National Crime Commission that the infrequency of its application is the most salient characteristic of capital punishment in the United States is echoed in the report of the Secretary General of the United Nations on the world-wide status of capital punishment. 'There is still a clear trend toward total abolition. Most countries are gradually restricting the number of offences for which the death penalty can be applied and a few have totally abolished capital offences even in wartime. Those countries retaining the death penalty report that in practice it is only exceptionally applied and frequently the persons condemned are later pardoned by executive authority. * * *' (United Nations, Economic and Social Council, Note by the Secretary General, Capital Punishment (E/4947) (February 23, 1971) p. 3.) Defendant has prepared the following table demonstrating the extent of de jure and de facto abolition of capital punishment in foreign jurisdictions:

"Worldwide Abolition

| Country | Year | Country | Year |
|---|---|---|---|
| Argentina | 1922 | Liechtenstein | 1798 |
| Australia (Federal) | 1945 | Luxembourg | 1821 |
| New South Wales | 1955 | Mexico (Federal) | 1931 |
| Queensland | 1922 | 29 of 32 states | 1931–1970 |
| Tasmania | 1968 | Monaco | 1962 |
| Austria | 1968 | Mozambique | 1867 |
| Belgium | 1863 | Nepal | 1950 |
| Bolivia | 1961 | Netherlands | 1886 |
| Brazil | 1946 | Antilles | 1957 |
| Canada | 1967 | New Zealand | 1961 |
| Columbia | 1910 | Nicaragua | 1892 |
| Costa Rica | 1880 | Norway | 1905 |
| Denmark | 1930 | Panama | 1915 |
| Dominican Republic | 1924 | Portugal | 1867 |
| Ecuador | 1897 | San Marino | 1848 |
| Finland | 1949 | Surinam | 1927 |
| Germany, West | 1949 | Sweden | 1921 |
| Greenland | 1954 | Switzerland | 1942 |
| Honduras | 1957 | United Kingdom | |
| Iceland | 1940 | Great Britain | 1965 |
| India | | No. Ireland | 1966 |
| Travencore | 1944 | Uruguay | 1907 |
| Israel | 1954 | Vatican City St. | 1969 |
| Italy | 1944 | Venezuela | 1863 |

"No longer can it be said that capital punishment is not 'cruel *per se,* for the whole current of law for centuries justifies its infliction.' (*In re Finley,* supra, 1 Cal.App. 198, 202, 81 P. 1041, 1043 [(1905)].) Although world-wide acceptance of capital punishment at the turn of the century may then have warranted resolving doubts as to its cruelty in favor of its constitutionality, the current has now reversed. It is now, literally, an unusual punishment among civilized nations." (Footnotes omitted.) 493 P.2d at 898–899.

*Death is cruel in fact and cruel in law— and—it is cruel in Wyoming.*

*The Loss of Rights as Constituting Cruelty*

The death penalty destroys the rights of the person condemned. It was said in *Commonwealth v. O'Neal,* 369 Mass. 342, 339 N.E.2d 676, 678 (1975), that "the right to live is the natural right of every man," (quoting from Camus, Reflections on the Guillotine in Resistance, Rebellion and Death 131, 221 (1969)), encompassing as it does "the right to have rights." *Trop v. Dulles,* supra, 356 U.S. at 102, 78 S.Ct. at 599. When the state kills a human being this involves a denial of the humanity of the state's victim. Those who go to prison do not lose the right to have rights—such a prisoner retains

" * * * the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments and to treatment as a 'person' for purposes of due process of law and the equal protection of the laws. * * *" *Furman v. Georgia,* supra, 408 U.S. at 290, 92 S.Ct. at 2752. Brennan, J., concurring.

Speaking of the loss of rights as coming within the purview of the Eighth Amendment, the Supreme Court found, as I have previously said, expatriation to be cruel punishment in *Trop v. Dulles,* supra. Justice Brennan, in a separate opinion necessary for a majority, commented:

" * * * The uncertainty, and consequent psychological hurt, which must accompany one who becomes an outcast in his own land must be reckoned a substantial factor in the ultimate judgment." 356 U.S. at 111, 78 S.Ct. at 603.

The Court went on to say that the penalty of expatriation

" * * * is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. * * * His very existence is at the sufferance of the country in which he happens to find himself. * * *" 356 U.S. at 101, 78 S.Ct. at 598.

*Psychological Fear as Constitutional Cruelty*

"Ay, but to die, and go we know not where;
To lie in cold obstruction and to rot;
This sensible warm motion to become
A kneaded clod; and the delighted spirit
To bathe in fiery floods, or to reside
In thrilling region of thick-ribbed ice;
To be imprison'd in the viewless winds,
And blown with restless violence round about
The pendent world. * * * " W. Shakespeare, Measure for Measure, Act III, Scene I.

The United States Supreme Court in *Weems v. United States,* supra, 217 U.S. at 372, 30 S.Ct. at 551 said that

" * * * it must have come to [the framers of the Eighth Amendment] that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation. * * *"

Therefore, the cruelty of capital punishment is expressed—not alone in the loss of rights—or the pain of execution—but also in the dehumanizing effects of long imprisonment pending execution during which the prisoner's rights are being exhausted. It is said in *People v. Anderson*, supra, that " * * * [p]enologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture. * * *" 493 P.2d at 894.

Surely the fear of death by gas is as great as the fear of expatriation, which was under consideration as constitutional cruelty in *Trop v. Dulles*, supra.

It was said in *Furman v. Georgia*, supra: " * * * Since the discontinuance of flogging as a constitutionally permissible punishment, *Jackson v. Bishop*, 404 F.2d 571 (CA8 1968), death remains as the only punishment that may involve the conscious infliction of physical pain. In addition, we know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death. * * *" 408 U.S. at 287–288, 92 S.Ct. at 2751.

Justice Frankfurter dissenting in *Solesbee v. Balkcom*, 339 U.S. 9, 14, 70 S.Ct. 457, 459, 94 L.Ed. 604 (1950), said: " * * * [T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon. * * *"

As C. Duffy, a former warden of California's prison at San Quentin has said: " * * * One night on death row is too long, and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination. It has always been a source of wonder to me that they didn't all go stark, raving mad." C. Duffy & A. Hirshberg, 88 Men and 2 Women 254 (1962).

Justice Liacos, in his concurring opinion in *District Attorney for Suffolk District v. Watson*, supra, 411 N.E.2d at 1288 expressed some salient observations in the course of amplifying his reasons for joining in the court's conclusion that " * * * the death penalty, with its full panoply of concomitant physical and mental tortures, is impermissibly cruel under art. 26 when judged by contemporary standards of decency." Id., 411 N.E.2d at 1283.

The Justice recites the story of one Henry Arsenault, a Massachusetts prisoner saved from the electric chair less than one-half hour before his scheduled execution. The Justice recites from the prisoner's brief, after explaining that for over two years Henry Arsenault " ' * * * lived on death row feeling as if the Court's sentence were slowly being carried out.' Arsenault could not stop thinking about death. Despite several stays, he never believed he could escape execution. 'There was a day to day choking, tremulous fear that quickly became suffocating.' If he slept at all, fear of death snapped him awake sweating. His throat was clenched so tight he often could not eat. His belly cramped, and he could not move his bowels. He urinated uncontrollably. He could not keep still. And all the while a guard watched him, so he would not commit suicide. The guard was there when he had his nightmares and there when he wet his pants. Arsenault retained neither privacy nor dignity. Apart from the guards he was alone much of the time as the day of his execution neared.

"And on the day of the execution, after three sleepless weeks and five days' inability to eat, after a night's pacing the cell, he heard the warden explain the policy of the Commonwealth—no visitors, no special last meal, and no medication. Arsenault asked the warden to let him walk to the execution on his own. The

time came. He walked up to the death chamber and turned toward the chair. Stopping him, the warden explained that the execution would not be for over an hour. Arsenault sat on the other side of the room as the witnesses filed in behind a one-way mirror. When the executioner tested the chair, the lights dimmed. Arsenault heard other prisoners scream. After the chaplain gave him last rites, Arsenault heard the door slam shut and the noise echoing, the clock ticking. He wet his pants. Less than half an hour before the execution, the Lieutenant Governor commuted his sentence. Arsenault's legs would not hold him up. Guards carried him back to his cell. He was trembling uncontrollably. A doctor sedated him. And he was moved off death row." (Footnote omitted.) Id., 411 N.E.2d at 1290.

In A. Camus, Reflections on the Guillotine, in Resistance, Rebellion and Death, 155–156 (1960), the author wrote:

"What man experiences at such times is beyond all morality. * * * Having to face an inevitable death, any man, whatever his convictions, is torn asunder from head to toe. The feeling of powerlessness and solitude of the condemned man, bound up and against the public coalition that demands his death, is in itself an unimaginable punishment. * * * [I]t would be better for the execution to be public. The actor in every man could then come to the aid of the terrified animal and help him cut a figure, even in his own eyes. But darkness and secrecy offer no recourse. In such a disaster, courage, strength of soul, even faith may be disadvantages. As a general rule, a man is undone by waiting for capital punishment well before he dies. Two deaths are inflicted on him, the first being worst than the second, whereas he killed but once. Compared to such torture, the penalty of retaliation seems like a civilized law." (Footnote omitted.)

*Physical Cruelty*

And then there is the kind of cruelty that we can all understand. This cruelty re-quires no legal or psychological explanation. It is the kind of cruelty that fits the dictionary identification of cruelty when that word is defined as "inhuman treatment." Webster's New Collegiate Dictionary. It is the kind of man's inhumanity to man that an unknown attorney described to the jury in a Texas capital case involving his client, one Jerry Bird. The attorney said:

"In Texas executions are performed around midnight. As the day of his execution begins Jerry Bird will be visited by the Assistant Warden, the man who will kill him. The warden will read him the order of the Court sentencing him to death. The warden will leave and then Jerry Bird will spend an hour or two with visitors, friends or family. At about 5:00 the phone will ring to announce the arrival of the barber. Jerry Bird will leave his cell to go to the barber's chair to have his head and leg shaved for the electrodes. As the barber works, Jerry Bird's belongings are being shifted from his own cell to the one next to the green door leading into the Death Chamber. He will return to his new cell. Soon the night guard will arrive, followed shortly by the food wagon. Jerry Bird will not eat that evening with the other men. He will have already had his last meal at their preceding eating hour. After the other prisoners have finished their meals the night guard will unwrap the bundle that was delivered earlier and will place its contents, Jerry Bird's death costume, on his cot. It will be a blue Eisenhower battle jacket with slacks to match, Khaki shirt, socks and shoes without laces. No belt and no shoe laces. After all, he must not hang or strangle himself and cheat the chair. The chaplain will return to wait with Jerry Bird. Soon there will be a knock from beyond the green door and the warden will say, 'We're ready.' The guard will unlock the cell and Jerry Bird will step out into the corridor and file into the Death Chamber with the chaplain and three guards. Inside the chamber already will be the doctor, the warden and four witnesses. The warden will be

behind a one-way mirror at the controls of his equipment. Jerry Bird will be asked if he has any last words. After those he will be asked to have a seat and the guards will strap him in, dampening the shaved areas on his head and leg with a saline solution before attaching the electrodes. His arms will be lashed to arm rests, his legs to the chair legs and his body to the chair with a broad strap so taut that it will straighten his spine to the chair back. The guards will stuff cotton up his nose to trap blood that might gush from ruptured veins in his brain. A mask will be placed across his face. The warden will glance around to see that everyone is in his place and then he will nod to the executioner behind the one-way mirror. The generator will whine and snarl, Jerry Bird's lips will peel back, his throat strain for a last desperate cry, his body arch against the restraining straps; then his features will purple, steam and smoke rise from the bald spots on his head and leg while the sick-sweet smell of burned flesh permeates the little room. The generator will purr to a halt. The physician will step forward and place his stethoscope against the steaming chest and then will pronounce Jerry Bird dead. Ventilator fans will suck out the fouled air as the guards wait for the corpse to 'cool off' before they remove it from the chair. The counties now pay the state $25.00 for each prisoner transferred to Death Row in Huntsville, a compensation for caring for him before, during, and after he meets his fate.

"I ask you in the name of all that is sacred and holy, how can such a spectacle as this ever magnify the law or make it honorable or preserve the peace and dignity of the state?

"And they say that Jerry Bird killed in cold blood." Anonymous.

To argue that state murder is not cruel is beyond my comprehension and beyond the comprehension of almost all who write on the subject. Additionally, and as we have

seen, in this day and age the state's punishment by death is unusual worldwide—in America and in Wyoming. I refer specifically to the figures furnished by the warden of the Wyoming State Penitentiary, which tell us that 143 first-degree murderers have received life sentences since the year 1912, while only 14 have been put to death for the same crime during the same period of time.

Those who urge the death sentence talk of retribution and deterrence. *Gregg*, supra.

*Retribution*

" * * * Revenge is a kind of wild justice; which the more man's nature runs to, the more ought law to weed it out. * * * " (Footnotes omitted.) [31]

I am sorry that we have had to come to a place in our history where the moral and legal judgments of our Supreme Court have dictated this following statement which I take from *Gregg*, supra:

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

" 'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' *Furman v. Georgia*, supra, at 308, 92 S.Ct. at 2761 (STEWART, J., concurring).

" 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York*, 337 U.S. 241, 248 [69 S.Ct. 1079, 1084, 93 L.Ed. 1337] (1949), but nei-

---

31. Of Revenge, the Works of Francis Bacon, 384 (J. Spedding ed. 1858).

ther is it a forbidden objective nor one inconsistent with our respect for the dignity of men. \* \* \* " (Footnote omitted.) 428 U.S. at 183, 96 S.Ct. at 2930.

For me, this concept is inconsistent with the historical view taken by the court.[32] The Court has, as Marshall says in *Furman*, supra, "consistently denigrated retribution as a permissible goal of punishment." He also says this of retribution:

" \* \* \* It is undoubtedly correct that there is a demand for vengeance on the part of many persons in a community against one who is convicted of a particularly offensive act. At times a cry is heard that morality requires vengeance to evidence society's abhorrence of the act. But the Eighth Amendment is our insulation from our baser selves. The 'cruel and unusual' language limits the avenues through which vengeance can be channeled. Were this not so, the language would be empty and a return to the rack and other tortures would be possible in a given case.

\* \* \* \* \* \*

"The history of the Eighth Amendment supports only the conclusion that retribution for its own sake is imporper." (Footnote omitted.) Furman, supra, 408 U.S. at 344, 92 S.Ct. at 2780, Marshall, J., concurring.

While retribution may have been found permissible in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), it cannot be the only objective of a capital sentencing and it cannot be founded upon a respect for the dignity of man as the court suggests in *Furman*, supra.

In addressing the contention that retribution excuses cruelty, and thus becomes a permissible purpose of punishment, *Williams v. New York*, supra, 337 U.S. at 248, 69 S.Ct. at 1083–1084, I would hold the following to be true:

1. Measured by the "evolving standards of decency that mark the progress of a maturing society," retribution cannot be the standard for the infliction of death in Wyoming. Our people are not so base as to opt for state murder in order to penalize murder, assuming circumstances in which they were given the opportunity to understand and appreciate the animal cruelty that is synonymous with the death-penalty process.

2. In Wyoming, we do not sanction punishment either *solely* for retribution or *partially* for retribution, because the standards against which Wyoming court judgments are tested are the "humane principles of reformation and prevention." Art. 1, § 15, Wyoming Constitution. The concepts of vengeance and retribution are incompatible with these lofty and caring goals and standards.

It is an inconsistency, according to the most fundamental rules of logic, to say that a statute must, before it may be said to be constitutional, adhere to a requirement that it promote *reformation* in the criminal defendant and the *prevention* of future crime against society while—in the same breath—saying, in pursuit of these humane doctrines, it is also permissible to commit state murder either solely or partially out of hatred and vengeance.

And so, in my judgment, the Constitution of this state does not permit the death

32. Note 86 to Marshall's dissenting opinion in *Furman*, supra, 408 U.S. at 344, 92 S.Ct. at 2780, says:

"See, e.g., *Rudolph v. Alabama*, 375 U.S. 889 [84 S.Ct. 155, 11 L.Ed.2d 119] (1963) (Goldberg, J., dissenting from denial of certiorari); *Trop v. Dulles*, 356 U.S., at 97 [78 S.Ct. at 596] (Warren, C. J.), 113 [78 S.Ct. at 604] (BRENNAN, J., concurring); *Morissette v. United States*, 342 U.S. 246 [72 S.Ct. 240, 96 L.Ed. 288] (1952); *Williams v. New York*, 337 U.S. 241 [69 S.Ct. 1079, 93 L.Ed. 1337] [69 S.Ct. 1079, 93 L.Ed. 1337] (1949). In *Powell v. Texas*, 392 U.S., at 530 [88 S.Ct. at 2153],

we said: 'This Court has never held that anything in the Constitution requires that penal sanctions be designed solely to achieve therapeutic or rehabilitative effects. \* \* \*' This is, of course, correct, since deterrence and isolation are clearly recognized as proper. E.g., *Trop v. Dulles*, supra, at 111 [78 S.Ct. at 603] (BRENNAN, J., concurring). There is absolutely nothing in the language, the rationale, or the holding of *Powell v. Texas* that implies that retribution for its own sake is a proper legislative aim in punishing."

penalty to be imposed out of vengeance and retribution.

*Deterrence*

If it can be said that cruelty by state murder is excusable (an irreconcilable incongruity so far as I am concerned), within the purview of the question which asks whether or not a statute authorizing state murder is constitutional, then deterrence is a permissible consideration under both the Wyoming Constitution and the United States Constitution.

The great death-penalty arguments usually come down to whether or not the sanction is justified by reason of the fact that it deters crime. But the central issue really is whether it deters potential criminals from committing capital felonies more effectively than life imprisonment. *Furman v. Georgia, supra,* 408 U.S. at 346–347, 92 S.Ct. at 2780–2781, Marshall, J., concurring.

Having admitted that the results of the debate between those who say the death penalty is a deterrent and those who say it is not are inconclusive, the *Gregg* plurality refers to a passage in the works of Charles Black, Capital Punishment: The Inevitability of Caprice and Mistake (1974), where the author says:

" '[A]fter all possible inquiry, including the probing of all possible methods of inquiry, we do not know, and for systematic and easily visible reasons cannot know, what the truth about this "deterrent" effect may be. * * *

" 'The inescapable flaw is * * * that social conditions in any state are not constant through time, and that social conditions are not the same in any two states. If an effect were observed (and the observed effects, one way or another, are not large) then one could not at all tell whether any of this effect is attributable to the presence or absence of capital punishment. A "scientific"—that is to say, a soundly based—conclusion is simply impossible, and no methodological path out of this tangle suggests itself.' C. Black, Capital Punishment: The Inevitability of Caprice and Mistake 25–26 (1974)." 428 U.S. at 185.

It is worthwhile, here, to see what Professor Black goes on to say on the subject of deterrence:

"On all scores, then, the 'deterrence' question is wide open and will, as far as anyone can see, remain wide open indefinitely. The connection with the thesis of this book is clear. If this thesis—that we do not and cannot administer the penalty of death without arbitrariness and mistake—is true, some might think we ought nevertheless to go on administering it if there were a clear case for its saving innocent lives by deterring homicide. There is, however, *no* case for the proposition that any such effect is to be attributed to capital punishment. We are entirely free to abolish capital punishment on the ground that it is not and cannot be rationally administered, without any fear, or at least any fear warranted by proof or experience, that any innocent life would thereby be endangered." (Emphasis in original.) Capital Punishment at 27.

It is admitted by the Court in *Gregg* that there is no evidence to support or refute views that the death penalty does or does not serve as a deterrent. *Gregg, supra,* 428 U.S. at 186, 96 S.Ct. at 2931.

Justice Marshall in his dissenting opinion in *Furman* said:

"There is no more complex problem than determining the deterrent efficacy of the death penalty. 'Capital punishment has obviously failed as a deterrent when a murder is committed. We can number its failures. But we cannot number its successes. No one can ever know how many people have refrained from murder because of the fear of being hanged.' This is the nub of the problem and it is exacerbated by the paucity of useful data. * * * " (Footnote omitted.) 408 U.S. at 347, 92 S.Ct. at 2781.

The Justice goes on to conclude, 408 U.S. at 353, 92 S.Ct. at 2784:

"The United Nations Committee that studied capital punishment found that '[i]t is generally agreed between the re-

tentionists and abolitionists, whatever their opinions about the validity of comparative studies of deterrence, that the data which now exist show no correlation between the existence of capital punishment and lower rates of capital crime.' "Despite the fact that abolitionists have not proved non-deterrence beyond a reasonable doubt, they have succeeded in showing by clear and convincing evidence that capital punishment is not necessary as a deterrent to crime in our society. This is all that they must do. We would shirk our judicial responsibilities if we failed to accept the presently existing statistics and demanded more proof. It may be that we now possess all the proof that anyone could ever hope to assemble on the subject. * * * " (Footnote omitted.)

Professor Black comments on the status of the deterrence question when it has deteriorated to resolving where the burden of proof lies, when he says (Capital Punishment at p. 26):

" * * * When I last sampled this enormous literature, I found two scholars were arguing over where the 'burden of proof' lay—whether, that is to say, the man who asserts that capital punishment deters has to prove this proposition of lose out, or whether the man who asserts that it does *not* deter has to prove *this* proposition or lose out. When you observe that an argument is in that posture, you can be very sure that neither side has a convincing case. Nobody is arguing about where the 'burden of proof' lies with respect to the assertion that families of five with incomes under $4000 are on the whole less well nourished than those with incomes over $20,000." (Emphasis in original.)

I must conclude that deterrence is an impermissible reason for even arguing that the death penalty is—in any circumstances —warranted, because there is no reliable proof that this is true. The state should not kill people in reliance upon an unproven excuse—even to salve its conscience.

## Conclusion

In conclusion, I would hold the death penalty statute with which we are here concerned (§ 6–4–102) to be in violation of the Wyoming Constitution, Art. 1, § 14, for the reason that it mandates both cruel punishment and unusual punishment by authorizing, under certain circumstances, the imposition of death by the state.

In reaching this conclusion, I find the sentence of death to be—not only cruel in fact—unusual in fact—but cruel and unusual in law.

When I say it is cruel in law, I rely heavily upon the parameters within which the testing process must take place as delineated in the Wyoming constitutional provision which says the criminal laws of this state must be founded in "the humane principles of reformation and prevention" (Art. 1, § 15, Wyoming Constitution) and the doctrine which has been identified by the United States Supreme Court when it has been said that we will test the cruelty of punishment from time to time by taking into account the "evolving standards of decency that mark the progress of a maturing society."

I have lived my entire life in Wyoming and I have to believe that were my friends and associates who are citizens of this state able to visit the whole process of the death penalty from indictment to the throwing of the switch—with its dehumanizing effect— that is, its tendency to turn all of us who are charged with the responsibility of committing state murder back into animals—I am positive that the vast majority of the people of Wyoming would say, "There has to be another way." They would say this, I think, even as they contemplated the plight of Hopkinson who pleads for life while he offered his victims no such option. They would say this, I think, not because they pitied him—because who could pity one so calculatingly evil and cold-heartedly vicious?—but because they, the people of this great state in the year 1981, would ultimately decide that murder in response to murder is a punishment no longer consistent with their self-respect. They would

say, I think, that there must be another way and that this form of punishment—while acceptable in another day—is no longer acceptable to a more advanced morality.

I would have held the Wyoming death-penalty statute unconstitutional for the reason that such a statute imposes cruel and/or unusual punishment.

McCLINTOCK, Justice, Retired, concurs in the court's disposition of the appeal but joins with the Chief Justice in his suggestions that:

1. Error was committed in the sentencing phase of the trial in that unauthorized aggravating circumstances options were made available to the jury for its consideration;

2. Instructions in the form proposed by defendant upon the penalty phase of the trial should be given upon retrial of that issue.